## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE

NEW ENGLAND FISHERMEN'S STEWARDSHIP
ASSOCIATION (NEFSA)

JERRY LEEMAN
14 Old Town Road
Orrs Island, ME 04066

        *Plaintiffs,*

    *v.*

GINA RAIMONDO, U.S. Secretary of
Commerce
1401 Constitution Ave. NW
Washington, DC 20230

NATIONAL MARINE FISHERIES SERVICE
(NMFS)
1315 East-West Highway, 14th Floor
Silver Spring, MD 20910

JANET COIT, NMFS Assistant Administrator
1315 East-West Highway,  14th Floor
Silver Spring, MD 20910

SAMUEL D. RAUCH III, NMFS Deputy
Assistant Administrator for Regulatory
Programs
1315 East-West Highway, 14th Floor
Silver Spring, MD 20910

        *Defendants.*

Civil Action No. _____

**PETITION FOR REVIEW AND
COMPLAINT**

**INJUNCTIVE RELIEF SOUGHT**

## INTRODUCTION

1.      The United States is blessed with abundant natural resources, including teeming marine fisheries.  The Framers recognized that our fisheries are vital to the Nation, THE FEDERALIST NO. 4 (John Jay), and the Government has an obligation to ensure these vital resources are harvested responsibly.  How to balance the competing interests in fishing—production versus conservation, commercial versus sport, fishing versus other uses of marine resources—is a complex question that turns on fundamental values and broad policy priorities.

2.      Despite the national importance of offshore fishing regulation, Congress has removed the issue from democratic control.  Rather than make these decisions itself or vest them in executive agencies accountable to the elected President, Congress has assigned control of the nation's fisheries to novel federal councils that violate the Constitution's structural protections in multiple respects.  This unconstitutional regime puts local fishermen like Jerry Leeman and the members of the New England Fishermen's Stewardship Association ("NEFSA") at the mercy of unaccountable bureaucrats who answer only to themselves.  The Constitution's fundamental promise of representative government forbids that result.

3.      In 1976, Congress passed the Magnuson-Stevens Fishery Conservation and Management Act (Act).  The Act was Congress's first comprehensive attempt to regulate fishing in federal territorial waters.  At the time, Congress was concerned that

1

foreign fleets were entering federal waters and pilfering a precious American resource. Congress also feared that new technologies could trigger unsustainable overfishing—threatening ecosystems and the Nation's long-term food security.  These were noble aims, and ones that nobody understands better than Plaintiffs, for whom the long-term health of America's marine fisheries is a matter of deeply personal concern.

4.     In its zeal to regulate, however, Congress converted federal waters into Constitution-free zones, violating the Constitution in multiple respects—violations that are increasingly drawing judicial scrutiny.  For example, the Fifth Circuit recently held that the National Marine Fishery Service (NMFS), which administers the Act, violates the Fourth Amendment rights of fishermen when it subjects their boats to round-the-clock GPS surveillance.  *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956 (5th Cir. 2023).  And fishermen are currently in the Supreme Court challenging NMFS's power under the Act to force government observers onto fishing boats while making fishermen fund that federal surveillance.  *Loper Bright Enters. v. Raimondo*, No. 22-451, 2023 WL 3158352 (S. Ct. May 1, 2023).  A well-intentioned attempt at rule by enlightened experts has devolved into a bureaucratic morass captured by narrow interests.

5.     That dynamic is clear in this case, which confronts the unconstitutional core of the Act's regulatory apparatus.  At the heart of the Act are eight Regional Fishery Management Councils: federal entities charged by Congress with "exercis[ing] sound

judgment in the stewardship of fishery resources" within multi-state zones. 16 U.S.C. § 1801(b)(5). This suit involves the New England Fishery Management Council, upon which Congress has bestowed broad policymaking "authority over the fisheries in the Atlantic Ocean seaward of" Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut. *Id.* § 1852(a)(1)(A).

6.    Congress "designated" the Councils as the "primary policy makers" for federal fisheries, "vest[ing] [them] with the authority to develop management plans" that "dictate the fundamental objectives and methods of managing a given fishery." William R. Rogalski, *The Unique Federalism of the Regional Councils Under the Fishery Conservation and Management Act of 1976*, 9 B.C. Env't Affs. L. Rev. 163, 177–78 (1980). This is clear from the Act's text, which enshrines the Councils as the first and last word on marine fishing policy. The Act provides that each Council "shall have authority" over, and "develop annual catch limits for," its fisheries. 16 U.S.C. § 1852(a)(1)(A), (h)(6). And each Council "shall" craft all "measures … necessary and appropriate for the conservation and management" of those fisheries. *Id.* § 1853(a)(1)(A). Once a Council exercises that power, the Secretary of Commerce "may repeal or revoke" its policies only if three-quarters of the Council approves of the Secretary's policy choice. *Id.* § 1854(h).

7.    Given this broad authority to set, monitor, adjust, and preserve federal policies—authority that trumps even the Commerce Secretary's power in certain

3

respects—one would expect some degree of federal democratic control over the Councils.  But Congress provided just the opposite, immunizing Council Members from meaningful control by the President, his Commerce Secretary, and through them the American people.  It conferred the power to appoint Council Members on *state* rather than *federal* officials and it granted Members nearly impenetrable tenure protections.  Congress thus ensured that fishermen like Mr. Leeman and NEFSA's members are regulated by officials insulated from democratic control and vulnerable to capture by narrow private interests.  More fundamentally, Congress broke the Constitution's promise of separated powers and executive accountability to the President.  This is clear in multiple respects.

8.     To start, the Act makes no effort to hew to the Appointments Clause.  *No federal official* is empowered to select and approve the vast majority of voting Council Members.  Five hold their federal office simply by virtue of holding particular state offices. *Id.* § 1852(b)(1).  Thus, a large bloc of each Council is composed of *state* officials who wield *federal* authority without having been approved by the President, the Secretary of Commerce, or anyone else with constitutionally sound appointment power.

9.     Another group of Council Members is likewise chosen by state officials, albeit in a more complicated fashion.  Governors of the states within each Council's region assemble lists of three or more potential Council Members whom they deem "qualified" under statutory criteria. *Id.* § 1852(b)(2)(A), (C).  Those lists are submitted

4

to the Secretary, who may either approve an appointment or "notify" the governor that he must provide "an additional explanation" of a nominee's "qualifications." *Id.* § 1852(b)(2)(C). The Secretary is forbidden from going outside the governors' lists of approved nominees to make her own selection.

10.     Then there are Council Members' removal protections. Most incredibly, under no circumstances may anyone in the Executive Branch dismiss a Member who holds his seat by virtue of his role in a state government. *Id.* § 1852(b)(1)(A). The Members from the governor-curated lists, for their part, can be removed only "for cause," with "cause" defined as solely breaking specific conflict-of-interest rules. *Id.* § 1852(b)(6). For *anything else*, the Secretary is limited to asking the Council to remove one of its own by a two-thirds supermajority vote. *Id.*

11.     These appointment methods and removal restrictions are patently unconstitutional. Council Members are "officers of the United States" subject to the Appointment Clause. But they are not selected according to its rules. Moreover, due to their near-ironclad removal protections, the Councils exercise policymaking authority beyond presidential control. That insulation flouts the Constitution's vesting of executive power in the President and frustrates his obligation to faithfully execute the Nation's laws.

12.     The Act's operation demonstrates the shortsightedness of subordinating constitutional structure to novel innovation. Councils have been captured by special

interests, from foreign-funded seafood titans to well-connected recreational fishermen. The immediate casualties are working-class commercial fishermen, who face a campaign of exclusionary restrictions.   Without the deep pockets or personal connections necessary to penetrate and persuade an insulated Council, these small businessmen face economic extinction.

13.     The public also suffers under this regime.   The Councils have failed to foster sustainability and undermined our domestic fishing fleet.   In particular, the Councils have implemented so-called "catch share" programs that divvy up fishing rights in a discriminatory manner and then allow them to be bought and sold.   This policy has consolidated the commercial fishing industry, squeezing out local fishermen and forcing them to lease rights from mega corporations.

14.     If this weren't enough, the Council's work is implemented by an agency official at NMFS who *himself* wields federal executive power in violation of the Constitution.   That position, the Deputy Assistant Administrator for Regulatory Programs, is currently filled by Defendant Samuel Rauch.   A career civil servant, Mr. Rauch is not subject to the at-will removal the Constitution requires for such senior executive officials.

15.     As a result of the illegitimate exercise of federal authority by the Council and NMFS, Jerry Leeman, NEFSA members, and others like them face the prospect of their industry's demise.   New England groundfishing is governed by the Northeast

6

Multispecies Fishery Management Plan (FMP). As the name suggests, "[t]he Fishery is composed of thirteen bottom-dwelling fish species, inhabiting waters from Maine to the mid-Atlantic, which are divided for management purposes into twenty individual 'stocks.'" *Lovgren v. Locke*, 701 F.3d 5, 14 (1st Cir. 2012). Catch limits are imposed on a stock basis; for instance, the Council sets different limits and allocations for Georges Bank cod stock than for cod harvested from the Gulf of Maine. Since 2010, the Council has subjected the fishery to a catch share program.

16. The Council's latest policy initiative is Framework Adjustment 65, which (among other things) sets annual catch limits for several groundfish species, including haddock (pictured below), cod, white hake, and yellowtail flounder. Most notably, it slashes the overall commercial catch limit for haddock by about 80%. The Council also chose to cut the white hake commercial catch limit by around 13% and install a 10-year Gulf of Maine cod rebuilding plan that will further restrict access to the cod fishery.



