# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MAINE
## PORTLAND DIVISION

NEW ENGLAND FISHERMEN'S STEWARDSHIP
ASSOCIATION,

                  *Plaintiff,*

   *v.*

GINA RAIMONDO, U.S. Secretary of Commerce, *et al.*

                  *Defendants.*

No. 23-cv-00339-JAW

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## [ORAL ARGUMENT REQUESTED]

## TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

BACKGROUND .............................................................................................................. 2

    A.    Regional Fishery Management Councils ............................................ 2

    B.    The National Marine Fisheries Service ............................................. 5

    C.    Framework Adjustment 65 ................................................................ 6

    D.    NEFSA ............................................................................................... 6

ARGUMENT .................................................................................................................... 7

    I.    Council Members Serve in Violation of the Appointments Clause. ............................ 8

        A.    Council Members are "Officers of the United States." ...................... 8

            1.    Council Members hold continuing offices. .............................. 9

            2.    Council Members exercise significant authority. ................... 10

        B.    Council Members are illegally appointed as principal officers. .................... 16

        C.    Council Members are illegally appointed as inferior officers. ...................... 17

            1.    State bureaucracy Members ..................................................... 18

            2.    Governor-nominated Members ................................................ 18

        D.    The Final Rule is invalid and unlawful. .......................................... 19

    II.    Council Members are Unconstitutionally Insulated from Removal. ......................... 20

        A.    Council Members do not fall within a *Seila Law* exception. ........................ 21

        B.    The Act's removal restrictions are unconstitutional regardless. ..................... 22

        C.    NEFSA is entitled to relief on this claim. ........................................ 23

            1.    The Act's unconstitutional components are inseverable. ................. 23

            2.    Prospective relief is warranted. ............................................. 27

    III.    Alternatively, the Act Violates the Private Nondelegation Doctrine. ......................... 28

    IV.    Defendant Rauch is Unconstitutionally Insulated From Removal. ........................... 32

    V.    NEFSA Has Article III Standing. ................................................................ 35

        A.    NEFSA members are suffering concrete injuries. .......................... 36

        B.    NEFSA members' injuries are traceable to Defendants. ................. 37

        C.    NEFSA members' injuries are redressable by the Court. ............... 40

CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Airlines, Inc. v. Brock,*
   480 U.S. 678 (1987)...............................................................................................24, 25

*Alfa Int'l Seafood v. Ross,*
   264 F. Supp. 3d 23 (D.D.C. 2017)...........................................................................5, 34

*Ass'n of Am. Railroads v. Dep't of Transp.,*
   721 F.3d 666 (D.C. Cir. 2013)...................................................................................29

*Aurelius Inv., LLC v. Puerto Rico,*
   915 F.3d 838 (1st Cir. 2019) ...................................................................................9, 10

*Axon Enter., Inc. v. FTC,*
   598 U.S. 175 (2023)............................................................................24, 28, 35, 37

*Buckley v. Valeo,*
   424 U.S. 1 (1976)...................................................................................................*passim*

*C & W Fish Co. v. Fox,*
   931 F.2d 1556 (D.C. Cir. 1991) ...................................................................................5

*Collins v. Yellen,*
   141 S. Ct. 1761 (2021) ........................................................................................*passim*

*Cutler v. U.S. Dep't of Health & Hum. Servs.,*
   797 F.3d 1173 (D.C. Cir. 2015).....................................................................................36

*Dep't of Com. v. New York,*
   139 S. Ct. 2551 (2019) ..................................................................................................40

*Dep't of Transp. v. Ass'n of Am. R.R.,*
   575 U.S. 43 (2015)........................................................................................................29

*Edmond v. United States,*
   520 U.S. 651 (1997)...............................................................................8, 13, 16, 17

*Esparraguera v. Dep't of the Army,*
   981 F.3d 1328 (Fed. Cir. 2020).......................................................................................33

*Farmers Ins. Exch. v. RNK, Inc.,*
   632 F.3d 777 (1st Cir. 2011) ..........................................................................................7

*FEC v. Cruz,*
   596 U.S. 289 (2022)........................................................................................................39

*FEC v. NRA Pol. Victory Fund,*
   6 F.3d 821 (D.C. Cir. 1993) ...........................................................................................20

## TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Feds for Med. Freedom v. Biden,*
    63 F.4th 366 (5th Cir. 2023) ...................................................................... 34

*Free Enterprise Fund v. PCAOB,*
    561 U.S. 477 (2010) ....................................................................... *passim*

*Freytag v. Comm'r,*
    501 U.S. 868 (1991) ....................................................................... *passim*

*Goethel v. Dep't. of Comm.,*
    854 F.3d 106 (1st Cir. 2017) ...................................................................... 16

*Goethel v. Pritzker,*
    No. 15-cv-497, 2016 WL 4076831 (July 29, 2016) ...................................... 15, 16

*Gregory v. Ashcroft,*
    501 U.S. 452 (1991) ...................................................................... 18

*Humphrey's Executor v. United States,*
    295 U.S. 602 (1935) ...................................................................... 21, 35

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
    684 F.3d 1332 (D.C. Cir. 2012) ...................................................................... 20

*Iowa Utilities Bd. v. FCC,*
    109 F.3d 418 (8th Cir. 1996) ...................................................................... 37

*Lebron v. Nat'l R.R. Passenger Corp.,*
    513 U.S. 374 (1995) ...................................................................... 29

*Lovgren v. Locke,*
    701 F.3d 5 (1st Cir. 2012) ...................................................................... 7

*Lucia v. SEC,*
    138 S. Ct. 2044 (2018) ....................................................................... *passim*

*Lujan v. Defs. of Wildlife,*
    504 U.S. 555 (1992) ...................................................................... 40

*Masterpiece Cakeshop v. Colo. Civil Rights Comm'n,*
    138 S. Ct. 1719 (2018) ...................................................................... 20

*Morrison v. Olson,*
    487 U.S. 654 (1988) ...................................................................... 22

*Myers v. United States,*
    272 U.S. 52 (1926) ...................................................................... 19, 32

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ................................................................................................ 24

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black,*
  53 F.4th 869 (5th Cir. 2022) .............................................................. 29, 30, 31, 32

*Nguyen v. United States,*
  539 U.S. 69 (2003) .................................................................................................. 20

*Oceana, Inc. v. Locke,*
  831 F. Supp. 2d 95 (D.D.C. 2011) .......................................................................... 7

*Oceana, Inc. v. Ross,*
  No. 17-cv-05146, 2020 WL 5239197 (C.D. Cal. Jan. 8, 2020) ............................ 3

*Oklahoma v. United States,*
  62 F.4th 221 (6th Cir. 2023) .............................................................. 29, 30, 31, 32

*Reddy v. Foster,*
  845 F.3d 493 (1st Cir. 2017) .................................................................................. 37

*Seila Law, LLC v. CFPB,*
  140 S. Ct. 2183 (2020) .................................................................................. *passim*

*Texas v. EEOC,*
  933 F.3d 433 (5th Cir. 2019) .................................................................................. 36

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021) ............................................................................................ 36

*United Cook Inlet Drift Ass'n v. NMFS,*
  2022 WL 2222879 (D. Alaska June 21, 2022) ........................................... 38, 39, 40

*United States v. Arthrex, Inc.,*
  141 S. Ct. 1970 (2021) .................................................................................. *passim*

*United States v. AVX Corp.,*
  962 F.2d 108 (1st Cir. 1992) .................................................................................. 36

*United States v. Donziger,*
  38 F.4th 290 (2d Cir. 2022) .............................................................................. 9, 10

*United States v. Germaine,*
  99 U.S. 508 (1879) .................................................................................................... 9

*Warth v. Seldin,*
  422 U.S. 490 (1975) ................................................................................................ 36

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Williams v. Pennsylvania,*
    579 U.S. 1 (2016) ...................................................................................................................... 20

**CONSTITUTIONAL AND STATUTORY AUTHORITIES**

U.S. Const. Article II, § 1, cl. 1 ....................................................................................................... 18

U.S. Const. Article II, § 2, cl. 2 ........................................................................................... 8, 18, 19

5 U.S.C. § 702 ........................................................................................................................................ 7

5 U.S.C. § 706 ..................................................................................................................................... 28

5 U.S.C. § 3132 ................................................................................................................................... 33

5 U.S.C. § 3393 ..................................................................................................................................... 5

5 U.S.C. § 3592 .................................................................................................................................. 5, 6

5 U.S.C. § 4311 ..................................................................................................................................... 6

5 U.S.C. § 4312 ..................................................................................................................................... 6

5 U.S.C. § 4313 ..................................................................................................................................... 6

5 U.S.C. § 4314 ..................................................................................................................................... 6

5 U.S.C. § 4315 ..................................................................................................................................... 6

5 U.S.C. § 7512 ................................................................................................................................... 33

5 U.S.C. § 7513 ................................................................................................................................... 33

5 U.S.C. § 7541 ..................................................................................................................................... 5

5 U.S.C. § 7542 ................................................................................................................................ 5, 33

5 U.S.C. § 7543 ............................................................................................................................ 5, 6, 33

15 U.S.C. § 3052 .......................................................................................................................... 28, 30

15 U.S.C. § 3053 .......................................................................................................................... 30, 32

15 U.S.C. § 7217 ................................................................................................................................. 13

16 U.S.C. § 1801 ........................................................................................................................ 2, 11, 15

16 U.S.C. § 1851 ................................................................................................................... 3, 11, 15, 17

16 U.S.C. § 1852 ......................................................................................................................... *passim*

16 U.S.C. § 1853 ......................................................................................................................... *passim*

16 U.S.C. § 1854 ......................................................................................................................... *passim*

**TABLE OF AUTHORITIES**
(continued)

Page(s)

16 U.S.C. § 1855.................................................................................................................*passim*

16 U.S.C. § 1856......................................................................................................................2, 26

16 U.S.C. § 1857.............................................................................................................................23

28 U.S.C. § 2201......................................................................................................................28, 36

42 U.S.C. § 274................................................................................................................................28

43 U.S.C. § 1312...............................................................................................................................2

**OTHER AUTHORITIES**

1 ANNALS OF CONG. 515 (June 17, 1789).....................................................................................32

5 C.F.R. § 317.501.............................................................................................................................5

5 C.F.R. § 317.502.............................................................................................................................5

5 C.F.R. § 752.604.............................................................................................................................6

5 C.F.R. § 752.605.............................................................................................................................6

85 Fed. Reg. 7246 (Feb. 7, 2020).....................................................................................................3

A. Bamzai & S. Prakash, *The Executive Power of Removal*,
   136 Harv. L. Rev. 1756 (2023)......................................................................................................19

Cong. Rsch. Serv., *Reauthorization Issues for the Magnuson Stevens Fishery Conservation and Management Act* (May 22, 2014)..................................................................................................2

B. Feinstein & J. Nou, *Submerged Independent Agencies*,
   171 U. Pa. L. Rev. 945 (2023).......................................................................................................33

G. Frug, *Does the Constitution Prevent the Discharge of Civil Service Employees?*,
   124 U. Pa. L. Rev. 942 (1976).......................................................................................................34

*Hearings Before the Senate Committee on Commerce on S. 961*, 94th Cong., 1st Sess., 468
   (1975)............................................................................................................................................26

*House Debates and Passage of H.R. 200*, 94th Cong., 1st Sess. (1975)......................................26

H.R. Rep. No. 94-445, 94th Cong., 1st Sess. (1975).....................................................................26

LEGISLATIVE HISTORY OF THE FISHERY CONSERVATION AND MANAGEMENT ACT
   OF 1976....................................................................................................................................26, 27

NOAA Fisheries, *Samuel D. Rauch III*...........................................................................................5

*Officers of the United States within the Meaning of the Appointments Clause*,
   31 Op. O.L.C. 73 (2007)..........................................................................................................10, 13

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rauch, Sam: Oral History Interview* (June 30, 2016) ........................................................... 12, 15, 35

William R. Rogalski, *The Unique Federalism of the Regional Councils Under the Fishery
Conservation and Management Act of 1976*, 9 B.C. Env't Affs. L. Rev. 163 (1980) ..................... 4, 9, 27

S. Rep. No. 94-711, 94th Cong., 2nd Sess. ..................................................................... 27

S. Rep. No. 961, 94th Cong., 1st Sess. (1975) ................................................................ 26

U.S. Office of Personnel Management, *Guide to the Senior Executive Service* (Mar. 2017) ...................... 33

J. Yoo, *Unitary, Executive, or Both?*,
76 U. Chi. L. Rev. 1935 (2009) ............................................................................... 34

## INTRODUCTION

The New England Fishermen's Stewardship Association (NEFSA) defends the livelihoods of commercial fishermen across the region, many of whom harvest groundfish species like haddock, cod, hake, and flounder.  Groundfishing in New England is subject to strict federal catch limits set by the New England Fishery Management Council.  The Magnuson-Stevens Fishery Conservation and Management Act (the Act) grants the Council broad authority to set and adjust regional fishery policies.  This year, the Council slashed the commercial haddock catch limit, lowered other limits, and imposed a decade of restrictions on the cod fishery.  And the National Marine Fisheries Service—the agency that audits Council policies for legality and issues them as rules—approved that plan.