Haddock (*Melanogrammus aeglefinus*)

17. For Mr. Leeman, NEFSA members, and others like him—who sacrifice earnings to enable corporations to lease catch shares—Framework Adjustment 65 is disastrous. The crushing weight of lease fees and other expenses makes fishing volume

crucial—but the Council has responded by decimating the haddock harvest. Moreover, the Council's restrictions will cause Mr. Leeman and NEFSA members to spend much of their time at sea *avoiding* areas where tightly regulated fish might be present—a difficult task when it comes to groundfish, and especially deep-water fish like white hake. And the cod rebuilding plan ensures that fishery will not take up the slack any time soon. In sum, for local fishermen like Plaintiffs, Framework Adjustment 65 threatens a generations-long history of groundfishing in the North Atlantic.

18.     This Court should vacate, enjoin, and declare unlawful Framework Adjustment 65, the Framework Adjustment Final Rule, and accompanying regulations.

## PARTIES

19.     Plaintiff New England Fishermen's Stewardship Association ("NEFSA") is an alliance of commercial fishermen dedicated to educating the public about seafood resource management and protecting the future of local commercial fishing in New England. It aims to promote regional economic strength, ecosystem sustainability, and American food security.

20.     NEFSA's members include fishermen adversely affected by the catch-limit reductions, cod rebuilding plan, and other regulations contained in Framework Adjustment 65. Among them is David Osier, a commercial fisherman and business owner from South Bristol, Maine, with over 49 years of experience. David's business consists of four fishing vessels—three groundfish trawlers and one seiner–trawler. In

past seasons, David's boats have harvested around 400,000 pounds of haddock; under the new regime, they are restricted to around 80,000 pounds combined. Framework Adjustment 65's lower white hake catch limit and more onerous cod plan will likewise injure David's business.

21.     Plaintiff Jerry Leeman is a commercial fisherman from Harpswell, Maine—a town of around 5,000 residents, most of whom depend on the commercial fishing industry. Jerry was on a fishing boat by the time he was five months old and started fishing with his grandfather at 12. He has been a commercial fisherman in the groundfish, lobster, and scallop fisheries his entire working life. Jerry is the founder and CEO of NEFSA.

22.     Jerry has fished under a Multispecies groundfishing permit for 23 years. For 18 of those years, Jerry has captained commercial fishing vessels out of every major fishing port in New England. He currently operates the *Teresa Marie IV*, a 91-foot steel-hull stern trawler with a 90-ton catch capacity. Each year he makes 20 to 30 commercial trips and spends around 240 days at sea. Jerry devotes most of that time to harvesting

haddock, but he is trained to target all groundfish species.  He sells his catch to processors for consumer markets.



Jerry Leeman (center) and
his family in Maine



The *Teresa Marie IV*
embarking on a fishing trip



Haddock and other
groundfish aboard
the *Teresa Marie IV*

23.     Defendant Gina Raimondo is the Secretary of Commerce and the official charged by law with administering the Act.  She is sued only in her official capacity.

24.     Defendant National Marine Fisheries Service (NMFS) is an agency within the Department of Commerce.  The Secretary of Commerce has delegated to the National Oceanic and Atmospheric Administration (NOAA) the authority to administer the relevant portions of the Act; NOAA sub-delegated that authority to NMFS.  *See infra* ¶¶ 62-64.

25.     Defendant Janet Coit is the Assistant Administrator for Fisheries at NMFS.  She has been delegated the power to administer various portions of the Act by the Under Secretary for Oceans and Atmosphere.  *See infra* ¶ 63.  She is sued only in her official capacity.

10

26.     Defendant Samuel Rauch is the Deputy Assistant Administrator for Regulatory Programs at NMFS.  The Assistant Administrator for Fisheries has delegated the authority to sign materials for publication in the Federal Register and the Code of Federal Regulations to this official.  Mr. Rauch executed the Framework Adjustment 65 Final Rule, finalizing the Framework Adjustment and accompanying regulations as legal and binding.  16 U.S.C. § 1854(a)(1)(A), (b)(1).  He also signed and issued the Final Rule in his own name.  He is sued only in his official capacity.

### JURISDICTION AND VENUE

27.     This is an action arising under the United States Constitution and the Magnuson-Stevens Fishery Management Act, 16 U.S.C. § 1801, *et seq.*  The Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331.

28.     The Act authorizes judicial review of NMFS rules and district-court jurisdiction over cases arising under the Act.  16 U.S.C. §§ 1855(f), 1861.

29.     Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202, as well as by Federal Rule of Civil Procedure 57.

30.     Equitable relief is authorized under this Court's equitable powers, *see, e.g., Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015), and the Administrative Procedure Act as incorporated by the Act, 16 U.S.C. § 1855(f)(1); 5 U.S.C. §§ 703, 706.

31.     Venue is proper in this District under 28 U.S.C. § 1391(e).

32.     There is an actual controversy between the parties concerning the lawfulness of Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations.   Plaintiffs will suffer concrete, irreparable injuries traceable to Defendants and redressable by this Court.  *See infra* ¶¶ 127-36.

## FACTUAL ALLEGATIONS

### *Federal Fisheries Management*

33.     "Groundfishing, the catching of fish that swim in close proximity to the bottom, was the first colonial industry in America."  S. Murawski, *A Brief History of the Groundfishing Industry of New England*, NOAA Fisheries 1 (2022).  The first European fishermen—the Portuguese—dropped lines off the banks of Newfoundland in 1501, soon followed by the French and Spanish.  W. Lear, *History of Fisheries in the Northwest Atlantic: The 500-Year Perspective*, 23 J. Northw. Atl. Fish. Sci. 41, 44 (1998).  And by the early 1700s, hundreds of vessels were sailing from New England ports to Nova Scotia, Georges Bank, and the Grand Banks in search of cod and other groundfish.  *Id.* at 52.

34.     "By the time of the American Revolution, the New England cod fisheries involved more than 500 boats and 5,000 cod fishermen."  *Id.*  And the Treaty of Paris, which ended hostilities and recognized American independence, addressed the recurring issue of fishing rights.  Its terms gave New England ships the right to fish across the region.  *Id.* at 60.  As a result, "[c]oastal towns in New England sent every able bodied man and boy" to sea in search of groundfish.  *Id.*  "Between 1790 and 1810

about 1,230 New England fishing vessels sailed each year, half of them to the Grand Banks," and by 1835, the Georges Bank cod fishery was "a permanent industry." *Id.*

35.    As this history attests, "[t]he fishing industry of New England has, for over 400 years, been identified both economically and culturally with groundfishing." Murawski, *supra*, at 1.  And debates about how to regulate groundfishing are as old as the industry itself.  "[T]he first apparent regulation of the New England fishing industry was enacted in 1652," and banned "the taking of cod, haddock, hake, and pollock during spawning times."  D. Allen, *Searching for Tradition: A Brief History of the New England Groundfish Fishery*, Commercial Fisheries News 36 (2014).

36.    For much of its history, the United States claimed only a narrow strip of exclusive territorial waters.  *See* Congressional Research Service, R43565, *Reauthorization Issues for the Magnuson Stevens Fishery Conservation and Management Act* 31 (May 22, 2014) ("CRS Report").  Nearly all regulation of commercial fishing fell to state authorities, who still manage nearshore waters.  *See United Cook Inlet Drift Ass'n v. NMFS*, 837 F.3d 1055, 1058 (9th Cir. 2016).  But after the United States asserted jurisdiction up to 200 miles offshore, substantial waters lay beyond state regulation and open to exploitation.

37.    Congress grew concerned that foreign fleets were overfishing American stocks and, in 1976, passed the Fishery Conservation and Management Act—a comprehensive attempt to regulate fishery resources in federal waters.  The statute has been reauthorized and amended multiple times.

38.     The Act establishes federal jurisdiction over all marine fishery resources located within 200 miles of any United States coastline and beyond state territorial waters.  *See* 16 U.S.C. § 1811(a).  To regulate this zone, the Act created "an entirely new[] regional management system."  CRS Report at 314.  And to operate it, the Act created eight Regional Fishery Management Councils.  *See* 16 U.S.C. § 1852.  Those "councils, composed of federal, state, and public representatives, are not modeled after any other authority; rather, they were shaped by the demands of compromise and necessity."  Rogalski, *supra*, at 164–65.  "[P]olitical pressures played an important role in placing the states in a dominant representative position on the councils," in part because the industry "would have been hostile towards a purely federal regime."  *Id.* at 174.

39.     Among the Act's enacted purposes is to "promote domestic commercial and recreational fishing under sound conservation and management principles" by "provid[ing] for the preparation and implementation … of fishery management plans." 16 U.S.C. § 1801(b)(3)–(4).  Congress "establish[ed] Regional Fishery Management Councils to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans."  *Id.* § 1801(b)(5).  These Councils must consider the interests of "States, the fishing industry, consumer and environmental organizations, and other interested persons," and "take into account the social and economic needs of the States."  *Id.*

14

40.    The Councils dominate the Act's regulatory regime, and Congress outlined their structure and functions in detail.  Each regional Council "shall reflect the expertise and interest of the several constituent States in the ocean area over which such Council is granted authority."  *Id.* § 1852(a)(2).  Not every fishery falls within a Council's ambit:  The Secretary of Commerce has "authority over any highly migratory species fishery," because such species move among jurisdictions.  *Id.* § 1852(a)(3).