As a result, NEFSA members' ability to profitably harvest groundfish has been crippled.  But the statutory regime that produced this rule is unconstitutional at every level.  It is unconstitutional at the outset because the Council Members who crafted the rule are unconstitutionally installed in office and then unconstitutionally shielded from removal by the President (freeing them from presidential supervision).  And the regime is unconstitutional at the endpoint because the agency official charged with promulgating the Council's rule is also unconstitutionally shielded from presidential removal.

The Supreme Court has made clear that the "legitimacy and accountability" of the federal bureaucracy requires "a clear and effective chain of command down from the President, on whom all the people vote," *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1979 (2021), but the Act severs that chain many times over.  In doing so, it subjects NEFSA members—and many others—to rule by officials who are immune from democratic control.  That insulation has, in turn, fostered an insular bureaucracy that favors monied interests at the expense of local fishermen—a bias evident in this latest policy.  Unchecked, this unconstitutional regime will decimate a centuries-old American industry.  This Court should vindicate "the Constitution's structural integrity," *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991), by entering final judgment for NEFSA and granting its requested relief.

## BACKGROUND

### A.    Regional Fishery Management Councils

For much of its history, the United States claimed only a narrow strip of territorial waters, leaving fishing regulation to the States.  Cong. Rsch. Serv., *Reauthorization Issues for the Magnuson Stevens Fishery Conservation and Management Act* 31 (May 22, 2014) (CRS Report).  Today, the States govern out to three nautical miles, while federal authority extends from the edge of state waters to 200 miles offshore.  *See* 43 U.S.C. § 1312; 16 U.S.C. § 1856(a)(1).  To regulate those federal waters, Congress in 1976 passed the Magnuson-Stevens Fishery Conservation and Management Act.

The Act installed "an entirely new[] regional management system" for federal fisheries, CRS Report at 31, and established eight Regional Fishery Management Councils to operate it, 16 U.S.C. § 1852(a).  The Councils dominate the Act's policymaking structure.  Congress entrusted the Councils with "exercis[ing] sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of" fishery management plans (FMPs).  *Id.* § 1801(b)(5).  If a Council decides that a "fishery under its authority … [requires] conservation and management," it must "prepare and submit" to the Secretary of Commerce an FMP and amendments as "necessary from time to time." *Id.* § 1852(h)(1).  In particular, Councils "develop annual catch limits" for their managed fisheries.  *Id.* § 1852(h)(6).  Councils craft regulations as they "deem[] necessary or appropriate for … implementing a [FMP] or amendment."  *Id.* § 1853(c).  And they may "conduct any other activities … which are necessary and appropriate to [their] functions."  *Id.* § 1852(h)(9).

Alongside its sweeping grant of policymaking authority to the Councils, the Act gives the Commerce Department a more limited role.  When it comes to Councils' primary power—to develop FMPs and amendments—the Secretary merely "assist[s]" the Councils by "establish[ing] advisory guidelines" that lack "the force and effect of law."  *Id.* § 1851(b).  And, because Councils do not have legal staff, the Secretary "review[s]" Council FMPs and amendments "to determine whether [they are]

consistent with" the Act and "other applicable law." *Id.* § 1854(a)(1)(A). The Secretary "shall" promulgate all legally "consistent" Council policies after notice and comment. *See id.* § 1854(a)(1)(A), (a)(3). If the Secretary identifies a legal defect, she offers "recommendations … that could be taken by the Council to conform [its] plan or amendment to … applicable law." *Id.* § 1854(a)(3)(C).[1] If for any reason the Secretary fails to "notify [the] Council" of her decision "within 30 days," the Council's "plan or amendment shall take effect as if approved." *Id.* § 1854(a)(3)(C).

Once a Council's FMP or amendment takes effect, that Council can block its revocation on policy grounds forever: "The Secretary may repeal or revoke a [FMP] for a fishery under the authority of a Council *only if* the Council approves the repeal or revocation by a three-quarters majority of the voting members." *Id.* § 1854(h) (emphasis added). The Secretary may develop her *own* FMP or amendment only in very narrow circumstances—(1) where a Council fails to do so "after a reasonable period of time," (2) where it "fails to submit a revised or further revised [FMP] or amendment," or (3) where the fishery is not within a Council's jurisdiction. *Id.* § 1854(c)(1). And even in one of the first two scenarios, the Council has the final say on a crucial policy decision: whether to subject a fishery to a controversial "limited access system." *Id.* § 1854(c)(3). Such catch-share regimes are off-limits "*unless* … first approved by a majority of the voting [Council] members." *Id.* (emphasis added).

Finally, under certain conditions, a Council can direct the Secretary to take immediate action: "If a Council finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction, whether or not a [FMP] exists for such fishery," "the Secretary

---

[1] A similar process governs a Council's proposed implementing regulations. When a Council "deems" regulations "necessary," the Secretary reviews them for legality and consistency with the Council's own policies. 16 U.S.C. § 1854(b)(1). The Secretary "shall promulgate final regulations" that she finds legal and must "consult with the Council before making any revisions." *Id.* § 1852(b)(2), (3). But the Secretary cannot order a Council to "consult" with her, giving the Councils even more control. *See Oceana, Inc. v. Ross*, No. 17-cv-05146, 2020 WL 5239197, at *5 (C.D. Cal. Jan. 8, 2020) (ordering NMFS to consult with a Council); *but see id.*, Dkt. No. 124, at 8–9 (Nov. 18, 2019) (NMFS "repeatedly attempted to consult with" the Council but cannot "compel the independent … Council to place this item on its agenda"); *see also* 85 Fed. Reg. 7246, 7247 (Feb. 7, 2020) (NMFS issuing rules it wished to alter because the Council would not consult).

*shall* promulgate emergency regulations … to address the emergency or overfishing if the Council, by unanimous vote," demands "the taking of such action." 16 U.S.C. § 1855(c)(2)(A) (emphasis added).

The Councils "are not modeled after any other authority; rather, they were shaped by the demands of compromise and necessity." William R. Rogalski, *The Unique Federalism of the Regional Councils Under the Fishery Conservation and Management Act of 1976*, 9 B.C. Env't Affs. L. Rev. 163, 164–65 (1980). The Council here "ha[s] authority over the fisheries in the Atlantic Ocean seaward of" Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut. 16 U.S.C. § 1852(a)(1)(A).

The Act provides for three sets of Council Members. *First*, it reserves Council seats for "[t]he principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State," "or the designee of such official." *Id.* § 1852(b)(1)(A). These Members serve on federal Councils "so long as" they occupy their predicate state positions. *Id.* No other provision governs their tenure on the Council.

*Second*, the Act provides seats for 12 Members chosen by State governors. "[T]he Governor of each … State" must submit "not less than three individuals" he deems "qualified" based on statutory factors. *Id.* § 1852(b)(2)(C). The Secretary "review[s] each list … to ascertain if the individuals on [it] are qualified" under the Act's rubric. *Id.* If they are, the Secretary *must* appoint one of them. If the Secretary "determines that any individual" on a governor's list "is not qualified," her only option is to "notify" the governor, who may then "submit a revised list or resubmit the original list with an additional explanation of the [relevant individual's] qualifications." *Id.* The Secretary cannot bypass a governor to make her own choice. And the Secretary may only remove such a Member "for cause" in the exceedingly narrow event that the Member "is found … after notice and an opportunity for a hearing" to have violated the Act's conflict-of-interest provision. *Id.* § 1852(b)(6)(B). For anything else, only the Council itself can initiate removal—requiring a two-thirds vote to proceed. *Id.*

4

*Third*, each Council includes the relevant National Marine Fisheries Service (NMFS) "regional director" or "his designee." *Id.* § 1852(b)(1)(B).  Like the state officials, this Member is not independently appointed to (or removable from) the Council; he automatically fills a Council seat due to his NMFS role.  This seat on the New England Council is filled by Mike Pentony, a career Senior Executive Service (SES) official with robust tenure protections.  *See* Administrative Record ("A.R.") 6264–65; *see also* 5 U.S.C. §§ 3592, 7541–43.

## B.    The National Marine Fisheries Service

The Secretary of Commerce has delegated her duties under the Act to the Under Secretary for Oceans and Atmosphere at the National Oceanic and Atmospheric Administration (NOAA), "a sub-agency of the [Commerce] Department." *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 37–38 (D.D.C. 2017).  "The Under Secretary, in turn, has delegated his authority to the Assistant Administrator for Fisheries"—*i.e.*, the NMFS Director, Defendant Janet Coit.  *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1558 (D.C. Cir. 1991); *see* A.R. 6245–48.  Finally, the Assistant Administrator has subdelegated the power to issue rules for publication in the Federal Register and Code of Federal Regulations to the Deputy Assistant Administrator for Regulatory Programs.  A.R. 6248.  Defendant Samuel Rauch has filled that role since 2006.  *See* Answer (ECF No. 38) at ¶ 62.

Mr. Rauch "oversees" all NMFS "regulatory actions and programs."  NOAA Fisheries, *Samuel D. Rauch III*, https://www.fisheries.noaa.gov/contact/samuel-d-rauch-iii (last visited Nov. 8, 2023).  He is a career-appointed SES civil servant hired by the Office of Personnel Management and NMFS.  *See* Answer at ¶ 120; 5 C.F.R. §§ 317.501, 317.502(a).  Following a "1-year probationary period," career SES appointees are nearly immune from removal.  5 U.S.C. § 3393(d).  They can be removed from the civil service or suspended more than 14 days "only for misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer."  *Id.* § 7543(a).  They can be stripped of their SES status only for "less than fully successful executive performance,"

as determined by a merit-based evaluation system. *Id.* § 3592(a)(2); *see also id.* §§ 4311–15. And they enjoy procedural protections and the right to a hearing before the Merits System Protection Board. *See id.* § 7543(b), (d); 5 C.F.R. §§ 752.604, 752.605.

## C.    Framework Adjustment 65

The New England Council recently developed Framework Adjustment 65, a policy under the Northeast Multispecies FMP that revises annual commercial catch limits for several groundfish species and installs a 10-year rebuilding plan for the cod fishery. On April 18, 2023, the Council submitted Framework Adjustment 65 to NMFS. A.R. 5386–744. NMFS published the plan in the Federal Register as a Proposed Rule on May 31, 2023. A.R. 6074. NEFSA commented. A.R. 6086. NMFS issued the Framework Adjustment 65 Final Rule on August 18, 2023. A.R. 6214. Mr. Rauch signed the Final Rule and the internal "decision memorandum" certifying the Rule's legality. A.R. 6205, 6229.

Framework Adjustment 65 makes numerous changes to federal groundfishing regulations. Most notably, it slashes haddock catch limits: For Georges Bank haddock, it cuts the acceptable biological catch (ABC) by 85%, from over 79,000 metric tons to just 11,901. A.R. 6216 (Table 2). For Gulf of Maine haddock, the cut is about 83%, from around 11,000 metric tons to just 1,936.[2] A.R. 6217 (Table 2). Framework Adjustment 65 also lowers the white hake catch limit by about 13 percent, *id.*, and installs a 10-year "rebuilding plan" that tightens restrictions on the cod fishery, A.R. 6215.