41.    "[T]he New England Fishery Management Council … regulates fishery resources within the federal waters off New England's coast."  *Lovgren*, 701 F.3d at 12. The Council "shall have authority over the fisheries in the Atlantic Ocean seaward of" Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut.  16 U.S.C. § 1852(a)(1)(A).

42.    The Council has "18 voting members."  *Id.*  They include "[t]he principal State official with marine fishery management responsibility and expertise in each constituent State … so long as the official continues to hold such position, or [his] designee."  *Id.* § 1852(b)(1)(A).  In other words, each state government has a permanent representative on the federal Council.  And while the Act reserves seats for the *head* of each state fishery agency, those officials can designate *others* to fill their seats.  *Id.*

43.    No federal official plays any role in selecting these Members or their designees.  Nor can any federal official remove them, because their *federal* Council

15

membership flows directly from their *state* position: they hold Council seats "so long as" they hold state office.

44.     Each Council also includes "[t]he regional director of the [NMFS] for the geographic area concerned, or his designee." *Id.* § 1852(b)(1)(B).  For the New England Council, that is Mike Pentony.  Mr. Pentony is part of the Senior Executive Service (SES) and holds a career-appointed position.  *See* House Committee on Oversight and Reform, 116th Cong., 2d Sess., *United States Government Policy and Supporting Positions* 27 (Comm. Print 2020) ("*Plum Book*").  He can be removed from office only for cause under civil-service statutes.  5 U.S.C. §§ 3592, 7541–43.

45.     The remaining 12 voting Members are chosen by the Secretary from "a list of individuals submitted by the Governor of each … constituent State." 16 U.S.C. § 1852(b)(2)(C).  When compiling these lists, a governor "determine[s] that each such individual is qualified" for the role under a statutory rubric.  *Id.*  Each list "shall include the names and pertinent biographical data of not less than three individuals."  *Id.*  The Secretary's job is to "review each list" and "ascertain if the individuals … are qualified" under the Act's terms.  *Id.*  If the Secretary finds them unqualified, she cannot make her own selection.  Instead, she must "notify" the governor, who then "submit[s] a revised list or resubmit[s] the original list with an additional explanation of the qualifications of the individual."  *Id.*

16

46.     These 12 Members can be removed by the Secretary only "for cause," and in only one situation: where "the member is found by the Secretary, after notice and an opportunity for a hearing … to have committed an act prohibited by" the Act's conflict-of-interest provision.  *Id.* § 1852(b)(6)(B).  For *anything else*, only the Council, by a two-thirds vote, can initiate removal.  *Id.* § 1852(b)(6)(A).

47.     Each Council conducts its statutory duties by majority vote, and a bare majority of voting Members present constitutes a quorum.  *Id.* § 1852(e)(1).

48.     A Council's core responsibility is the development of fishery management plans (FMPs) and amendments to FMPs.  Each Council must, "for each fishery under its authority that requires conservation and management, prepare and submit to the Secretary" an FMP and "amendments to each such plan that are necessary from time to time."  *Id.* § 1852(h)(1).  Specifically, each Council must "develop annual catch limits for … its managed fisheries."  *Id.* § 1852(h)(6).

49.     Each Council may also develop any regulations it "deems necessary or appropriate for … implementing a [FMP] or plan amendment" and submit them to the Secretary before or after such FMP or amendment takes effect.  *Id.* § 1853(c).

50.     The Act empowers Councils to "develop … multi-year research priorities" for "areas of research that are necessary for management purposes," *id.* § 1852(h)(7), and to generally "conduct any other activities … which are necessary and appropriate to [their] functions," *id.* § 1852(h)(9).

17

51.     Each Council may "appoint[] and assign duties to" various administrative employees, "determine its organization, and prescribe its practices and procedures." *Id.* § 1852(f)(1), (6). And each Council "shall establish, maintain, and appoint ... a scientific and statistical committee to assist it in the ... development and amendment of any [FMP]." *Id.* § 1852(g)(1)(A). Indeed, each Council is empowered to "establish such advisory panels as are necessary or appropriate to assist it in carrying out its functions." *Id.* § 1852(g)(2).

52.     In contrast with its sweeping grant of policymaking authority to the Councils, the Act gives the Commerce Department only a limited role. The Secretary's role in the development of FMPs and amendments is purely advisory: She "establish[es] advisory guidelines (which shall not have the force and effect of law) ... to *assist in the development* of [FMPs]" by the Councils. *Id.* § 1851(b) (emphasis added).

53.     Once a Council develops a FMP or amendment, the Secretary "review[s]" its work "to determine whether it is consistent with" the Act and "other applicable law." *Id.* § 1854(a)(1)(A). The Secretary simultaneously publishes the FMP or amendment in the Federal Register and initiates a comment period. *Id.* § 1854(a)(1)(B).

54.     At the end of that period, the Secretary must "approve, disapprove, or partially approve" the FMP or amendment. *Id.* § 1854(a)(3). But a "disapprov[al]" or "partial[] approv[al]" does not end a Council's involvement. The Secretary's authority following disapproval is limited to offering "recommendations ... that could be taken

by the Council to conform [its] plan or amendment to the requirements of applicable law." *Id.* § 1854(a)(3)(C). The Council "may" then "submit a revised plan or amendment." *Id.* § 1854(a)(4).

55. If for any reason the Secretary fails to "notify [the] Council" of her decision "within 30 days of the end of the comment period," the Council's "plan or amendment *shall take effect* as if approved." *Id.* § 1854(a)(3) (emphasis added).

56. A similar process governs a Council's proposed implementing regulations. When a Council "deems" such regulations necessary, *id.* § 1853(c), the Secretary reviews them over 15 days to determine their legality and consistency with the Council's FMP or amendment, *id.* § 1854(b)(1). If the Secretary finds the rules illegal or inconsistent with the Council's work, she may "recommend[] … revisions." *Id.* § 1854(b)(1)(B). The Council "may" then "revise the proposed regulations." *Id.* § 1854(b)(2).

57. Following notice and comment, the Secretary "shall promulgate final regulations" and must "consult with the Council before making any revisions to the proposed regulations." *Id.* § 1854(b)(3). The Secretary cannot bypass this consultation requirement—even as she has no authority to summon a Council to consult with her. *See Oceana, Inc. v. Ross*, No. 17-CV-05146, 2020 WL 5239197, at *5 (C.D. Cal. Jan. 8, 2020) (ordering NMFS to consult with a Council); *see also* Dkt. No. 124 at 8–9, *Oceana, Inc.*, No. 17-CV-05146 (C.D. Cal. Nov. 18, 2019) (NMFS "has repeatedly attempted to

consult with" the Council but "lacks the authority to *compel* the independent ... Council to place this item on its agenda").

58.    Once a FMP or amendment takes effect, the Council *must* approve its repeal or revocation:  "The Secretary may repeal or revoke a [FMP] for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members."  16 U.S.C. § 1854(h).

59.    The Secretary has authority to promulgate her own FMP or amendment in only very narrow circumstances—(1) where a Council "fails to develop" a FMP or amendment "after a reasonable period of time," (2) where a Council "fails to submit a revised or further revised plan or amendment," or (3) where the fishery is not within any Council's jurisdiction.  *Id.* § 1854(c)(1).  But even then, the Secretary must "submit [her] plan or amendment to the appropriate Council for consideration and comment," which she must then "tak[e] into account."  *Id.* § 1854(c)(4)(A), (5).  The same is true of Secretary-generated regulations.  *Id.* § 1854(c)(6).

60.    A Council can force the Secretary to take immediate action.  If it "finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a [FMP] exists for such fishery," "the Secretary *shall promulgate* emergency regulations ... if the Council, by unanimous vote ... requests the taking of such action."  *Id.* § 1855(c)(2)(A) (emphasis added).

61.     Even when the Secretary is authorized to adopt fishing regulations, the Council can permanently block the Secretary from adopting a "limited access system" that "limits participation in a fishery to those satisfying certain eligibility criteria."  *Id.* §§ 1802(27), 1854(c)(3).  The Council can also permanently block the Secretary from adopting a "limited access privilege program," whereby fishermen gain "a Federal permit . . . to harvest a quantity of fish . . . of the total allowable catch of the fishery." *Id.* §§ 1854(c)(3), § 1802(26).

62.     Making matters worse, while the Act refers to "the Secretary," the reality is that the Secretary plays no role in this process.  She has instead delegated her authority under the Act to the Under Secretary for Oceans and Atmosphere (the head of NOAA).



63.    The Under Secretary has, in turn, redelegated that authority to the Assistant Administrator for Fisheries—currently Defendant Janet Coit—who heads NMFS.  *See* NOAA, *NOAA Organizational Handbook: Transmittal No. 61*, U.S. Department of Commerce, at 2–4 (Feb. 24, 2015) ("NOAA Handbook"); *see also* NOAA, *Transmittal 61 Clearance Memo*, U.S. Department of Commerce (Jan. 26, 2015).

64.    The Assistant Administrator for Fisheries has, in turn, redelegated the authority to sign material generated under the Act for publication in the Federal Register and Code of Federal Regulations to the Deputy Assistant Administrator for Regulatory Programs.  *See* NOAA Handbook at 5.  That role has been filled by Defendant Samuel Rauch for nearly twenty years.