## D.    NEFSA

Plaintiff NEFSA is an alliance of commercial fishermen dedicated to educating the public about seafood resource management and protecting the future of local commercial fishing in New

---

[2] While Framework Adjustment 65 was pending before NMFS, the Council sought emergency agency action to reduce the magnitude of its own proposed cut to the Gulf of Maine haddock catch limit. *See* A.R. 6128–36. In response, NMFS enacted (in the same Final Rule) a short-term rule setting the ABC for Gulf of Maine haddock at 2,515 metric tons—still a 78% reduction from the previous year. A.R. 6215–16. Unless that emergency regulation is extended, after 180 days the limit will "revert to the amount originally recommended by the Council in Framework 65 and approved in th[e] final rule." A.R. 6216.

England.  NEFSA seeks to promote economic growth, ecosystem sustainability, and American food security.  NEFSA's members include commercial fishermen adversely affected by the catch reductions and other regulations contained in Framework Adjustment 65 and implemented in the Final Rule. Among them, David Osier and Devyn Campbell operate fishing businesses that are suffering because of the Rule, which cripples their ability to profitably harvest haddock, hake, and other groundfish species.  *See* Osier Decl. ¶¶ 6–17; Campbell Decl. ¶¶ 6–20.

## ARGUMENT

"Summary judgment is appropriate" where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Farmers Ins. Exch. v. RNK, Inc.*, 632 F.3d 777, 782 (1st Cir. 2011).  Where a plaintiff seeks review of agency action, "summary judgment … serves as the mechanism for deciding, as a matter of law, whether the agency action" is lawful.  *Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 106 (D.D.C. 2011).  "Judicial review of regulations" issued under the Magnuson-Stevens Act "is governed by the Administrative Procedure Act [APA]."  *Lovgren v. Locke*, 701 F.3d 5, 20 (1st Cir. 2012); *see also* 16 U.S.C. § 1855(f)(1)(B) (incorporating certain APA standards). The reviewing court thus determines whether the regulation is "not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 702(A)–(C).[3]

The Framework Adjustment 65 Final Rule is invalid and unlawful on all of those grounds, for four reasons:  *First*, the Council Members who developed it serve in violation of the Appointments Clause.  *Second*, those Members enjoy unconstitutional protections from removal. *Third*, alternatively,

---

[3] Plaintiff has also raised claims *directly* under the Constitution to enjoin unlawful executive action.  *See* Am. Compl. ¶¶ 25–28, 138, 149, 160.  These are substantively identical to Plaintiffs' constitutional claims under the Magnuson-Stevens Act, and may be evaluated on the same record—Plaintiff simply possesses two causes of action by which to assert them.  A judgment for Plaintiff on any one of its constitutional claims—whether viewed through the lens of the Magnuson-Stevens Act and its APA standards or the Constitution itself—would entitle Plaintiff to all the relief requested in the Amended Complaint.

the Act violates the private nondelegation doctrine. *Finally*, the NMFS agency official who executed the Final Rule is also unconstitutionally insulated from removal.

## I.    Council Members Serve in Violation of the Appointments Clause.

The Framers "viewed the principle of separation of powers as the central guarantee of a just government." *Freytag*, 501 U.S. at 870. The Constitution delivers on that guarantee, in part, through the Appointments Clause, under which the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint" all "Officers of the United States." U.S. Const. art. II, § 2, cl. 2. The only exception to that rule covers "inferior Officers," whose appointment "Congress may by Law vest … in the President alone, in the Courts of Law, or in the Heads of Departments." *Id.* In two ways, the Appointments Clause "ensure[s] that those who wield[]" the appointment power are "accountable to political force and the will of the people." *Freytag*, 501 U.S. at 884. It "divid[es] the power to appoint the principal federal officers … between the Executive and Legislative Branches" and "allows Congress only limited authority to devolve appointment power" for inferior officers. *Id.*

The Appointments Clause is not a matter of "mere[] … etiquette or protocol," *Buckley v. Valeo*, 424 U.S. 1, 125 (1976), but rather serves as a "structural safeguard[] of the constitutional scheme," *Edmond v. United States*, 520 U.S. 651, 659 (1997). By violating it, the Act fractures the "clear and effective chain of command down from the President" and thus forfeits the Councils' "legitimacy and accountability to the public." *Arthrex*, 141 S. Ct. at 1979. Council Members—the Act's "primary policy makers"—are quintessential officers. Rogalski, *supra*, at 178. Indeed, the Act is best read to create a class of principal officers. But even if Council Members are considered inferior officers, the Act's unorthodox selection methods violate the Appointments Clause.

### A.    Council Members are "Officers of the United States."

The Appointments Clause envisions three categories of federal officials: principal officers, inferior officers, and "lesser functionaries." *Buckley*, 424 U.S. at 126 n. 162. "Officers" are those who

hold "continuing office[s] established by law," *Lucia v. SEC*, 138 S. Ct. 2044, 2053 (2018), and "exercis[e] significant authority pursuant to the laws of the United States," *Buckley*, 424 U.S. at 126; *see also Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 856 (1st Cir. 2019) (outlining test).

### 1.    Council Members hold continuing offices.

Workers called on to complete discrete, limited tasks on an intermittent basis are typically not officers. For example, "civil surgeons" were not officers because their *ad hoc* medical duties were "occasional and intermittent." *United States v. Germaine*, 99 U.S. 508, 511–12 (1879). By contrast, officers hold "positions" that are "established by law," with continuing "duties and functions." *Freytag*, 501 U.S. at 881. In short, "to qualify as an office, the position must not depend on the identity of the person occupying it, and the duties should continue, though the person be changed." *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022) (internal quotation marks omitted).

Council Members hold "continuing office[s] established by law" and are entrusted with "continuing and permanent duties." *Lucia*, 138 S. Ct. at 2051, 2053. *First*, Congress "created" Council seats "by statute"—"down to [their] duties, salary, and means of appointment." *Id.* at 2053 (internal quotation marks omitted); 16 U.S.C. § 1852(a)(1). The Act details Members' responsibilities and provides for their pay. *See, e.g., id.* §§ 1852(d), (h), 1853(a). *Second*, unlike the surgeons in *Germaine*, who worked only "when called on … in some special case," 99 U.S. at 512, Council Members' duties are ongoing: They review stock assessments "on a *continuing* basis," "develop *annual* catch limits," and oversee "*multi-year* research." 16 U.S.C. § 1852(h)(5)–(7) (emphases added). Unsurprisingly, no Member serves on an "occasional or temporary" basis: most serve three-year terms (which can be extended to nine years), while the state-bureaucracy Members and Regional Director hold their Council seats indefinitely. *Id.* § 1852(b)(1), (3); *Aurelius*, 915 F.3d at 856 (renewable three-year term and restrictions on removal made position an "office"). *Third*, Council seats are permanent positions that exist independent of the individuals who fill them. *Donziger*, 38 F.4th at 297.

9

The Government may argue that Members drawn from state governments and the private sector are not part of the federal government or subject to Article II at all. Accepting that premise would doom the Act under the private nondelegation doctrine. *See infra*, at 28–32. But the argument is wrong. As the Office of Legal Counsel has explained, "federal employment is not necessary for the Appointments Clause to apply." *Officers of the United States within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 78 (2007). Rather, "a position, however labeled, is in fact a federal office if (1) it is invested by legal authority with a portion of the sovereign powers of the federal Government, and (2) it is 'continuing.'" *Id.* at 73–74. Every Council seat meets those criteria—regardless of a Member's independent status as a state or private employee.

### 2. Council Members exercise significant authority.

Officers of the United States "exercis[e] significant authority pursuant to" federal law. *Buckley*, 424 U.S. at 126. Officers *alone* may undertake "administrative functions," including "rulemaking, [issuing] advisory opinions, and [making] determinations of [benefit] eligibility." *Id.* at 140–41. In other words, officers "perform more than ministerial tasks" and "exercise significant discretion." *Freytag*, 501 U.S. at 881–82. And if an official wields officer-level authority in exercising *any* of his duties, he qualifies as an "officer" under the Appointments Clause. *Id.* at 822; *accord Lucia*, 138 S. Ct. at 2052 n. 4. The "officer" category is broad, encompassing officials from postmasters to district court clerks. *Buckley*, 424 U.S. at 126.

Council Members exercise significant authority and policymaking discretion over the Nation's fisheries. The Councils are the centerpiece of the Act, and their Members are a far cry from the "broad swath of 'lesser functionaries' in the Government's workforce." *Lucia*, 138 S. Ct. at 2051. The Act vests Members with "authority over the[ir] fisheries" and charges them to "exercise sound judgment in the stewardship of fishery resources." 16 U.S.C. §§ 1801(b)(5), 1852(a)(1).

To fulfill that mandate, the Act principally empowers each Council to adopt and amend FMPs for its fisheries. *Id.* §§ 1852(h)(1), 1853(a)(1)(A). Relying on input from advisory committees that report only to it, a Council determines how much of a species can be harvested, how to divide the catch, and how it can be caught. *See id.* § 1852(h)(6). The Act leaves these policy decisions to Councils; the Secretary contributes only nonbinding guidance and can repeal an existing Council policy only if three-quarters of the Council agrees. *Id.* §§ 1851(b), 1854(h). Each Council likewise drafts implementing regulations as it "deems necessary or appropriate." *Id.* § 1853(c). Along the way, each Council makes crucial determinations regarding the health of its fisheries and "develop[s]" its own "multi-year research priorities." *See id.* § 1852(h)(5), (7).

Moreover, in addition to their essential role in the ordinary rulemaking process, Councils enjoy the power to *compel* the Secretary's imposition of emergency or interim regulations, *id.* § 1855(c)(2)(A), and an unqualified right to *veto* the creation of any "limited access system" governing their fisheries, *id.* § 1854(c)(3). Councils also hold sweeping residual authority to "conduct any other activities" under the Act "or which are necessary and appropriate to the foregoing functions." *Id.* § 1852(h)(9).

This case demonstrates Councils' vast power. Here, the Council "develop[ed] annual catch limits" for groundfish species. *Id.* § 1852(h)(6). Throughout the Framework Adjustment 65 process, the Council relied on its teams of scientists, weighed policy considerations, and considered and the competing interests of environmental groups, recreational fishermen, and the commercial sector. *See id.* § 1801(b)(5). The Council's fact-finding, internal deliberations, and policy decisionmaking take up thousands of pages of the Administrative Record. *See generally* A.R. 1–5370. In the end, the Council slashed commercial catch limits for haddock by around 80% and imposed other restrictive regulations. *See supra*, at 6. And now that Framework Adjustment 65 has taken effect, the Council must consent to any lifting of its restrictions. 16 U.S.C. § 1854(h). If adjudicators who take evidence and propose

opinions in *individual* disputes are officers, *Lucia*, 138 S. Ct. at 2054, Council Members vested with the *general* rulemaking authority exercised here are unquestionably officers too.

The Government will no doubt trumpet the agency's role in approving Council policies. But that does not strip Council Members of officer status, for several reasons.