65.    Mr. Rauch is a member of the SES appointed to a career position.  *See Plum Book* at 26.  As an SES career appointee, Mr. Rauch may be removed only for cause.  *See* 5 U.S.C. §§ 3592, 7541–43.

66.    In an interview posted to a NMFS website, Mr. Rauch described his role in detail.  *See* Ruth Sando, *Rauch, Sam ~ Oral History Interview*, Voices from the Fisheries (June 30, 2016) ("Rauch Interview").  Mr. Rauch "work[s] with the [C]ouncils … to put out fisheries regulations" and "sign[s] all of those" regulations, *id.* at 5, as his job is "to manage the regulations," *id.* at 9.  Asked whether fishery regulations "all kind of bubbl[e] up to" him, Mr. Rauch answered: "Yes.  Somebody has to[.]"  *Id.* at 5.

67.    Although Mr. Rauch acknowledged that he exercises these duties under the Act, he reiterated that the Councils "really drive the system" of "who, when, and where people get to fish," and described them as "mini legislative bod[ies]." *Id.* at 15. Mr. Rauch explained that although he "ultimately issue[s] the regulations," he "do[es] that" only "because it resolves what [the Council] do[es] as legal." *Id.* In other words, he is "the auditor[]" of a Council-controlled "system." *Id.*

### *Consequences for Local Commercial Fishermen*

68.    The unaccountable Councils have overseen massive—and damaging— changes to American commercial fishing.  An industry once characterized by small, family-run businesses has been transformed by relentless consolidation.  The voices of big business, environmental groups, and the recreational sector have drowned out those of local fishermen like Mr. Leeman and NEFSA's members.  Captains and crew with the generational knowledge needed to responsibly steward our marine resources have been reduced to hired hands for distant corporations.  As a result, the domestic fishing fleet faces an uncertain future—a looming threat to American food security.  But because the Act insulates the Councils from democratic accountability, Plaintiffs cannot effect political change.  Under the current regime, not even the elected President of the United States has the authority to steer federal fishery policy in a different direction.

69.    The Councils' approach is perhaps best illustrated by the implementation of so-called "catch share" programs.  Under this system, as implemented in New

23

England, the Council first determines how much of a given species can be harvested—the "Total Allowable Catch," or TAC.  It then allocates the TAC among "sectors"—"self-selecting groups" of Multispecies permit holders who agree to follow certain regulations.  *Lovgren*, 701 F.3d at 15.

70.     In 2010, the New England Council "assigned every … permit holder" a share of the catch limit for each of the fishery's stocks "based on [the] permit holder's historic landings from 1996 to 2006."  *Id.*  at 19.  A sector's combined individual shares determine its annual catch entitlement—"the maximum amount of each fish stock that a sector's members could collectively catch."  *Id.*

71.     Under catch shares, initial allocations are based on past harvest levels—necessarily privileging large players and freezing out younger fishermen like Mr. Leeman—who, as a hired hand when the program began, was not allocated rights to access the groundfish fishery.  To make matters worse, the right to fish under sector permits can be transferred and leased—allowing deep-pocketed corporations to seize an ever-growing share of the fishery's profits.  And those corporations pass the cost of leasing permit rights along to the captains and crew who venture into the North Atlantic to harvest groundfish.

72.     In New England and nationwide, catch share regulation has triggered dramatic industry consolidation.  Indeed, that was the goal:  By concentrating rights in a few hands, the Council sought to end "overcapitalization" by squeezing out smaller,

less profitable players.  The leading beneficiary of consolidation in New England is Blue Harvest Fisheries, the subject of a 2022 exposé.  W. Sennott, *How Foreign Private Equity Hooked New England's Fishing Industry*, ProPublica (July 6, 2022).  Since catch shares arrived courtesy of the Council, Blue Harvest and other newcomers have dominated Atlantic fisheries from haddock to flounder.  After leasing as much of the fishing quota as the law allows, these firms pass along lease fees to the captains and crew who operate their vessels.  After deducting lease charges and other expenses, fishermen take home pennies on the dollar.  "You can no longer work your way up from the deck, become a captain and buy your own boat and permit," one fisherman explained.  *Id.*  "You'll never make enough. They made it unattainable to do anything but work for them."  *Id.*  Blue Harvest is owned by Bregal Partners, part of a wealthy Dutch family's financial empire.

73.     Researchers have long known that catch shares have these effects.  "No matter what you do," one academic has observed, "there is a dynamic that is going to unfold in predictable ways, toward the concentration of wealth and away from public participation."  Susanne Rust, *System turns US fishing rights into commodity, squeezes small fishermen*, Reveal (Mar. 12, 2013).

74.     A 2016 study supported by another regional Council revealed numerous problems driven by catch shares.  *See* D. Griffith et al., *Private Fish, Public Resource: Socioeconomic Impacts of the Grouper-Tilefish Individual Fishery Quota (IFQ) Program on Gulf of Mexico Communities* (Sept. 2016).  The authors reported that fleet consolidation poses

particular threats to "diverse, multispecies, and multi-gear fisheries." *Id.* at 4. Fishermen told researchers that high barriers to entry and cuts to take-home pay have led to "an aging population of fishermen and a dearth of younger fishers." *Id.* at 6. The study concluded that regulators "need to rethink the wisdom of putting every species under [a catch-share] program." *Id.* at 7.

75.     For years, Mr. Leeman and NEFSA members have watched the influence of large shareholders and environmentalists play out in Council meetings and decisions. As they can attest, the Council is uninterested in the concerns of local commercial fishermen. In fact, the NMFS Deputy Assistant Administrator—Defendant Rauch—has spoken *favorably* of the Councils' capture. For instance, Mr. Rauch explained that the Councils' approach is driven by "the environmental community": "We've got the regulatory structure that we do now because the environmentalists are pushing us." Rauch Interview at 19. Unsurprisingly, activist groups have pivoted away from lawsuits and toward a strategy of influencing the Councils. As Mr. Rauch explained, "the environmental community—they still use litigation, but they are also *making an enormous investment in the [C]ouncil process*, and that has moved the [C]ouncil[s] in their direction." *Id.* (emphasis added).

76.     If any doubt remained about the regulators' perspective, Mr. Rauch has dispelled it: If the Councils and NMFS "fail" to properly calibrate their regulatory efforts, he shrugged, "it's just less money for fishermen." *Id.* at 20. To NMFS and the

Councils, those "consequences of failure" just aren't "significant." *Id.* But for NEFSA's membership, Mr. Leeman, and others like them, "less money for fishermen" is not only "significant"—it could cripple their businesses and doom a centuries-old way of life in New England.

*Framework Adjustment 65*

77.     The New England Council recently developed Framework Adjustment 65, a policy under the Northeast Multispecies FMP that revises catch limits for groundfish species and installs a 10-year Gulf of Maine cod rebuilding plan. On April 18, 2023, the Council announced that it had finalized Framework Adjustment 65. NMFS published Framework Adjustment 65 in the Federal Register for comment on May 31, 2023. NMFS issued the Framework Adjustment 65 Final Rule and implementing regulations on August 18, 2023.[1] Defendant Rauch signed both the proposed and final rules.

78.     Framework Adjustment 65 makes numerous changes to groundfishing regulation under the Northeast Multispecies FMP. Most notably, it slashes haddock catch limits: For Georges Bank haddock, the commercial annual catch limit falls from

---

[1] The haddock catch limit in the final rule was somewhat more relaxed than that in the Council's original plan. At its April 2023 meeting, the Council acknowledged that its scientists had previously underestimated the haddock population in the Gulf of Maine. Consequently, it voted for NMFS to take an "emergency" action to modestly increase the Gulf of Maine haddock catch limit. NMFS complied with the Council's demand in the Final Rule, noting the revised catch limit still "represent[ed] a substantial reduction" from the prior year.

81,383 metric tons to 11,901—an 85% reduction. For haddock in the Gulf of Maine, the cut is over 78%—from 11,526 metric tons to just 2,515. Framework Adjustment 65 also lowers the white hake commercial catch limit by around 13%. And it initiates a "more cautious" 10-year rebuilding plan for Gulf of Maine cod, which will tightly restrict access to the cod fishery. NEFMC, *Framework 65 – Final Submission – April 2023* at 27.

79.    Even before Framework Adjustment 65, Plaintiffs and other local New England groundfishermen operated on razor-thin margins. After expenses and paying lease fees under the Council's catch share program, Mr. Leeman and NEFSA members are often left with pennies on the dollar. The Framework Adjustment's dramatic cuts to the haddock harvest will erase much of what remains. And these restrictive quotas in a multispecies fishery characterized by bottom-dwellers will cause Mr. Leeman and NEFSA members to spend much of their precious time and resources *avoiding* fish populations.

80.    Every day Framework Adjustment 65 is in effect, Mr. Leeman and NEFSA members will lose the opportunity to harvest haddock and other groundfish species and bring that harvest to market. And they will waste a growing share of resources avoiding fish populations that the Council has tightly regulated and for which he cannot afford to purchase permitting rights. These injuries are irreparable and indefinite. They are imposed by a Council that Plaintiffs attest is out of touch,

28

unresponsive to commercial fishermen, and beholden to special interests.  And it is overseen by an equally unaccountable career bureaucrat at NMFS.