*First*, Councils unilaterally set the policy agenda through the Act's two-step rulemaking process. For Council-managed fisheries, NMFS typically has *no* policymaking power without Council cooperation; it can act unilaterally *only* when a Council chooses not to. *See* 16 U.S.C. § 1854(c)(1)(A), (6). The Councils decide when to *begin* the rulemaking process by "transmit[ing]" a policy or regulation. *Id.* § 1854(a)(1), (b)(1). When a Council *does* choose to act, the agency's back-end review is limited to "consisten[cy] with … applicable law"—not mere policy disagreements. *Id.* § 1854(a)(1), (b)(1). If a Council's course of action is lawful, NMFS "shall" promulgate it as a final rule. *Id.* § 1854(a)(3), (b)(3). And if NMFS identifies a legal error, it merely explains that error and "recommend[s]" revisions. *Id.* § 1854(a)(3)–(4), (b)(1)(B). In short, as Mr. Rauch has put it, "policy-level decisions" are made though the "[C]ouncil process." *Rauch, Sam: Oral History Interview* at 19 (June 30, 2016), https://voices.nmfs. noaa.gov/sites/default/files/2018-09/rauch_samuel.pdf (Rauch Interview). The agency plays a mere "auditor[]" role, "resolv[ing] what [the Councils] do as legal." *Id.* at 15.[4]

The fact that Councils' FMPs, amendments, and regulations are reviewed by NMFS does not render Council Members non-officer employees.[5] Indeed, the Supreme Court has "explicitly

---

[4] Consider the Act's treatment of overfishing—one of the most pressing policy problems confronted by fishery regulators. If NMFS determines that a fishery has become overfished and that remedial action is needed, the Act requires the agency to *ask the Council* to address the issue. 16 U.S.C. § 1854(e)(2). After it does so, NMFS is *forbidden* from taking unilateral action on the matter unless the Council fails to act to end overfishing for *two years. Id.* § 1854(e)(5).

[5] The Final Rule's legal compliance was certified by Regional Administrator Pentony—a Council Member. A.R. 6201–05. That hardly amounts to independent review.

reject[ed]" the "theory that final decisionmaking authority is a *sine qua non* of officer status." *Lucia*, 138 S. Ct. at 2052 n. 4. An official's duties can make him an officer even if his "opinion counts for nothing unless" another official "adopts it as his own." *Id.* at 2054; *accord Freytag*, 501 U.S. at 881 (an official who "lack[s] authority to enter a final decision" may still be an officer); 31 Op. O.L.C. at 95 ("The question" is "whether a position possesses delegated sovereign authority to act … whether or not that act may be subject to direction or review."). Such review is often relevant to the distinction between inferior and principal officers, *Edmond*, 520 U.S. at 663—it does not *also* define the line between officers and "lesser functionaries." *Buckley*, 424 U.S. at 126 n. 162.

In important respects, the Councils resemble the Private Company Accounting and Oversight Board (PCAOB) in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477 (2010). The Sarbanes-Oxley Act provides that *no* PCAOB policy can "become effective without prior approval of the [Securities and Exchange] Commission," 15 U.S.C. § 7217(b)(2), and that the SEC "*shall* approve a proposed rule, if it finds that the rule is consistent with the requirements of this Act," *id.* § 7217(b)(3) (emphasis added). Beyond that, the SEC (unlike NMFS) has broad authority to "abrogat[e], delet[e], or add[]" to PCAOB rules. *Id.* § 7217(b)(5). But the SEC's oversight powers did not alter the conclusion that PCAOB members "exercise significant executive power." *Free Enter. Fund*, 561 U.S. at 514. So too here, where the reviewing agency has comparatively *less* authority to override the primary policymaker.

Moreover, unlike in *Free Enterprise Fund* and *Lucia*, Council policies may "take effect" *without* NMFS approval. In *Lucia*, the Supreme Court deemed SEC administrative law judges officers because the SEC could "decline[] [to] review" a judge's ruling, thereby making it "final." 138 S. Ct. at 2054 (internal quotation marks omitted). Here, while the Act states that the Secretary "shall" engage in a limited review of Council policies, it further provides that such review is *not* required: If the Secretary fails for any reason to "notify a Council within 30 days … of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment *shall take effect as if approved*." 16

U.S.C. § 1854(a)(3)(C) (emphasis added).   That gives Councils even *more* authority than the adjudicators in *Lucia*, where the SEC had to affirmatively "issue an opinion" declining to review a particular decision before that decision would take effect.  138 S. Ct. at 2054.  The Councils' even greater "last-word capacity makes this an *a fortiori* case."  *Id.*

*Second*, the Act plainly *does* empower Council Members to make various final decisions affecting the rights and obligations of fishermen.  For example, a Council can: **(1)** make any policy choices that are "consistent" with the Act and other relevant statutes, 16 U.S.C. § 1854(a)(1); **(2)** unilaterally and indefinitely veto, on any grounds, an attempt by the agency to "repeal or revoke" a FMP, *id.* § 1854(h); **(3)** exercise its policy judgment to "find[] that an emergency exists or that interim measures are needed to reduce overfishing," and thereby *order* the Secretary to issue regulations, *id.* § 1855(c)(2)(A); and **(4)** make an unreviewable decision on whether to implement a "limited access system" to govern any of its fisheries—*even* where NMFS would otherwise have leeway to impose its own rule, *id.* § 1854(c)(3).  These provisions confirm beyond doubt that Council Members exercise significant authority even beyond their essential role in developing fishery regulations.

*Third*, Council Members further wield significant authority by "prepar[ing] proposed findings," *Freytag*, 501 U.S. at 874, and "shap[ing] the administrative record" upon which their policy determinations and NMFS review are based, *Lucia*, 138 S. Ct. at 2053.  The Act charges Councils with detailing the factual basis for a FMP or amendment, *see* 16 U.S.C. § 1853(a), collecting public comments, *id.* § 1852(h)(3), and incorporating input from its advisory committees, *id.* § 1852(g).  Thus, Councils would possess officer-level authority even if (contra the statute) NMFS *could* review Council policies *de novo*.  *See Lucia*, 138 S. Ct. at 2054 (rejecting "standard-of-review" test for officer status).

Despite all this, the Government will surely urge the Court to pretend that the Councils are powerless advisory bodies.  But Congress (and America's fishermen) would be stunned to learn that those charged with "exercis[ing] sound judgment in the stewardship" of the nation's fisheries, 16

U.S.C. § 1801(b)(5), only perform "[in]significant," "ministerial tasks." *Freytag*, 501 U.S. at 881–82. Congress knows how to create advisory bodies. Indeed, it did so elsewhere in the Act, authorizing "scientific and statistical committee[s]," "advisory panels," and a "fishing industry advisory committee." *Id.* § 1852(g)(1)–(3). These advisory groups "assist" the Councils "in carrying out [their] functions." *Id.* § 1852(g)(2). Congress clarified that the "[d]ecisions and recommendations" of these "committees and panels … shall be considered to be advisory." *Id.* § 1852(g)(5). But the Act never describes the Councils or their policies in such terms. To the contrary, it repeatedly directs the *Secretary* to offer advisory recommendations *to the Councils*—not the other way around.[6] The reason is obvious: The Act establishes each Council as "a mini legislative body" that decides "who, when, and where people get to fish." Rauch Interview, at 15, 19. As such, Council Members wield the "significant authority" that our Constitution reserves for officers. *Buckley*, 424 U.S. at 126.

In an unpublished 2016 order, the District of New Hampshire rejected an Appointments Clause challenge to the Act on procedural grounds, then opined that Council Members are not officers. *Goethel v. Pritzker*, No. 15-cv-497, 2016 WL 4076831, at *10 (July 29, 2016). *Goethel*'s dicta merits no weight here. After all, the court first deemed the suit untimely under 16 U.S.C. § 1855(f)(1), and the First Circuit affirmed on that ground alone. *See Goethel*, 2016 WL 4076831 at *3–4; *Goethel v. Dep't. of Comm.*, 854 F.3d 106, 116 (1st Cir. 2017) (taking "no position on the district court's … constitutional rulings"). Nevertheless, the district court devoted four cursory sentences to the Appointments Clause issue, and stated (without citing any statutory provision) that "Councils do not exercise 'significant' authority." *Id.* at *10. The sole basis for that statement was a conclusory

---

[6] *See, e.g.*, 16 U.S.C. §§ 1851(b) (Secretary "establish[es] advisory guidelines … to assist" Councils), 1854(a)(3)(C) (Secretary makes "recommendations concerning the actions that could be taken by the Council to conform" its FMP or amendment "to … applicable law"); 1854(b)(1)(B) (same, for regulations); 1854(e) (Secretary "report[s] annually to … the Councils" on overfishing status, "request[s]" action if needed, and "recommend[s] … conservation and management measures"), 1855(b)(1) (Secretary creates "guidelines to assist the Councils in the description and identification of essential fish habitat" and "provide[s] each Council with recommendations … to assist it in the identification of … habitat").

observation that Councils "propose" but do not "promulgate" implementing regulations. *Id.* The court did not assess the full range of Council authority under the Act or the nature of NMFS review, and it did not have the benefit of *Lucia*, decided in 2018. This Court should thus consider the question afresh.

### B.    Council Members are illegally appointed as principal officers.

The Appointments Clause establishes a default appointment method for officers: presidential nomination and Senate confirmation. Congress may deviate from that method only for "inferior" officers—that is, those "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663, 664–65. Any officer not so supervised constitutes a "principal" officer, and so cannot be appointed using the Clause's alternative mechanisms. *Arthrex*, 141 S. Ct. at 1980. Courts consider three factors to determine "how much power an officer exercises free from control by a superior." *Id.* at 1982. *First*, does a principal officer exercise sufficient "administrative oversight" of the officer in question? *Id.* at 1980. *Second*, may a principal officer freely remove him from office? *Id. Third*, can a principal officer "review the [relevant officer's] decisions"? *Id.*

All three considerations confirm that Council Members are principal officers. *First*, no principal officer oversees the Councils. This factor is met where a superior can "prescribe uniform rules of procedure" for, or "formulate policies and procedure in regard to," the subordinate officer's duties. *Edmond*, 520 U.S. at 664. It can also be met where a principal officer "fixes the [officer's] rate of pay," "controls the decision whether to" initiate his work, or can "select[]" the subordinate officer to perform particular tasks. *Arthrex*, 141 S. Ct. at 1980. But the Councils are subject to only minimal NMFS oversight. They control their own procedures, policy priorities, research agendas, and staffing decisions. *See* 16 U.S.C. § 1852(e)–(i). No superior controls their pay. *See id.* § 1852(d). Nor, in general, does anyone other than a Council itself decide whether to initiate the Act's policymaking

16

process. *See id.* § 1854(a)(1). And the Act insulates that process: The agency's front-end input is limited to "advisory guidelines" without "force and effect of law," *id.* § 1851(b); its back-end legal review is likewise tightly limited.

*Second*, no principal officer—nor even the President—may remove Council Members at will. Each enjoys nearly impenetrable removal protections that violate the Constitution in their own right. *See infra*, at 20–23. Even if those protections were constitutional, they clearly deny any principal officer the power to freely remove Members—"a powerful tool for control." *Edmond*, 520 U.S. at 664.

*Third*, no principal officer can veto a Council's policy decisions. "Since the founding, principal officers have directed the decisions of inferior officers on matters of *law as well as policy*." *Arthrex*, 141 S. Ct. at 1983 (emphasis added). But while NMFS may return a FMP or amendment to a Council if it identifies a *legal* defect, that just means the Council has the final word when it comes to *lawful* policies. Nor is NMFS approval always essential, given that Council policies "shall take effect as if approved" if the agency fails to act. 16 U.S.C. § 1854(a)(3)(C). The finality of Council decisions is particularly apparent if the President wishes to revoke an existing plan—a step that just five Members can block. Moreover, a Council can make the unreviewable decision to force the Secretary to impose emergency regulations. *Id.* § 1855(c)(2)(A). Likewise, no official can countermand a Council's unilateral judgment that its fishery shall not be governed by a "limited access system." *Id.* § 1854(c)(3).

### C.  Council Members are illegally appointed as inferior officers.

Even if Members are inferior officers, though, they were still unlawfully appointed. Article II authorizes Congress to "vest the Appointment" of "inferior Officers" in "the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. art. II, § 2, cl. 2. Neither the President nor any court selects Council Members. That leaves "the Heads of Departments"—typically cabinet-level officers. *See Freytag*, 501 U.S. at 886. But 17 of 18 Members are not appointed by such officials.

17

### 1.    State bureaucracy Members

The Appointments Clause denies Congress power to delegate the *federal* appointment power to *state* officials—who are certainly not Heads of Departments.  Indeed, the whole point of the Clause is to provide clear "lines of accountability," *Arthrex*, 141 S. Ct. at 1982, by "limit[ing] the universe of eligible recipients of the power to appoint," *Freytag*, 501 U.S. at 880.  But *state* officials are accountable, if at all, only to *state* electorates.  Such officials cannot wield the *federal* power to appoint officers whose authority transcends state borders.  Allowing them to do so would turn federalism on its head—undermining the values of representation and accountability that our system of dual sovereignty is built to advance.  *See, e.g., Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991).