## CONSTITUTIONAL VIOLATIONS

### *Council Members Serve in Violation of the Appointments Clause*

81.    The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  The Clause also allows Congress to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  *Id.*

82.    Principal officers must be nominated by the President and confirmed by the Senate.  The same rule presumptively applies for inferior officers, but Congress may authorize the President alone, the courts, or the "Heads of Departments" to appoint such officers.  The Appointments Clause does not dictate the manner of appointment for "lesser functionaries" beyond these categories.  *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979–80 (2021).

83.    The Council's voting Members wield vast authority on behalf of the United States, subject only to limited supervision by NMFS.  Yet none of them are appointed by the President or anyone accountable to him.  Whether viewed as principal or inferior officers, all Members serve in violation of the Appointments Clause.

**Council Members are Officers of the United States.**

84.     Any official assigned "continuing and permanent" duties, *Lucia v. SEC*, 138 S. Ct. 2044, 2051 (2018), and who "exercis[es] significant authority pursuant to the laws of the United States[,] is an 'Officer of the United States,'" *Buckley v. Valeo*, 424 U.S. 1, 126 (1976) (per curiam).

85.     Council Members—the "primary policy makers" for federal fisheries— are quintessential officers. *See* Rogalski, *supra*, at 178. They bear no resemblance to the "broad swath of 'lesser functionaries' in the [federal] workforce." *Lucia*, 138 S. Ct. at 2051. Thus, Council Members must be appointed "in the manner prescribed by" the Appointments Clause. *Buckley*, 424 U.S. at 126.

86.     *First*, Council Members "occupy a 'continuing' position established by law." *Lucia*, 138 S. Ct. at 2051 (quoting *United States v. Germaine*, 99 U.S. 508, 511 (1879)). Congress established Council seats by statute and spelled out Members' duties in detail. *See* 16 U.S.C. § 1852. Twelve of the Council's 18 Members serve statutorily-defined three-year terms, which can be extended for a further six years. *Id.* § 1852(b)(3). The Members from state bureaucracies hold their positions indefinitely. *See supra* ¶ 42. No Members serve for merely "occasional or temporary" periods. *Germaine*, 99 U.S. at 511–12.

87.     *Second*, Council Members exercise significant policymaking authority over federal fisheries, affecting every aspect of the commercial and recreational fishing industries. Congress vested Councils with sweeping and ongoing "authority over the

fisheries in" their regions, 16 U.S.C. § 1852(a)(1)(A), and empowered them to "exercise sound judgment in the stewardship of fishery resources," *id.* § 1801(b)(5).

88.     To fulfill this mandate, each Council has the power to adopt and amend FMPs for all federal fisheries within its jurisdiction. *Id.* §§ 1852(h)(6), 1853(a)(1)(A). Relying on data from advisory committees that report only to it, a Council determines how much of a particular species can be harvested, how to divide the catch, and the manner in which fish can be caught.  The Act leaves these decisions to a Council's policy judgment.  The Secretary contributes only nonbinding guidance.  *Id.* § 1851(b).

89.     Here, Council Members made several important decisions that affect Mr. Leeman's livelihood and those of NEFSA members.  It chose to drastically reduce commercial catch limits for haddock, to cut the quota for white hake, and to install a more cautious decade-long rebuilding plan for the Gulf of Maine cod fishery.  These policy judgments—made solely by the Council—make it unfeasible for commercial fishermen like Mr. Leeman and NEFSA members to harvest haddock and other groundfish species, preventing fresh seafood from reaching stores and restaurants.

90.     After a Council makes a policy decision, the Act requires it to submit its proposed edict to the Secretary of Commerce.  But that formal approval does not— and cannot—divest the Council from its control over federal policy.

91.     NMFS can block the Council's edicts only if it identifies a *legal* defect in its proposal.  16 U.S.C. § 1854(a)(3)(A).  The agency cannot block a proposal based on

a *policy* disagreement. And if NMFS does happen to identify a legal defect, its only option is to remand the plan to the Council with "recommendations" on how to fix the legal problem—recommendations that the Council is not obliged to even *consider*, much less adopt. *Id.* § 1854(a)(3)(C), (a)(4).

92.    If for any reason NMFS fails to act on a Council submission within 30 days, the FMP or amendment "shall take effect as if approved." *Id.* § 1854(a)(3); *Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 431 (D.D.C. 2014).

93.    The Council's power is even greater, though, if the President or Secretary ever wishes to repeal or modify an existing FMP or amendment. The Secretary may repeal or modify federal fishing policy "only if the Council approves" that repeal or modification "by a three-quarters majority." 16 U.S.C. § 1854(h). Thus, once Framework Adjustment 65 takes effect, *only* the Council may lift it. Indeed, a bloc of unaccountably-appointed-and-insulated officials can preserve Framework Adjustment 65 *forever*.

94.    An official cannot serve as an "officer[] for purposes of some of [his] duties" but as a "mere employee[] with respect to other responsibilities." *Freytag v. Comm'r*, 501 U.S. 868, 882 (1991). Thus, if Council Members wield officer-level authority in the exercise of *any* of their duties, they must be appointed under the terms of the Appointment Clause.

95.    In sum, each Council is "a mini legislative body" that decides "who, when, and where people get to fish."  Rauch Interview at 15, 19.  That is "significant authority" that can only be exercised by "Officers of the United States."  *Buckley*, 424 U.S. at 126.

### Council Members are principal officers.

96.    Council Members are principal officers who must be appointed by the President and confirmed by the Senate.  The Appointments Clause refers to certain "inferior" officers "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond v. United States*, 520 U.S. 651, 663, 664–65 (1997).  Any officer who does *not* fit that description is a "principal" officer.  *See Arthrex*, 141 S. Ct. at 1980.  The key inquiry is "how much power an officer exercises free from control by a superior."  *Id.* at 1982. Three factors guide that inquiry:  *First*, does any principal officer exercise "administrative oversight" over the officer in question?  *Id.* at 1980.  *Second*, may a principal officer remove the officer without cause?  *Id.*  *Third*, can a principal officer "review the [officer's] decisions"?  *Id.*

97.    These factors all demonstrate that Council Members are principal officers. *First*, Council Members are subject only to minimal NMFS oversight.  No principal officer controls the Council's policy priorities, research agenda, procedural rules, or staffing decisions.  *See* 16 U.S.C. § 1852(e)–(i); *Arthrex*, 141 S. Ct. at 1980; *Edmond*, 520 U.S. at 664–65.

33

98.     The Act shields the Council's core responsibility—developing FMPs and amendments—from administrative or policy oversight.  The Secretary's input consists of mere "advisory guidelines."  16 U.S.C. § 1851(b).  Once the Council completes a FMP or amendment, NMFS merely checks it for legality.  Indeed, a Council Member— the Regional Administrator—is involved in this process.  *See* NOAA Handbook at 7. And as Mr. Rauch explained, although he "ultimately issue[s] the regulations," he "do[es] that" only "because it resolves what [the Council] do[es] as legal."  Rauch Interview at 15.  None of this circumscribed review involves a principal officer.

99.     *Second*, Council Members enjoy extraordinarily strong protection from removal.  The Supreme Court has recognized that the "power to remove officers … is a powerful tool for control."  *Edmond*, 520 U.S. at 664.  But not even the President can freely remove Council Members.  Much of the Council is immune from removal by any federal official, and the remaining Members enjoy some of the most robust tenure protections in federal law.  *See infra*, at ¶¶ 114-15.

100.     *Third*, given the Council's dominant role in developing FMPs and amendments, it issues "final decision[s]."  *Arthrex*, 141 S. Ct. at 1981.  Although NMFS may block a plan or amendment if it identifies a *legal* defect, the Council has the final word when it comes to fishery *policy*.  "Since the founding, principal officers have directed the decisions of inferior officers on matters of law *as well as policy*."  *Id.* at 1983 (emphasis added).  The Act also provides that the Council's policies "shall take effect"

if NMFS fails to act. 16 U.S.C. § 1854(a)(3). And the finality of the Council's decisionmaking is most stark whenever the President wishes to revoke or change the existing limits—a step that just five Council Members can thwart.

101. In sum, Council Members hold primary responsibility for federal fisheries policy and answer to no principal officer in the course of their duties. Councils operate independently, free of administrative oversight. They cannot be removed at will, if they are removable at all. And their policy judgments cannot be overturned by any federal official that answers to the President—or even by the President himself.

### Even as inferior officers, 17 Council Members were appointed in violation of the Appointments Clause.

102. Because no Member was nominated by the President and confirmed by the Senate, each serves unlawfully as a principal officer.

103. Even if Members are *inferior* officers, though, 17 of them were still unlawfully appointed. Congress may "vest the Appointment" of "inferior Officers" in three (and only three) places—"in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Neither the President nor any court is involved in the selection of Council Members. That leaves "Heads of Departments"—Cabinet-level officers and certain independent agencies. *Freytag*, 501 U.S. at 886; *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 511–12 (2010). But Heads of Departments do not appoint 17 of 18 Council Members either.

35

104.   To start, five Members hold their seats simply because they hold positions in state governments within the Council's region.  *See supra* ¶¶ 42-43.  These Members were thus "appointed" by state officials.  The Appointments Clause does not allow Congress to outsource the power to fill federal offices to state officials.  The Clause "ensure[s] that those who wield[]" the appointment power are "accountable to political force and the will of the people."  *Freytag*, 501 U.S. at 884.  But state officials are accountable, if at all, only to state electorates.  Allowing those officials to choose federal officers with authority over multiple states is a clear Appointments Clause violation.