Nevertheless, the Act reserves Council seats for "[t]he principal State official with marine fishery management responsibility and expertise in each constituent State, who is designated as such by the Governor of the State," or his "designee."  16 U.S.C. § 1852(b)(1)(A).  In other words, the Act empowers state officials to appoint federal officers.  Indeed, state bureaucrats enjoy plenary discretion to select designees to serve on Councils, and have done so.  This is an extraordinary "diffusion of accountability."  *Free Enter. Fund*, 561 U.S. at 497.  Federal officers wield the "executive Power," and that power is vested in the President, who answers to a national electorate.  U.S. Const. art. II, § 1, cl. 1.  But Members purport to wield it despite having been appointed by governors or (more often) by obscure state bureaucrats.  As a result, if a Council issues a policy that harms fishermen in one state, those fishermen have *zero* political recourse against a significant portion of its Members.  That is plainly unconstitutional.

### 2.    Governor-nominated Members

Twelve Council Members are nominated by governors and selected from curated lists by the Commerce Secretary.  As noted, this procedure does not allow the Secretary to choose whomever she (or the President) prefers.  *See supra*, at 4.  Instead, the Secretary—relying solely on a short list of

statutory criteria—*must* pick from a closed set of candidates nominated by a state official.  Governors are in control throughout the process:  The Act does not impose time restraints, limit the amount of back-and-forth, or otherwise empower the Secretary to bypass the governors.  Thus, a governor committed to elevating particular candidates has the power to keep a Council seat empty until the Secretary relents and chooses one of the governor's nominees.

This convoluted appointment process unconstitutionally "limit[s] selection" and "trench[es] upon executive choice."  *Myers v. United States*, 272 U.S. 52, 128 (1926).  Generally, the Executive Branch must be able to exclude officials with "different views of policy."  *Collins v. Yellen*, 141 S. Ct. 1761, 1787 (2021).  But the Act assigns an essential role in officer selection to *separate sovereigns*—a wanton "diffusion of the appointment power" that assaults "the Constitution's structural integrity."  *Freytag*, 501 U.S. at 878.  Moreover, the Appointments Clause's text confirms that the appointment power is not shared, divided into phases, or otherwise diluted.  For inferior officers, Congress must "*vest*" the power in one of a short list of decisionmakers—meaning the President, court, or department head "alone" must wield the authority.  U.S. Const. art. II, § 2, cl. 2. (emphasis added).  Likewise for principal officers, "although the Senate must *consent* to" the appointment, "the Constitution gives the power to *appoint* to the President alone."  A. Bamzai & S. Prakash, *The Executive Power of Removal*, 136 Harv. L. Rev. 1756, 1775 (2023) (emphases added).

### D.    The Final Rule is invalid and unlawful.

Because the Council's Members were appointed in violation of the Appointments Clause, the Council lacked authority to develop Framework Adjustment 65.  The Council can no more wield "power that [it] … d[oes] not lawfully possess" than could 18 members of the general public.  *Collins*, 141 S. Ct. at 1788.  Framework Adjustment 65 is thus "void *ab initio*," as are NMFS rules implementing it, which embody the policy judgments of an unconstitutionally appointed Council.  *Id.* at 1787.  And because Framework Adjustment 65 was void, NMFS lacked statutory authority to issue it and should

19

have rejected it as illegal under 16 U.S.C. § 1854(a)(1)(A).  *See infra*, at 37–39.  Instead, NMFS adopted

the Council's policies and converted them into a binding regulation.  For these reasons, the Final Rule

must be vacated and its enforcement enjoined.[7] *See*  16 U.S.C. § 1855(f)(1)(B); *see also Lucia*, 138 S. Ct.

at 2055 (ordering a new proceeding before a constitutionally appointed adjudicator); *Intercollegiate Broad.*

*Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012) (vacating agency action).

## II.    Council Members are Unconstitutionally Insulated from Removal.

"Under our Constitution, the 'executive Power'—all of it—is 'vested in a President,' who must

'take Care that the Laws be faithfully executed.'"  *Seila Law, LLC* v. *CFPB*, 140 S. Ct. 2183, 2191

(2020) (quoting U.S. Const. art. II, § 1, cl. 1, and § 3).  Thus, although the President may delegate his

power to subordinates, "[t]hese lesser officers must remain accountable to the President, whose

authority they wield."  *Id.* at 2197.  The President must retain "the ability to remove executive officials,

for it is only the authority that can remove such officials that they must fear and, in the performance

of their functions, obey."  *Id.*; *see also* Bamzai & Prakash, *supra*, at 1763 ("The Vesting Clause's grant

of power has several components, one of which is the power to remove executive officers.").

Otherwise, the President "could not be held fully accountable for discharging his own responsibilities;

the buck would stop somewhere else."  *Free Enter. Fund*, 561 U.S. at 514.

Accordingly, the Constitution's default rule is that the President must be able to remove

executive officials at will.  *Seila Law*, 140 S. Ct. at 2191–92.  This rule has two narrow exceptions for

(1) multimember agencies that lack "executive power" and (2) certain inferior officers.  *Id.* at 2199–

---

[7]No Council Member was constitutionally appointed.  But the Final Rule would be void if even just *one* Member served in violation of Article II.  Here as elsewhere, one unconstitutional decisionmaker is one too many.  *See Free Enter. Fund*, 561 U.S. at 511–12 & n. 12; *FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993); *see also, e.g.*, *Nguyen v. United States*, 539 U.S. 69, 82 (2003) (vacating a conviction affirmed by a panel that unlawfully included an Article IV judge despite two Article III judges voting to affirm); *Williams v. Pennsylvania*, 579 U.S. 1, 14 (2016) (one compromised judge on a multi-judge court violated due process); *cf. Masterpiece Cakeshop v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1725 (2018).  And the illegitimate Council could not begin the process that enabled NMFS to issue this Final Rule.  *See supra*, at 19–20; *infra*, at 37–39.

2200.  Even *within* those categories, however, Congress cannot abrogate all presidential control.  For instance, in limited circumstances, Article II may tolerate classic for-cause provisions.  *See Humphrey's Executor v. United States*, 295 U.S. 602, 619 (1935).  But when Congress imposes an *additional* layer of such protection, it impermissibly interferes with presidential control over the Executive Branch.  *See Free Enter. Fund.*, 561 U.S. at 495–96.  In short, certain tenure-protection schemes are inherently "inappropriate" for any official who "wield[s] the executive power of the United States."  *Id.* at 503.

## A.    Council Members do not fall within a *Seila Law* exception.

"[T]he President's removal power is the rule" and Council Members enjoy no "exception."  *Seila Law*, 140 S. Ct. at 2206.  The first exception was recognized in *Humphrey's Executor*, where the Court "permitted Congress to give for-cause removal protections to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power."  *Id.* at 2199.  And to be clear, rulemaking is not a "legislative" function but an executive one; truly "legislative function[s]" consist of "making investigations and reports … for the information of Congress."  *Humphrey's Executor*, 295 U.S. at 629; *Seila Law*, 140 S. Ct. at 2200.

The Court has restricted the *Humphrey's Executor* exception to "officers of the kind … under consideration" there, and Council Members fall far beyond it.  *Seila Law*, 140 S. Ct. at 2198.  The Act lacks partisan-balance requirements, and Council Members exercise the *executive* function of rulemaking—not the legislative function of advising Congress nor any adjudicatory role.

The remaining exception reaches "certain *inferior* officers with narrowly defined duties."  *Id.* at 2192.  The touchstone for this exception is *Morrison v. Olson*, where the Court upheld protections for the independent counsel—a prosecutor "appointed … to accomplish a single" criminal investigation.  487 U.S. 654, 672 (1988).  The independent counsel "lacked policymaking or administrative authority" because her power "was trained inward to high-ranking Governmental actors identified by others, and was confined to a specified matter."  *Seila Law*, 140 S. Ct. at 2200.

Council Members do not fit this exception, either. To start, they are *principal* officers. *See supra*, at 16–17. And regardless, they bear no resemblance to the time-limited, narrow-in-scope independent counsel. Unlike a special prosecutor with solely "inward"-facing power, Members' "policymaking … authority" affects "private citizens and businesses" across the country. *Seila Law*, 140 S. Ct. at 2200. Their extensive "duties" under the Act "are far from limited." *Id.*

Because neither exception applies, the President must be free to remove Members *at will*—but he is not. Indeed, the Act's removal protections for most of the Council are essentially absolute. And Council Member Pentony, as the NMFS Regional Administrator, enjoys robust SES tenure protections that likewise violate the Constitution. *See supra*, at 5; *infra*, at 32–35.

### B.    The Act's removal restrictions are unconstitutional regardless.

Even if Council Members could somehow fit within a *Seila Law* exception, though, the Act's extraordinary and unprecedented removal protections would still be unconstitutional.

The President is utterly powerless to remove five Council Members: the state bureaucrats appointed by other state officials. These Members serve "so long as" they occupy their predicate state positions. 16 U.S.C. § 1852(b)(1)(A). As a result, their tenure in federal office is limited only by the vagaries of state law and (potentially) their superiors within a state bureaucracy. *No federal official* can remove such a Member. It is difficult to imagine a more "inappropriate" form of insulation "for officers wielding the executive power of the United States," *Free Enter. Fund*, 561 U.S. at 503, than one that vests all removal power in the government of a *separate sovereign*.

The 12 governor-nominated Members likewise enjoy unconstitutional removal protections. The Secretary may remove these Members only "for cause." 16 U.S.C. § 1852(b)(6). But that overstates things, because the Act provides just *one* scenario in which the Secretary can remove a Member unilaterally: after a formal hearing finds the Member violated a specific conflict-of-interest provision. *Id.* § 1852(b)(6)(B). That rule requires Members to disclose financial interests and sets

recusal rules, but it does not reach other abuses. *See id.* § 1857(1)(O). Thus, the Secretary cannot dismiss a Member for inefficiency, neglect, criminality, nepotism, embarrassing conduct, undermining the President's policies, or anything else. *But see Collins*, 141 S. Ct. at 1787 (the President "must be able to remove" officers for these reasons). If the President wishes to remove a Member for something *other* than violating § 1857(1)(O), he must rely on the Member's own colleagues to "first recommend[] removal" by a two-thirds vote. 16 U.S.C. § 1852(b)(6)(A).

A Council's discretionary power to *allow* the President to remove its Members plainly "impedes the President's ability to perform his constitutional duty." *Seila Law*, 140 S. Ct. at 2199. Again, *Free Enterprise Fund* rejected two layers of traditional for-cause requirements. 561 U.S. at 495–96. That limit on presidential control pales in comparison to the Act's scheme, under which a shifting coalition of just a few Members can thwart their colleague's removal indefinitely and with impunity.

### C.    NEFSA is entitled to relief on this claim.

The Council exercised executive power free from presidential control when it developed and adopted Framework Adjustment 65, and NMFS converted its unsupervised policy judgments into law. NEFSA is entitled to relief for two reasons. *First*, because the Act's rulemaking system cannot be severed from the Councils' unconstitutional removal protections, the Final Rule must be vacated and enjoined. *Second*, NEFSA is entitled to vacatur and declaratory relief even if this Court could somehow re-write the Act to create a constitutionally compliant Council.