105.   The Government has argued elsewhere that all but one of the Council's Members are not Officers of the United States because they are not federal employees. *See Arnesen v. Raimondo*, 1:23-cv-00145, Dkt. No. 66 at 20-23 (S.D. Miss. Aug. 29, 2023). The Supreme Court has recognized that officials can be Officers of the United States even if they are not federal employees.  *See, e.g.*, *Free Enterprise Fund*, 561 U.S. at 484-85 (addressing privately employed federal officers).  But if the Government were correct that most of the Council's Members are not federal officers, *then* the Act is "unconstitutional because it delegates government power to a [non-federal] entity without sufficient agency supervision."  *Nat. Horsemen's Benevolent and Protective Ass'n v. Black*, 53 F.4th 869, 872 (5th Cir. 2022).  "A cardinal constitutional principle is that federal power can be wielded only by the federal government."  *Id.*  But under the Government's theory, most of the Council's Members impermissibly wield federal

36

power *without* serving as federal officials.  Because "the Constitution vests federal power only in the three branches of the federal government," *id.* at 872, this arrangement is unconstitutional under the Government's own account.

106.    Meanwhile, 12 Members were improperly appointed because they were nominated by governors.  For inferior officers, the Constitution permits Congress to "vest" the "Appointment" power in the Secretary of Commerce.  U.S. Const. art. II, § 2, cl. 2.  But the Act violates that instruction by giving the Secretary only a limited, subordinate role in selecting these Members.  *See supra* ¶ 45.

107.    These Members are deemed "qualified" not by the Secretary's (or the President's) judgment, but through a set of statutory criteria evaluated by State governors wholly outside the Executive Branch.  *See* 16 U.S.C. § 1852(b)(2)(A), (C). The Secretary may disagree with a governor's conclusion that a candidate is "qualified," but that does not empower the Secretary to exercise independent judgment.  *Id.* § 1852(b)(2)(C).  Instead, she can only "notify" the governor of her view.  *Id.*  That governor may then resubmit the candidate "with an additional explanation of [his] qualifications," or nominate someone else.  *Id.*  The Act does not limit the amount of back-and-forth or empower any federal official to bypass state stonewalling.

108.    Under this scheme, the Secretary is never permitted to choose whom she (or the President) would like to appoint; she must always pick from a closed set dictated by a state official.

37

109.   This scheme unconstitutionally "limit[s] selection and … trench[es] upon executive choice." *Myers v. United States*, 272 U.S. 52, 128 (1926).  The President must be able to exclude those with "different views of policy," those "from a competing political party," and those he thinks "not intelligent or wise." *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021) (cleaned up).  The Act flouts that principle by delegating Member selection to state officials accountable only to state voters.  This "diffusion of the appointment power" to separate sovereigns assaults "the Constitution's structural integrity." *Freytag*, 501 U.S. at 878.

### Council Members are Unconstitutionally Insulated from Removal

110.   "[T]he 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2191 (2020) (quoting U.S. Const. art. II, § 1, cl. 1, & § 3).  Although the President can delegate to subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Id.* at 2197.  A President powerless to fire such officials "could not be held fully accountable for discharging his own responsibilities; the buck would stop somewhere else." *Free Enter. Fund*, 561 U.S. at 514.

111.   Thus, the default rule is that the President must be able to remove Executive Branch officials at will.  *Seila Law*, 140 S. Ct. at 2191–92.  There are only two exceptions.  The first covers "multimember bod[ies] of experts, balanced along partisan lines, that performed legislative and judicial functions" and do not "exercise any

executive power." *Id.* at 2199.  The second covers certain "inferior officers with limited duties and no policymaking or administrative authority."  *Id.* at 2199–2200.

112.    Even within those categories, Congress does not have free rein to insulate subordinate executive officials.  The Constitution permits only certain forms of modest tenure protection.  *See Humphrey's Ex'r v. United States*, 295 U.S. 602, 619 (1935) (President may remove FTC commissioners for "inefficiency, neglect of duty, or malfeasance in office"); *but see Free Enter. Fund.*, 561 U.S. at 495–96 (two layers of such for-cause removal protection are unconstitutional).  Some protections are simply "inappropriate for officers wielding the executive power of the United States."  *Free Enter. Fund*, 561 U.S. at 503.

113.    The Act unconstitutionally insulates every Council Member from removal.  *First*, regardless of the *Seila Law* exceptions, 17 of the Council's 18 Members enjoy removal protections stronger than any removal protection the Supreme Court has ever approved in any context.  These restrictions impose far greater restrictions on presidential control and democratic accountability than the two-layer for-cause regime the Court invalidated in *Free Enterprise Fund*, and exponentially greater burdens than those the Court blessed in *Humphreys Executor*.

114.    The President is powerless to remove five of the Council's Members— those seats appointed and filled by state bureaucrats—who hold Council seats "so long as" they occupy state offices.  *See supra* ¶ 42.  Indeed, the only officials empowered to

39

remove these Members are employed by separate sovereigns.  It is hard to imagine a more "inappropriate" form of tenure protection "for officers wielding the executive power of the United States," *Free Enter. Fund*, 561 U.S. at 503, than absolute protection at the grace of a separate sovereign.

115.    The 12 governor-nominated Members also enjoy unconstitutional protections. The President—through the Secretary—may remove these Members only "for cause."  16 U.S.C. § 1852(b)(6).  And the Act provides just *one* scenario that could supply the requisite "cause"—when a formal hearing reveals the Member violated 16 U.S.C. § 1857(1)(O), a conflict-of-interest provision.  *Id.* § 1852(b)(6)(B).  The President cannot unilaterally remove a Member for anything else.  If the President wishes to remove a Member outside that extraordinary narrow circumstance, he must persuade the Member's colleagues on the Council to "first recommend[] removal" by a two-thirds vote.  *Id.* § 1852(b)(6)(A).  This scheme clearly "impede[s] the President's ability to perform his constitutional duty."  *Seila Law*, 140 S. Ct. at 2199 (internal quotation marks omitted).

116.    *Second*, the Council and its Members do not fit either *Seila Law* exception and thus *any* removal restriction violates the Constitution.  To start, the Council is not the sort of "multimember body of experts, balanced along partisan lines," that *Humphrey's Executor* found "not to exercise any executive power."  *Id.*  Such independent agencies lack "the authority to promulgate binding rules" and serve as "mere legislative

or judicial aid[es]." *Id.* at 2200.  The Council is a "body of experts" but bears none of the exception's other hallmarks:  It lacks partisan balance; it is not a "legislative agency," *Humphrey's*, 295 U.S. at 628; and it exercises executive functions by, among other things, developing rules.

117.    Nor do Council Members fit the second *Seila Law* exception for inferior officers akin to the independent counsel in *Morrison v. Olson*, 487 U.S. 654 (1988). Members are *principal* officers.  *See supra* ¶¶ 96-101.  And even if they were inferior officers, they bear no resemblance to a prosecutor with no "policymaking or administrative authority," *Seila Law*, 140 S. Ct. at 2200, who was "appointed … to accomplish a single task," *Morrison*, 487 U.S. at 672.

118.    Thus, Council Members lie beyond both *Seila Law* exceptions.  Their tenure protections are thus unconstitutional.  This includes Regional Director Pentony, who serves on the Council in his capacity as a career SES official in NMFS.  Although his tenure protections are more familiar, they likewise transgress Article II by improperly insulating an official who exercises substantial executive authority.

119.    The Constitution's Executive Vesting and Take Care Clauses protect democracy by ensuring that only those accountable to the President—and thus, the American people—wield executive power.  The Act violates that principle.

41

### *The Deputy Assistant Administrator is Likewise Unconstitutionally Insulated from Removal*

120.    Article II of the Constitution mandates that the President possess the power to freely remove any officer who exercises "the executive power."

121.    Neither the President nor any of his deputies may freely remove Mr. Rauch from office.  As a member of the SES appointed to a career position, Mr. Rauch may be removed only for cause.  5 U.S.C. §§ 3592, 7541–43.  This removal protection is "a *de facto* form of life tenure."  *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 391 (5th Cir. 2023) (Ho, J., concurring).

122.    Mr. Rauch is an "Officer of the United States."   *First*, he holds a continuing office created by federal regulations, which can establish officer positions.  *See United States v. Mouat*, 124 U.S. 303, 307–08 (1888).  Mr. Rauch has held this position for years, and the civil-service laws protect his continued tenure.  *Second*, he "exercis[es] significant authority pursuant to the laws of the United States."  *Buckley*, 424 U.S. at 126.  Mr. Rauch issues legally binding regulations on behalf of the Federal Government.  In this case, he signed Framework Adjustment 65 and published it in the Federal Register in his own name.  The power to issue final rules is one of the most consequential actions an agency can take—one that can be exercised only by "Officers of the United States."  *See id.* at 140–41.  More broadly, Mr. Rauch "oversees" all NMFS "regulatory actions and programs"—for instance, he "[c]oordinat[es]" the agency's "National Environmental Policy Act programs."  NOAA Fisheries, *Samuel D. Rauch III,*

42

*Deputy        Assistant        Administrator        for        Regulatory        Programs*, https://www.fisheries.noaa.gov/contact/samuel-d-rauch-iii (last visited June 5, 2023). As the "auditor[]" of the federal fisheries "system," Mr. Rauch is an officer of the United States.  Rauch Interview at 15.