### 1.    The Act's unconstitutional components are inseverable.

If an officer's unconstitutional tenure protection cannot be severed from Congress's grant of authority, that authority cannot be lawfully exercised. For instance, the challengers in *Free Enterprise Fund* sued on the theory that the PCAOB's "'freedom from Presidential oversight' rendered unconstitutional 'all power and authority [it] exercised.'" *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 189 (2023) (quoting *Free Enter. Fund*, 561 U.S. at 508). And that theory would have prevailed but for

severability: "Only the Court's ability to sever the relevant statute's for-cause removal provision enabled the Board to keep running." *Id.*

Here, unlike there, the Act's unconstitutional Council structure cannot be severed from its policymaking system. Severance of an unconstitutional provision is appropriate "unless the statute created in its absence is legislation that Congress would not have enacted." *Seila Law*, 140 S. Ct. at 2209 (internal quotation marks omitted). This inquiry has two steps. The court first considers whether the law's "surviving provisions [are] capable of 'functioning independently.'" *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 509). If the statute, or the relevant portion of it, cannot "remain[] fully operative as a law with [an officer's] tenure restrictions excised," it cannot be enforced. *Free Enter. Fund.*, 561 U.S. at 509 (internal quotation marks omitted). The question is not whether the "remaining provisions will operate in some coherent way," *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 692 (2012) (joint dissent), but "whether the statute will function in a *manner* consistent with the intent of Congress," *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 685 (1987). Second, if the law *can* survive, the court next examines its "text [and] historical context" to determine whether Congress would have passed it without its "invalid" components. *Free Enter. Fund.*, 561 U.S. at 509. At both steps, it is clear the Act's unconstitutional Council structure is inseverable from its policymaking system.

*First*, Council Members' tenure protections are so intertwined with the broader Council system that the system would not be "fully operative" without them. *Id.* Indeed, it is unclear *how* a court could excise these protections. The Act contains *no* removal provisions for Members appointed from state bureaucracies, who "shall be" Members by virtue of their state employment. 16 U.S.C. § 1852(b)(1)(A). Likewise, the Regional Administrator serves on the Council due to his appointment to a career NMFS position; *his* tenure protections arise from statutes *outside* the Act. There is thus no provision in the Act this Court could excise to cure the defect; the only remedy would be to erase these six Council Members from the Act *entirely.*But the Act's Council-based policymaking system

24

cannot function in the "manner" Congress "inten[ded]" without a third of Congress's carefully chosen Members. *Alaska Airlines, Inc.*, 480 U.S. at 685.

Only the governor-nominated Members are removable from the Council at all. *See* 16 U.S.C. § 1852(b)(2). But for them, too, Congress's scheme defies the judicial "scalpel." *Seila Law*, 140 S. Ct. at 2210. *Which* aspects of the Act's bizarre removal mechanism should a court toss out? Its restriction to conflict-of-interest violations, the formal hearing rule, the supermajority requirement, the Council's prerogative to "recommend removal," or all of the above? *See* 16 U.S.C. § 1852(b)(6). There is simply too much guesswork to ensure the revised Act will "remain[] fully operative" in the manner Congress intended. *Free Enter. Fund*, 561 U.S. at 509; *Alaska Airlines, Inc.*, 480 U.S. at 685.

These features of the Act distinguish *Free Enterprise Fund* and *Seila Law*. In those cases, the Court severed discrete for-cause provisions, rendering officials freely removable by their appointing officers. *Seila Law*, 140 S. Ct. at 2210; *Free Enter. Fund*, 561 U.S. at 509. Because the statutes required minimal "blue-pencil[ing]," severance left their operative provisions unscathed. *Id.* The Act here is more complex: Members' tenure protections are often bound inextricably to their mandatory Council service and there are no simple or standalone removal limits to sever. Curing the constitutional defect would require a "bulldozer" not a scalpel, usurping "editorial freedom" that "belongs to the Legislature." *Seila Law*, 140 S. Ct. at 2210–11 (internal quotation marks omitted).

*Second*, even if this Court could rewrite the Act to create Councils accountable to the President rather than State officials, the Act's text and history reveal that Congress would not have enacted that law. *See Free Enter. Fund*, 561 U.S. at 509. Prior to the Act, fishery policy was largely left to the States—and still is, absent a FMP. *See* 16 U.S.C. § 1856(a)(3)(A). State governments and the fishing industry staunchly opposed federal control, and Congress secured their support *precisely by* putting States in charge of the Council system (and thus fishing regulation generally).

The Act's legislative history bears that out: The Senate's original proposal called for Members to be appointed by the President in consultation with Governors, then confirmed by the Senate.[8] The House's plan featured three federal officials, a gubernatorial appointee from each state, and at-large seats filled by the Commerce Secretary from lists prepared by the other Members.[9] The legislative record is replete with expressions of concern that the Federal Government would dictate Council selection and operation—along with corresponding reassurances that it would not. *See, e.g.*, *Hearings Before the Senate Committee on Commerce on S. 961*, 94th Cong., 1st Sess., 468 (1975) (Sen. Stevens) ("We have set up a … council which is composed of people from the area—not from Washington. They are selected by the Governors."), 279 ("It is vital that the state fishery management agency be a member.").[10] Unsurprisingly, the final Council roster that emerged from Conference Committee was more State-centric than either chamber's opening bid: The Senate's standard appointment procedure was tossed out; the House saw its three federal agency officials whittled to one.[11]

It is thus clear that "political pressures"—and political compromise—"played an important role in placing the states in a dominant representative position on the councils." Rogalski, *supra*, at

---

[8] S. Rep. No. 961, 94th Cong., 1st Sess. (1975), *reprinted in* Committee on Commerce, 94th Cong., 2nd Sess., LEGISLATIVE HISTORY OF THE FISHERY CONSERVATION AND MANAGEMENT ACT OF 1976, at 737 (1976) ("LEGISLATIVE HISTORY").

[9] H.R. Rep. No. 94-445, 94th Cong., 1st Sess. (1975), *reprinted in* LEGISLATIVE HISTORY, at 1115.

[10] *See also, e.g.*, *id.* at 169 (Sen. Stevens) (expressing "reluctan[ce] to establish categories which the States must recognize in making [Council] appointments, because" that "is a matter of State concern"); *id.* at 266 (statement of J. Mehos) ("[m]ost if not all" industry members "are apprehensive about any legislation that gives the Federal Government the power to adopt any fisheries management plan without the concurrence or approval of the regional council" staffed with state representatives); *House Debates and Passage of H.R. 200*, 94th Cong., 1st Sess. (1975), *reprinted in* LEGISLATIVE HISTORY, at 834 (Rep. Leggett) (concerns "raised [about] States' rights" are misplaced "because the … councils … are heavily dominated by State interests"); *id.* at 915 (Rep. Rogers) (Council membership "achieves the intent of leaving State jurisdiction unimpaired to the maximum extent possible"); *id.* at 940 (Rep. Leggett) ("[W]e do not intend to usurp State jurisdictions. … We give the Governors of the States the opportunity to appoint members."); *id.* at 993 (Rep. Lott) (it is "absolutely essential to the success of the" Act that "the head of each State's fisheries … agency" be a Member).

[11] S. Rep. No. 94-711, 94th Cong., 2nd Sess., Conference Report (1975), *reprinted in* LEGISLATIVE HISTORY, at 56–57, 75–76, 86–87.

174.  The Act, "shaped by the demands of compromise and necessity," reassured an industry "hostile towards a purely federal regime" and States accustomed to steering fishery policy.  *Id.* at 165, 174.  This history confirms that Congress would never have enacted a federally controlled regulatory regime.  Indeed, we know Congress would not have created Councils accountable to the President because it rejected the Senate's plan to do *precisely that*.  No Court can overturn this quintessential legislative compromise and create fully federal Councils that Congress would never have established.

### 2.    Prospective relief is warranted.

Even if the Act's removal protections were somehow severable from its policymaking system, NEFSA would remain entitled to relief.  The Council's policies—embodied in Framework Adjustment 65 and the Final Rule—represent an exercise of federal power free from presidential control.  And a successful plaintiff is generally entitled to relief from the imposition of such power.  In *Seila Law*, the Supreme Court concluded that subjecting a business to an unconstitutionally structured agency's subpoena would "inflict[] a 'here-and-now' injury … that can be remedied by a court."  140 S. Ct. at 2196 (quoting *Bowsher v. Synar*, 478 U.S. 714, 728 n. 5 (1986)).  The obvious remedy (assuming the Government could not prevail on some other ground on remand) would be to dismiss the agency's action—*i.e.*, to vacate it.  *Id.* at 2208.  And in *Free Enterprise Fund*, the Court held that the challengers were "entitled to declaratory relief sufficient to ensure that the [regulations] to which they are subject will be enforced only by a constitutional agency accountable to the Executive."  561 U.S. at 513.

NEFSA is likewise entitled to vacatur and a declaratory judgment.  Its members are subject to the Council's ongoing authority—and because the Council acts unrestrained by mandatory presidential control, its use of executive power is "illegitimate," "cannot be undone," and requires "meaningful" judicial relief.  *Axon Enter.*, 598 U.S. 191–92.  Vacatur is the appropriate remedy.  *See* 5 U.S.C. § 706(2)(B); 16 U.S.C. § 1855(f)(1)(B).  At the very least, NEFSA's standing (*see infra*, at 35–40) entitles it to a declaration that the Act's removal restrictions are unconstitutional and the Final Rule is

unlawful.  The Declaratory Judgment Act, which authorizes relief where "appropriate" to "declare the rights" of a party, 28 U.S.C. § 2201(a), exists for this scenario.  Because the parties have an "actual controversy" over the validity of the rule and the Act, declaratory relief is "appropriate."  *See id.*

The Supreme Court has indicated that a plaintiff seeking monetary "retrospective relief" must show "compensable harm" stemming from the officer's insulation from removal.  *Collins*, 141 S. Ct. at 1787, 1789.  But nothing in *Collins* casts doubt on the availability of a prospective injunction, vacatur, or declaratory relief.  Not only that, by clarifying that a party has standing if he is impacted by the *conduct* of an illegally insulated official—"not [by] the provision of law that is challenged"—*Collins* confirms that declaratory relief is appropriate.  *See id.* at 1779, 1788 n. 24.

## III.    Alternatively, the Act Violates the Private Nondelegation Doctrine.

Consistent with its Appointments Clause and removal claims, NEFSA contends that the Councils are federal government entities, comprised of federal officers, who wield federal authority.  After all, Congress knows how to task private entities with statutory duties.[12]  It did not do so in the Act, which creates eight Regional Councils and provides for the appointment of Council Members.  *See* 16 U.S.C. § 1852.  Thus, if private corporations like Amtrak and the PCAOB are considered "'part of the Government' for constitutional purposes," the Councils must be, too.  *Free Enter. Fund*, 561 U.S. at 486 (quoting *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995)).  Indeed, the Councils would qualify as government entities even if Congress *had* denominated them as private:  They were "created by a special statute, explicitly for the furtherance of federal governmental goals," and wield authority in concert with a federal agency.  *Lebron*, 513 U.S. at 397.

---

[12] *See, e.g.*, 15 U.S.C. §§ 3052(a) ("recogniz[ing]" a "private, independent, self-regulatory, nonprofit corporation"); 7211(a)–(b) ("The Board shall be a … nonprofit corporation," *not* "an agency or establishment of the United States Government"); 42 U.S.C. § 274(a)–(b)(1) ("The Secretary shall … provide for the establishment and operation of an Organ Procurement and Transplantation Network," which "shall be a private nonprofit entity").

Nevertheless, the Government has argued elsewhere that the Councils—because they feature Members drawn from the private sector and state governments—are exempt from separation-of-powers principles. That is wrong, both because the Councils are government bodies and because federal employment is not a prerequisite to officer status. *See supra*, at 10. But if this argument were somehow correct, treating Members as anything *but* federal officials would only steer the Act headlong into a *different* constitutional guardrail: the private nondelegation doctrine.

"Those who govern the People must be accountable to the People." *Oklahoma v. United States*, 62 F.4th 221, 228 (6th Cir. 2023). Accordingly, "[o]ur Constitution permits only the federal government to exercise federal power." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022). The Supreme Court has approved limited delegations to federal agencies, but "[w]hen it comes to private entities, … there is not even a fig leaf of constitutional justification." *Dep't of Transp. v. Ass'n of Am. R.R.*, 575 U.S. 43, 62 (2015) (Alito, J., concurring). So while Congress may give a non-federal entity a "role" in "proposing regulations," it may do so *only* if "that role is merely as an aid to a government agency." *Ass'n of Am. Railroads v. Dep't of Transp.*, 721 F.3d 666, 671 (D.C. Cir. 2013). The body must be an "advisor[]"—nothing more. *Oklahoma*, 62 F.4th at 229.