123.    As noted above at paragraph 111, *Seila Law* recognized "two exceptions" to the rule that the President must be able to freely remove Executive Branch officials from office.  140 S. Ct. at 2191–92.  The Court identified exceptions "for multimember expert agencies that do not wield substantial executive power" and "inferior officers with limited duties and no policymaking or administrative authority."  *Id.* at 2199–2200 (internal quotation marks omitted).

124.    Mr. Rauch is not part of an expert board, nor is he analogous to the independent counsel in *Morrison*.   Most relevant here, Mr. Rauch issues binding regulations that embody the Council's policy judgments and his own agency's legal review.   That alone ranks Mr. Rauch above mere employees in the constitutional hierarchy.  Mr. Rauch's rulemaking authority and oversight of all NMFS "regulatory actions and programs," *see supra*, at ¶¶ 66-67, entail substantial exercises of discretionary executive power.

125.    Mr. Rauch's protection from at-will removal "subverts the President's ability to ensure that the laws are faithfully executed—as well as the public's ability to

pass judgment on his efforts." *Free Enter. Fund*, 561 U.S. at 498. His exercise of federal authority is "incompatible with the Constitution's separation of powers." *Id.*

126.   Mr. Rauch has, indeed, bragged about his substantial-and-unaccountable executive authority. Specifically, he has told the story of his "most proud" accomplishment—implementing a rule regulating ship speeds—over the objections of the elected Vice President of the United States. Rauch Interview at 30–31. He described the White House as an "evil empire" against which he "fought" and "won." *Id.* at 31. And he recounted "find[ing] every friend we … have in the government" to assist his effort to resist the very President whose executive power Mr. Rauch wields. *Id.* It is difficult to imagine a starker violation of Article II.

### STANDING

127.   Plaintiffs have Article III standing to challenge Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations. A plaintiff has standing if he (1) suffers a concrete "injury in fact" that was (2) "likely caused by the defendant" and (3) "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). A court must "assume, for purposes of the standing analysis," that a plaintiff is "correct on the merits of [his] claim[s]." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019); *accord Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015).

128.   Mr. Leeman and NEFSA members will suffer concrete, irreparable injuries as a result of Framework Adjustment 65.  The Council's policies will cost Plaintiffs revenue, profits, and business opportunities derived from groundfishing.  In particular, Mr. Leeman's revenue derived from the haddock fishery will decline under the Framework Adjustment's roughly 80% reduction to the overall species catch limit. Likewise, NEFSA member David Osier's seafood business will be devastated by the Adjustment's reductions of the haddock and white hake catch limits.  Moreover, as a result of these shifts, Mr. Leeman and NEFSA members will expend more resources *avoiding* fish species that they cannot afford to catch under the Council's restrictions. Finally, Plaintiffs' ability to harvest cod will be impeded by the Framework Adjustment's decade-long cod rebuilding plan.

129.   Moreover, being subjected to regulations developed, approved, and issued by unconstitutionally appointed and insulated officers is an independently cognizable "here-and-now" injury.  *Seila Law*, 140 S. Ct. at 2196; *Axon Enter., Inc. v. FTC*, 143 S. Ct. 890, 903 (2023) ("The harm [plaintiffs] allege is being subjected to unconstitutional agency authority …. That harm may sound a bit abstract; but this Court has made clear that it is a here-and-now injury." (quotation marks omitted)).

130.   Plaintiffs' injuries are "fairly traceable" to Defendants. *Collins*, 141 S. Ct. at 1779.  NMFS issued the Final Rule adopting the illegitimate Council's policymaking as law.  And an unconstitutional statute that undergirds a regulatory process may be

challenged in a suit attacking the *product* of that process.  *See FEC v. Cruz*, 142 S. Ct. 1638, 1649–50 (2022).

131.   NMFS issued the Final Rule under provisions of the Act authorizing it to adopt and implement *the Council*'s FMP amendment.  *See* 16 U.S.C. § 1854(a)–(b).  But the Council did not lawfully develop such an amendment; instead, officials *devoid* of constitutional authority *purported* to do so.  There was no valid FMP amendment to promulgate.  The Act's constitutional defects thus short-circuited the regulatory process and deprived NMFS of authority to promulgate the Final Rule.  NMFS did so anyway, thus subjecting Plaintiffs to concrete injuries.

132.   Moreover, as the product of an illegitimate Council, Framework Adjustment 65 was unlawful, and NMFS should have exercised its statutory authority to reject it.  *See* 16 U.S.C. § 1854(a)(1)(A).  Because it did not, Mr. Leeman and NEFSA members will suffer irreparable harm.

133.   Plaintiffs' injuries are also traceable to Defendant Rauch, who executed the Final Rule subjecting Plaintiffs to the Council's groundfishing policy.  In addition, Mr. Rauch's tenure protections divest him of lawful authority to issue the Final Rule or accompanying regulations.

134.   The Supreme Court recently clarified that, "for purposes of [Article III] traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to *allegedly unlawful conduct* of the *defendant*, not to the *provision of law* that is challenged."  *Collins*, 141

S. Ct. at 1779 (internal quotation marks omitted; emphasis added).  Here, all Defendants engaged in "conduct" that Plaintiffs "allege[]" is "unlawful."  *Id.*  That same conduct will result in concrete injuries to Plaintiffs.  Article III requires nothing more.

135.    Plaintiffs' standing does not require proof that a properly appointed or removable Council Member or agency official would have acted differently.  *Seila Law*, 140 S. Ct. at 2196.  First, because Plaintiffs will be "harmed by … action that was taken by" illegally appointed and insulated officials, they have "establish[ed] standing." *Collins*, 141 S. Ct. at 1788 n.24.  Moreover, like the challengers in *Axon* and *Cochran*, Plaintiffs "protest the 'here-and-now' injury of subjection to an unconstitutionally structured decisionmaking process."  *Axon Enter.*, 143 S. Ct. at 904.

136.    This Court can redress Plaintiffs' injuries.  When a party "challenging the legality of government action … is himself an object of the action[,] there is ordinarily little question" that a "judgment preventing" that action will redress his harm.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).  That is true here.  If the Court vacates or enjoins the challenged actions, Mr. Leeman and NEFSA members will be able to harvest more haddock, cod, white hake, and other groundfish species.  And if the Court grants such relief, Plaintiffs will no longer be "subjected to unconstitutional agency authority," remedying that ongoing injury.  *Axon*, 143 S. Ct. at 903.

## CLAIMS FOR RELIEF

## Count I:  Council Members Serve in Violation of the Appointments Clause

137.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

138.    The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States."  U.S. Const. art. II, § 2, cl. 2.  The Clause allows Congress to "vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  *Id.*

139.    Plaintiffs have two causes of action to enforce this requirement:  The first arises under the U.S. Constitution and this Court's traditional equitable authority to enjoin unconstitutional executive action.  *See supra* ¶ 30; *Free Enter. Fund*, 561 U.S. at 491 n.2; *Armstrong*, 575 U.S. at 326–27; *Axon Enter.*, 143 S. Ct. at 906 (allowing plaintiffs to proceed on this equitable cause of action regardless of statutory restraints on judicial review).  The second cause of action arises under the Act's provisions authorizing judicial review of Framework Adjustment 65, which incorporate the relevant sections of the APA.  *See* 16 U.S.C. § 1855(f).

140.    All 18 Council Members are "Officers of the United States" because they wield substantial authority on behalf of the Federal Government.

141.    All 18 Members are principal officers because they are not adequately supervised by or accountable to principal officers.  Therefore, all 18 must be nominated by the President and confirmed by the Senate.  None were.

48

142.   Even if Members are inferior officers, 17 of 18 were unconstitutionally appointed.  Congress may vest the appointment of inferior officers in the President, the courts, or the "Heads of Departments."   Seventeen Members were appointed by someone else.   Five hold office by virtue of their appointments within State governments; twelve were selected by State Governors and approved by the Assistant Administrator for Fisheries.  The Council cannot lawfully act if any of its Members were unlawfully appointed.  *See Nguyen v. United States*, 539 U.S. 69, 82 (2003) (vacating a conviction affirmed by a circuit panel that unlawfully included an Article IV judge despite two Article III judges voting to affirm); *Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1725 (2018); *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016).  One unconstitutional official is one too many.  *Free Enter. Fund*, 561 U.S. at 511–12 & n.12.  Alternatively, Plaintiffs are entitled to relief if the Court concludes that 9 or more of the Members were improperly appointed, because that would deprive the Council of a quorum for its vote on Framework Adjustment 65.  *See supra* ¶ 47.

143.   The Council's Members were appointed in violation of the Appointments Clause and thus never received lawful federal authority.   As a result, Framework Adjustment 65 is unlawful and void.   Because the Council's structure "was unconstitutional at the time [the rule] issued," vacatur of Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations is

warranted.  *See Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012); *see also Lucia*, 138 S. Ct. at 2055.

144.   The Framework Adjustment 65 Final Rule and accompanying regulations—formulated by an unconstitutionally appointed Council—are "contrary to constitutional right, power, privilege, or immunity" and must be vacated.  5 U.S.C. § 706(2)(B).

145.   Given the Council's lack of authority, NMFS was obligated to reject Framework Adjustment 65 under 16 U.S.C. § 1854(a)(1)(A).  Because it did not, the Framework Adjustment 65 Final Rule and all accompanying regulations are also "not in accordance with law," are "in excess of statutory … authority," and must be vacated. 5 U.S.C. § 706(A), (C).