Two recent decisions illuminate the doctrine and its application here. In 2020, Congress enacted the Horseracing Integrity and Safety Act ("HISA")—which resembles the Magnuson-Stevens Act in important ways. HISA grants broad policymaking authority over the horseracing industry to a "private, independent, self-regulatory, nonprofit corporation"—the "Horseracing Integrity and Safety Authority." 15 U.S.C. § 3052(a). The Authority "develop[s]" regulatory "program[s]," *id.*, and submits them to the Federal Trade Commission, *id.* § 3053(a). The FTC publishes the Authority's proposed rules in the Federal Register for comment. *Id.* § 3053(b)(1). Those rules "shall not take effect" unless approved—but the FTC "shall approve" any rule that is "consistent" with HISA. *Id.* § 3053(b)(2), (c)(2). If the FTC finds an inconsistency, it offers "recommendations," which the Authority "may"

use to craft a revised submission. *Id.* § 3053(c)(3). As originally enacted, HISA cabined the FTC's power to unilaterally impose its own regulations—and gave it no power to abrogate or modify the Authority's rules. *See Black*, 53 F.4th at 886.

The Fifth Circuit declared HISA unconstitutional based on three aspects of the statute. *First*, HISA gave the Authority "sweeping" policymaking power over "myriad" aspects of the industry. *Id.* at 882. While Congress enacted "factors to guide the Authority's" choices, "that only underscore[d]" the Authority's prerogative to "weigh[] policies." *Id.* at 882–83. *Second*, the court emphasized the FTC's "limited review" for "consistency" with HISA. *Id.* at 884. "Saying a rule is or is not 'consistent'" with HISA's broad "standard[s] says next to nothing"—and only delegates the all-important "details" to the Authority. *Id.* at 885. As such, "'consistency' review" cannot be understood as a plenary check on "the Authority's policy choices." *Id.*; *see also id.* at 886 n. 32. *Third*, the court stressed the FTC's inability to "abrogate" or "modify" Authority rules. *Id.* at 887–88. Unlike statutes that have passed constitutional muster, HISA did not empower the FTC to "'abrogate, add to, and delete from'" such rules as "'necessary or appropriate.'" *Id.* at 887. The FTC could decline to *approve* a rule that flunked "consistency" review, but the "power to *recommend* modifications" is insufficient. *Id.* at 888.

Congress responded by amending HISA, giving the FTC "sweeping power to … create rules that 'abrogate, add to, and modify the rules of the Authority.'" *Oklahoma*, 62 F.4th at 227 (quoting 15 U.S.C. § 3503(e)). The Sixth Circuit upheld the amended law for two main reasons. *Id. First*, it allowed the FTC to unconditionally and unilaterally "abrogate" or "modify" the Authority's proposed and enacted rules. *Id.* at 230. *Second*, it "grant[ed] the FTC a comprehensive oversight role," ensuring that its newfound "power to write and rewrite the rules" would "span[] the [Authority's] *whole jurisdiction*." *Id.* (emphasis added). Together, these changes relocated *all* "policymaking discretion" to the FTC; in particular, empowering the agency to "modify *any* rules for any reason at all" effectively nullified HISA's original scheme of mere "consistency" review. *Id.* at 230–31.

30

The Magnuson-Stevens Act shares every flaw identified by the Fifth Circuit and none of the safeguards relied on by the Sixth in upholding the recently revised HISA.  Like the Authority, Councils enjoy "sweeping" jurisdiction over every corner of the fishing industry.  *Black*, 53 F.4th at 882.  Like the Authority, Councils exercise their policy judgment to "develop" and "prepare" fishery rules, then submit them to a federal agency for comment and promulgation.  *See* 16 U.S.C. § 1852(h)(1), (6).  Like HISA, the Act limits agency review to whether a policy is "consistent with" the Act—and provides that all "consistent" policies "shall" be approved.  *See id.* § 1854(a)(1)(A), (a)(3).  As the Fifth Circuit explained, such review *by its nature* delegates "the very business of regulating" to the policy's author— here, the Councils.  *Black*, 53 F.4th at 885.  Likewise, under both Acts, identifying an inconsistency does not empower the reviewing agency to take unilateral action, but triggers a remand accompanied by "recommendations."  16 U.S.C.§ 1854(a)(3)(C).

Moreover, the Act (like the original HISA) narrowly cabins the agency's power to impose its own FMPs—and does not allow it to "abrogate" or "modify" Council plans at will.  *See id.* § 1854(c)(1).  In fact, the Act expressly *bars* NMFS from "repeal[ing] or revok[ing]" a Council's plan without its consent.  *Id.* § 1854(h).  These features of the Act distinguish it from the amended HISA.  By expressly empowering the FTC to "abrogate, add to, and modify" the Authority's rules whenever it "deems necessary and appropriate," Congress replaced "consistency" review with plenary authority.  15 U.S.C. § 3053(e); *Oklahoma*, 62 F.4th at 230.  Congress has embarked on no such rescue mission here.

Indeed, the Councils are *far more* powerful than the pre-amendment Authority.  (Again, these powers all underscore the Council's status as a federal entity subject to Article II; but to the extent the Council could instead be seen as private, these additional powers further doom it under the private nondelegation doctrine.)  For example, while the Authority's rules "shall not take effect unless … approved" by the FTC, 15 U.S.C. § 3053(b)(2), Council rules "shall take effect" if NMFS *fails* to act, 16 U.S.C. § 1854(a)(3)(C).  And while both versions of HISA subjected *all* Authority rules to FTC

approval, the Act leaves crucial decisions to the Councils *alone*. *See, e.g., id.* §§ 1854(c)(3) (whether to enact a "limited access system"); 1855(c)(2)(A) (whether to mandate NMFS issuance of emergency regulations). As a result, NMFS lacks the "comprehensive oversight"—across the Councils' "whole jurisdiction"—that the Sixth Circuit found dispositive in *Oklahoma*. *See* 62 F.4th at 230.

In sum, if the Council is somehow *not* a government entity, the Act violates the "cardinal constitutional principle … that federal power can be wielded only by the federal government." *Black*, 53 F.4th at 872. Accordingly, the Final Rule is invalid under both the Act and the Constitution.

## IV. Defendant Rauch is Unconstitutionally Insulated From Removal.

The Framers understood that a great "danger to liberty" lay in "the difficulty of displacing" entrenched Executive Branch officials. 1 ANNALS OF CONG. 515 (June 17, 1789) (Rep. Madison). The Constitution thus ensures that "[e]very individual, in the long chain which extends from the highest to the lowest link of the Executive Magistracy," is subject to democratic control through presidential removal—a power inherent in "that great principle of unity and responsibility in the executive department." *Id.* at 515–16, 518. The Supreme Court has thus held that the Constitution guarantees to the President the power to remove his subordinates at will. *See, e.g., Collins*, 141 S. Ct. at 1787; *Seila Law*, 140 S. Ct. at 2191–92; *Myers*, 272 U.S. at 122. Every executive official "who exercise[s] significant authority" must be "subject to" that democratic "control." *Free Enter. Fund*, 561 U.S. at 506. Even "modest" protections, *Collins*, 141 S. Ct. at 1787, are tolerable only for minor functionaries with "limited duties" and "no policymaking or administrative authority," *Seila Law*, 140 S. Ct. at 2200.

Nevertheless, Congress has created an insulated cadre of "Senior Executive Service" officers who *by definition* "exercise[] important policy-making, policy-determining, or other executive functions." 5 U.S.C. § 3132(a)(2)(E). These "high-level federal employees … exercise significant responsibility—including directing organizational units, supervising work, and determining policy." *Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1330 (Fed. Cir. 2020). "Occupying significant positions

of trust, senior executives are selected, in no small part, for their leadership abilities." *Id.*  In short, the "SES is comprised of the men and women charged with leading the Federal Government." U.S. Office of Personnel Management, *Guide to the Senior Executive Service* at 2 (Mar. 2017).  They are "the major link between [presidential] appointees and the rest of the Federal workforce," and they "operate and oversee nearly every Government activity in approximately 75 Federal agencies." *Id.*  And many wield delegated authority to issue rules that bind individuals and businesses nationwide.  *See, e.g.*, B. Feinstein & J. Nou, *Submerged Independent Agencies*, 171 U. Pa. L. Rev. 945, 999–1001 (2023).

Despite their substantial executive power, SES officials can be suspended or terminated only for "misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function"—and only with robust procedural protections and appellate rights.  *See* 5 U.S.C. §§ 7542–43, 7512–13.  And they can be expelled from the SES only "under another set of procedures for 'unsatisfactory' or 'less than fully successful' performance"— with a guarantee of continued (non-SES) federal employment at the same salary.  *Esparraguera*, 981 F.3d at 1330–31 (citing 5 U.S.C. §§ 3592(a), 3954, 4314(a)(3)).

These removal protections for powerful executive officials are wholly "incompatible with the Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 498.  They impede the President's prerogative to remove those "who disobey his commands, … those he finds negligent and inefficient, those who exercise their discretion in a way that is not intelligent or wise, those who have different views of policy, those … from a competing political party[,] … and those in whom he has simply lost confidence." *Collins*, 141 S. Ct. at 1787 (internal quotation marks and alterations omitted).  And while *some* in the SES are relatively low on agency organizational charts, "the unchecked exercise of executive power by an officer buried many layers beneath the President poses more, not less, of a constitutional problem." *Arthrex*, 141 S. Ct. at 1983.  As a result, "the President actually controls surprisingly little of the Executive Branch." *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 390 (5th Cir. 2023) (Ho., J.,

concurring).  Insulated bureaucrats "are rarely discharged from government for inadequately doing their jobs."  G. Frug, *Does the Constitution Prevent the Discharge of Civil Service Employees?*, 124 U. Pa. L. Rev. 942, 945 (1976).  More important, "tenure-like protections for the civil service have sharply reduced the president's ability to change the direction of the permanent bureaucracy."  J. Yoo, *Unitary, Executive, or Both?*, 76 U. Chi. L. Rev. 1935, 1956 (2009).  None of this accords with our constitutional order.

Defendant Rauch is the Deputy Assistant Administrator for Regulatory Programs at NMFS and a career SES official.  *See* Answer ¶¶ 62, 120.  Because his one-year probationary period long ago elapsed, he enjoys the powerful removal protections that follow SES status.  *See supra*, at 5–6.  But the Constitution forbids that insulation, because—as an SES official—Mr. Rauch wields substantial executive power.  Indeed, he "oversees" all NMFS "regulatory actions and programs."  *Supra*, at 5.

Consider, for example, Mr. Rauch's authority to issue rules.  "The Supreme Court has held that, under the Constitution, only 'Officers' … have [that] power," *Alfa Int'l Seafood*, 264 F. Supp. 3d at 41, because "rulemaking … represents the performance of a significant governmental duty," *Buckley*, 424 U.S. at 140–41.  But Mr. Rauch issues rules by executing and publishing Council FMPs, amendments, and regulations in the Federal Register and CFR as final rules—as he did here.  *See supra*, at 6; Feinstein & Nou, *supra*, at 999–1000.  He also signed the official internal "decision memorandum" certifying the Rule's legality.  A.R. 6205.  As Mr. Rauch has explained in an interview posted to a NMFS website, he "work[s] with the [C]ouncils" to "put out fisheries regulations" and "signs all of those" regulations.  Rauch Interview at 5.  Fishery regulations "all … bubbl[e] up to" him.  *Id.*  He "ultimately *issue[s] the regulations*" and serves as "the auditor[]" of the Councils' policies.  *Id.* at 15 (emphasis added).  How Mr. Rauch wields this authority is crucial for fishermen nationwide.  Moreover, he exercises this power (and others) across *all* federally managed fisheries—those under Councils and those under NMFS.