146.   Injunctive relief is warranted.  Plaintiffs have no adequate remedy at law. And "subjection to an unconstitutionally constituted decision-maker" is "in itself a constitutional injury sufficient to warrant injunctive relief."  *See United Church of the Med. Ctr. v. Med. Ctr. Comm'n*, 689 F.2d 693, 701 (7th Cir. 1982); *see also Axon Enter.*, 143 S. Ct. at 899, 903–04.  The Court should enjoin the enforcement of Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations.

147.   Declaratory relief is also "appropriate" to "declare [Plaintiff's] rights."  28 U.S.C. § 2201(a).  The Court should declare that Council Members are unlawfully

appointed and that Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations are therefore void.

## Count II:  Council Members are Unconstitutionally Insulated from Removal

148.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

149.   Article II of the Constitution provides that "[t]he executive power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1, & § 3.   Although the President can delegate tasks to subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield."  *Seila Law*, 140 S. Ct. at 2197.   In order to hold officials accountable, the President must normally have "the ability to remove executive officials, for it is only the authority that can remove such officials that they must fear and, in the performance of their functions, obey."  *Id.* (cleaned up).

150.   Plaintiffs have two causes of action to enforce this requirement:  The first arises under the U.S. Constitution and this Court's traditional equitable authority to enjoin unconstitutional executive action.  *See Free Enter. Fund*, 561 U.S. at 491 n.2; *Armstrong*, 575 U.S. at 326–27; *Axon Enter.*, 143 S. Ct. at 906 (allowing plaintiffs to proceed on this equitable cause of action regardless of statutory restraints on judicial review).   The second cause of action arises under the Act's provisions authorizing

judicial review of Framework Adjustment 65, which incorporate the relevant sections of the APA. *See* 16 U.S.C. § 1855(f).

151.    The President cannot hold Council Members accountable because he cannot freely remove any of them. He cannot remove the five Members who hold federal office by virtue of their State offices under any circumstances. The 12 governor-nominated Members can be removed only if a supermajority of the Council consents or if they violate certain financial conflict-of-interest provisions. And Council Member Pentony may only be removed for cause. These restrictions unlawfully interfere with the President's supervision of the Executive Branch.

152.    The Council's removal protections cannot be severed from the Act's provisions granting the Council policymaking authority over federal fisheries. Because the Council exercised that authority here, Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations were issued without lawful authority and must accordingly be vacated. *See Axon Enter.*, 143 S. Ct. at 902 ("Only the … ability to sever the relevant statute's for-cause removal provision enable[s]" an agency "to keep running.").

153.    "[T]he 'traditional' rule is that 'the unconstitutional provision must be severed unless the statute created in its absence is legislation that Congress would not have enacted.'" *Seila Law*, 140 S. Ct. at 2209 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987)). Given the unambiguous intent of Congress to enshrine *state-*

controlled Councils as its primary policymakers, Congress would never have passed the Act if its Councils were directly accountable only to federal officials.  Congress ensured that 17 of the Council's 18 Members would be accountable to state officials.  Indeed, "political pressures played an important role in placing the states in a dominant … position," in part because the industry would have rejected "a purely federal regime." Rogalski, *supra*, at 174.  "Thus, the composition of each council shows a strong state representation among those voting … and a strong federal representation among those advising though not voting." *Id.* at 173.  No court can undo that choice.

154.    Declaratory relief is also "appropriate" to "declare [Plaintiff's] rights."  28 U.S.C.  § 2201(a).    The Court should declare that Council Members are unconstitutionally insulated from removal; and declare that Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and all accompanying regulations are therefore the unlawful products of an unconstitutionally constituted Council.

## Count III:  Alternatively, the Act Violates the Nondelegation Doctrine by Granting Federal Regulatory Power to Officials Outside the Federal Government.

155.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

156.    Plaintiffs maintain that all Council Members who exercise federal power over New England's fisheries are *federal* officials.  But if the Court concludes that the bulk of the Council Members are not federal officers and are thus not subject to the

Appointments Clause and the Constitution's removal restrictions—as the Government will surely contend—*then* the Act violates the private nondelegation doctrine. "[T]he Constitution vests federal power only in the three branches of the federal government." *Nat. Horsemen's Benevolent and Protective Ass'n*, 53 F.4th at 872. If the Council's members are *not* federal officials—contrary to Plaintiffs' view, but, again, as the Government has argued before—then those non-federal-officials wield federal power in violation of the "cardinal constitutional principle . . . that federal power can be wielded only by the federal government." *Id.*

157. As the product of unlawfully empowered officers, Framework Adjustment 65 would be "contrary to constitutional right, power, privilege, or immunity" and must be vacated. 5 U.S.C. § 706(2)(B).

158. Given the Council's lack of authority, NMFS was obligated to reject Framework Adjustment 65 under 16 U.S.C. § 1854(a)(1)(A). Because it did not, the Framework Adjustment 65 Final Rule and all accompanying regulations are also "not in accordance with law," are "in excess of statutory … authority," and must be vacated. 5 U.S.C. § 706(A), (C).

## Count IV: The Deputy Assistant Administrator is Unconstitutionally Insulated from Removal

159. Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

160.    Article II of the Constitution provides that "[t]he executive Power shall be vested in a President," who must "take Care that the Laws be faithfully executed." U.S. Const. art. II, § 1, cl. 1, & § 3. Although the President can delegate tasks to subordinates, "[t]hese lesser officers must remain accountable to the President, whose authority they wield." *Seila Law*, 140 S. Ct. at 2197.

161.    Plaintiffs have two causes of action to enforce this requirement: The first arises under the U.S. Constitution and this Court's traditional equitable authority to enjoin unconstitutional executive action. *See Free Enter. Fund*, 561 U.S. at 491 n.2; *Armstrong*, 575 U.S. at 326–27; *Axon Enter.*, 143 S. Ct. at 906 (allowing plaintiffs to proceed on this equitable cause of action regardless of statutory restraints on judicial review). The second cause of action arises under the Act's provisions authorizing judicial review of Framework Adjustment 65, which incorporate the relevant sections of the APA. *See* 16 U.S.C. § 1855(f).

162.    The President cannot hold the Deputy Assistant Administrator accountable because he cannot freely remove him. As a career-appointed SES civil servant, the Deputy Assistant Administrator may be fired only for cause, under a scheme that effectively bestows "life tenure." *Feds for Med. Freedom*, 63 F.4th at 391 (Ho, J., concurring). That is unconstitutional: The Deputy Assistant Administrator exercises the core executive function of unilaterally issuing final binding regulations and thus fits into neither *Seila Law* exception.

55

163.    This Court cannot re-write the SES regime to render the Deputy Assistant Administrator terminable at will.  The whole point of a Senior Executive Service with career appointees is to create an insulated class of civil servants.  Congress would not have enacted a self-defeating scheme that permitted such employees to be fired at will. *See Seila Law*, 140 S. Ct. at 2209.  Because the Court cannot revise the web of statutes and regulations that resulted in Mr. Rauch's unconstitutional service, this Court should declare that his issuance of the Final Rule and accompanying regulations was unlawful, vacate those actions, and grant injunctive relief.  *See Axon Enter.*, 143 S. Ct. at 902.

164.    Declaratory relief is "appropriate" to "declare [Plaintiff's] rights."  28 U.S.C. § 2201.  The Court should declare that the Deputy Assistant Administrator is unconstitutionally insulated from removal; and declare that the Framework Adjustment 65 Final Rule and all accompanying regulations are the unlawful products of an unconstitutionally insulated official.

## PRAYER FOR RELIEF

**Now, therefore,** Plaintiffs request a judgment in their favor against Defendants as follows:

A.    Declaring that the voting Members of the New England Fishery Management Council were appointed in violation of the Appointments Clause.

B.      Alternatively, declaring that Act violates the Constitution's private nondelegation doctrine by delegating federal power to officials outside the federal government.

C.      Declaring that the voting Members of the New England Fishery Management Council are unconstitutionally insulated from removal.

D.      Declaring Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations unlawful, unenforceable, and void as the products of unconstitutionally appointed Council Members.

E.      Declaring Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations unlawful, unenforceable, and void as the products of Council Members with unconstitutional removal protections.

F.      Declaring that the Deputy Assistant Administrator for Regulatory Programs at NMFS is unconstitutionally insulated from removal.

G.      Declaring the Framework Adjustment 65 Final Rule and accompanying regulations unlawful, unenforceable, and void as the products of a Deputy Assistant Administrator for Regulatory Programs with unconstitutional removal protections.

H.      Vacating Framework Adjustment 65, the Framework Adjustment 65 Final Rule, and accompanying regulations as "not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations," and/or "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(A)–(C); 16 U.S.C. § 1855(f)(1).

I.    Permanently enjoining Defendants from enforcing Framework Adjustment 65, the Framework Adjustment 65 Final Rule, or accompanying regulations against Plaintiffs.

J.    Awarding reasonable attorneys' fees and costs, plus interest accruing thereon, under 28 U.S.C. § 2412; and

K.    Granting such other and further relief as the Court may deem appropriate.

Dated:  September 8, 2023                  Respectfully submitted,

                                           /s/ Megan S. Newton
                                           Megan S. Newton, ME Bar No. 004461
                                           JONES DAY
                                           51 Louisiana Avenue N.W.
                                           Washington, DC 20001
                                           (202) 879-3986
                                           msowardsnewton@jonesday.com

                                           *Counsel for Plaintiffs*

58