34

Mr. Rauch does not fit either exception to the Constitution's rule of at-will removal. While those "wholly disconnected from the executive department" may enjoy modest protections, *see Humphrey's Executor*, 295 U.S. at 630, purely executive officials like Mr. Rauch must be freely removable unless they possess "*no* policymaking or administrative authority," *Seila Law*, 140 S. Ct. at 2200. The ongoing power to promulgate rules that bind "private citizens and businesses" and that embody executive policy judgments distinguishes his position from those that have been approved before. *Id.*

The Constitution accordingly subjects the Deputy Assistant Administrator to "the President's unrestricted removal power." *Seila Law*, 140 S. Ct at 2192. Because Mr. Rauch has thus far operated free from presidential control, those exercises of executive authority are "illegitimate." *Axon Enter.*, 598 U.S. at 191. Thus, if Mr. Rauch's unconstitutional removal protections cannot be severed, the rules he signed are void. *See id.* at 189; *supra*, at 23–24. And severance is all but impossible. This Court cannot re-write the web of SES statutes to render Mr. Rauch freely removable, and the *whole point* of the SES regime is to create tenured civil servants. *See Seila Law*, 140 S. Ct. at 2209; Feinstein & Nou, *supra*, at 1006 (severance is inappropriate because "the purpose of the civil service laws was to insulate civil servants"). This Court should declare that Mr. Rauch's issuance of the Final Rule was unlawful, vacate it, and enjoin its enforcement.

Finally, as discussed, severing Mr. Rauch's tenure protections would not preclude relief. *See supra*, at 27–28. At a minimum, this Court should declare that Mr. Rauch's exercise of executive authority free from the President's "removal power" was unconstitutional. *Seila Law*, 140 S. Ct. at 2192. Such a judgment is "appropriate" given NEFSA's standing and the parties' adversity on the Rule's legality and the constitutionality of Mr. Rauch's tenure protections. *See* 28 U.S.C. § 2201(a).

## V.     NEFSA Has Article III Standing.

An association has Article III standing to sue on behalf of its members when "(1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks

35

to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals." *United States v. AVX Corp.*, 962 F.2d 108, 116 (1st Cir. 1992). All three criteria are satisfied here.

NEFSA was formed in part to protect the interests of local commercial fishermen who face onerous regulations like Framework Adjustment 65. *See* Osier Decl. ¶ 4. And neither NEFSA's claims nor its requested relief requires the participation of individual members. *Warth v. Seldin*, 422 U.S. 490, 515 (1975) (where an "association seeks … prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of [injured] members"). NEFSA thus has standing if any of its members would possess standing to sue in his own right. On that score, an individual has standing if he (1) suffers a concrete "injury in fact" that was (2) "likely caused by the defendant" and (3) "would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). And a court must "assume, for purposes of the standing analysis," that a plaintiff is "correct on the merits of [his] claim[s]." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019); *accord Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015).

Commercial fishing businesses owned and operated by NEFSA members have suffered, and will continue to suffer, serious harm as a result of the Framework Adjustment 65 catch limits in the Final Rule. *See* Osier Decl. ¶¶ 6–17; Campbell Decl. ¶¶ 6–20. As a result, NEFSA has standing to challenge the Final Rule.

### A.    NEFSA members are suffering concrete injuries.

The injuries here are concrete: Before NMFS imposed Framework Adjustment 65 through the Final Rule, NEFSA members could catch and sell more groundfish. By cutting multiple commercial quotas—including a more-than 80% cut for haddock and about 13% for white hake—Framework Adjustment 65 reduces harvest opportunities across the board. The Final Rule thus denies NEFSA members earnings, profits, and business opportunities derived from groundfishing—as those

members explained in detailed declarations. *See* Osier Decl. ¶¶ 6–17; Campbell Decl. ¶¶ 6–20. Those unrecoverable losses—the inevitable consequence of compliance with the Final Rule—are concrete, irreparable injuries. *See Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017); *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996). Finally, the mere "subjection to" rules developed and issued by unconstitutionally appointed and insulated officers imposes an independently cognizable "here-and-now injury." *Axon Enter.*, 598 U.S. at 191–92.

### B.    NEFSA members' injuries are traceable to Defendants.

NEFSA members' injuries are "fairly traceable" to Defendants. *Collins*, 141 S. Ct. at 1779. Article III causation does *not* require evidence that "the Government's … conduct would have been different in a counterfactual world in which [it] had acted with constitutional authority." *Seila Law*, 140 S. Ct. at 2196. Instead, "for purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." *Collins*, 141 S. Ct. at 1779 (internal quotation marks omitted). In one recent challenge to the Act, a district court accepted the Government's claim that plaintiffs lacked standing, but that is plainly wrong. *United Cook Inlet Drift Ass'n v. NMFS*, 2022 WL 2222879, at *17–20 (D. Alaska June 21, 2022) ("*UCIDA*"). In an obvious legal error, the *UCIDA* court demanded precisely what *Collins* and *Seila Law* reject—faulting plaintiffs for failing to "allege that a differently structured Council would have voted against" the challenged policy. *Id.* at *19. This Court should not repeat that error.

Defendant NMFS (through Defendants Rauch and Coit) issued the Final Rule pursuant to the Secretary's statutory authority to approve and publish *Council* policies as regulations. *See* 16 U.S.C. § 1854(a)–(b); A.R. 6228. The Council purported to wield its power to "develop annual catch limits" when it "prepare[d] and submit[ted]" Framework Adjustment 65. *See id.* § 1852(h)(1), (6). But because the Council lacked *any* lawful authority—a merits claim accepted at the standing stage—its Members were *powerless* to develop and submit Framework Adjustment 65 for NMFS approval. As such, NMFS

never actually received a valid proposal to review—a legal and factual predicate to issuing any regulation under § 1854(b).  For these reasons, the Act's constitutional defects short-circuited the regulatory process and denied NMFS any authority to promulgate the Final Rule.  But NMFS did so anyway—an unlawful act that is currently subjecting NEFSA members to concrete injuries.

The Act's text further confirms that the agency's promulgation of the Rule was unlawful.  As the product of an invalid Council devoid of lawful authority, Framework Adjustment 65 *itself* was void from the beginning.  And NMFS has the statutory authority to *reject* such a policy—indeed, it has an inflexible statutory *duty* to do so.  *See* 16 U.S.C. § 1854(a)(1)(A).  Neglecting that duty, NMFS issued Framework Adjustment 65 as a federal regulation—and NEFSA members are now suffering.  However one looks at it, Defendants took (allegedly unlawful) action that subjected NEFSA members to the Council's harmful policies.  That is all Article III demands.[13]

On this point, too, *UCIDA* erred.  The court there reasoned that plaintiffs can *never* raise Appointments Clause or removal challenges to the Act because Council rules have "no legal effect" until "the agency first promulgat[es] implementing regulations."  2022 WL 2222879 at *18.  That is wrong—agency action is *not* a prerequisite to Council policy "tak[ing] effect," 16 U.S.C. § 1854(a)(3)— and it obscures the Act's limits on NMFS review.  But more important here, *UCIDA*'s reasoning assumes that the precise scope of the *Council's* authority controls a plaintiff's standing to sue the *agency*.  That is wrong.  At the standing stage, the Court must presume that NEFSA's central merits contention is *correct*—namely, that the Council lacks lawful executive authority, and thus NMFS could not issue

---

[13]As noted, the Final Rule departs from the Proposed Rule in one respect—a slight reduction in the magnitude of the catch-limit cut for Gulf of Maine haddock.  *See supra*, at 6 n. 2.  That tweak does not change the standing analysis.  *First*, Plaintiff's standing does not turn on the precise magnitude of the cut to Gulf of Maine haddock:  The Rule's haddock cuts remain huge, and the *rest* of Framework Adjustment 65 *also* injures NEFSA members.  *See* Osier Decl. ¶¶ 12–13; Campbell Decl. ¶¶ 9, 13–15 (white hake).  *Second*, NMFS lacked authority to review or issue *any* part of Framework Adjustment 65—most of which the Final Rule adopted in full.  *Third*, NMFS adjusted the Gulf of Maine limit because the Council *asked* it to.  Once more, the Council had no lawful power to submit that request.  *Finally*, the Council's initial Gulf of Maine limit is still part of the Final Rule, and will take effect if the emergency adjustment is not extended.  *See* A.R. 6216.

the Final Rule. That is all that matters: If the Council was powerless to act *at all*, NMFS was powerless to issue the Council's policies through a binding federal regulation. *See supra*, at 19–20.

The Government will likely reprise *UCIDA* and argue that, because NEFSA attacks the constitutionality of provisions related to the Council, and because the Council is (supposedly) powerless, NEFSA cannot raise its claims in a suit against Defendants. That logic is flawed. A plaintiff can challenge an unconstitutional statute that undergirds a regulatory process in a suit attacking the *product* of that unlawful process. *See FEC v. Cruz*, 596 U.S. 289, 301–02 (2022). When an agency "promulgate[s] a rule to implement" a statute, a plaintiff may contest the *statute's* constitutionality even if the *rule* triggered his injury. *Id.* at 301. Rules implementing an "invalid and unenforceable" statute are void, and a plaintiff harmed by such a rule may "raise constitutional claims against" the underlying "statutory provision." *Id.* at 302. Here, NEFSA's members' injuries are directly "traceable to the operation of" the Act itself—which is ripe for this challenge. *Id.* at 301.

Finally, under the Act's terms, the Council *did* take actions that harmed NEFSA's members. *See Collins*, 141 S. Ct. at 1788 n. 24. Again, the Act authorizes Councils to "develop" policies, while NMFS "approves" them. *See* 16 U.S.C. §§ 1852(h)(6), 1854(a)(3). Once a Council acts, the agency decides whether to adopt the Council's policies. NMFS approved Framework Adjustment 65, but its substance was developed by the Council. Thus, Article III is satisfied even under the (false) premise that standing requires subjection to the *Council's* lawless actions, not merely the *agency's*. *See Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) ("Article III requires no more than *de facto* causality.").

The Supreme Court's recent admonition bears repeating: "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' *injury* can be traced to *allegedly unlawful conduct* of the defendant, not to the *provision of law* that is challenged." *Collins*, 141 S. Ct. at 1779 (emphasis added). Defendants engaged in "conduct" that NEFSA "allege[s]" is "unlawful"—and that conduct has caused "injury" to NEFSA's members. *Id.* Article III traceability requires precisely that—and nothing more.

39

### C.    NEFSA members' injuries are redressable by the Court.

When a party "challenging the legality of government action … is himself an object of the action[,] there is ordinarily little question" that a "judgment preventing" that action will redress his injuries. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561–62 (1992).  That rule applies here.  NEFSA seeks vacatur of the challenged Final Rule, injunctive relief, and a declaratory judgment.  Such relief would redress its members' injuries by enabling them to fish as if the Framework Adjustment 65 process had not occurred—and thus to catch and sell more groundfish.  In a final error, the *UCIDA* court opined that even if it vacated the agency's rule, "the constitutional issues [plaintiffs] raise regarding the makeup of the Council would not be redressed."  2022 WL 2222879 at *20.  But courts redress *injuries*, not "issues."  Defendants imposed burdensome regulations pursuant to the Act's unconstitutional terms, and the resulting harm to NEFSA's members is entirely redressable.

### <u>CONCLUSION</u>

This Court should grant Plaintiff's motion and order its requested relief.

Dated:  November 8, 2023

Respectfully submitted,

James M. Burnham*
King Street Legal, P.L.L.C.
800 Connecticut Avenue NW, Suite 300
Washington, DC 20006
(602) 501-5469
james@kingstlegal.com

*Admitted *pro hac vice*

/s/ *Megan S. Newton*
Megan S. Newton, ME Bar No. 004461
Brett Shumate*
John Henry Thompson*
Louis J. Capozzi, III*
Alexis Zhang*
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3986
msowardsnewton@jonesday.com

*Counsel for Plaintiff*
*New England Fishermen's Stewardship Ass'n*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on November 8, 2023, I electronically filed the foregoing with the Clerk

of the Court using the ECF system which sent notification of such filing to all attorneys of record.


<u>*/s/ Megan S. Newton*</u>
Megan S. Newton