UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

NEW ENGLAND FISHERMEN'S )
STEWARDSHIP ASSOCIATION, )
)
Plaintiff, )
)
v. )          2:23-cv-00339-JAW
)
GINA RAIMONDO, et al., )
)
Defendants. )

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

A trade group files a lawsuit on behalf of commercial fishermen against the federal agency and officials responsible for implementing federal fishery policy in New England, asserting that a federal statute violates various provisions of the federal Constitution, including the Appointments Clause and the non-delegation doctrine. The trade group moves for summary judgment on its claims, while the defendants, in turn, jointly move for summary judgment for lack of standing and on the merits as a matter of law. The court concludes the plaintiff has standing to bring its claims against the agency and that statutory provisions allowing fishery councils made up of state bureaucrat and governor-nominated members to block certain types of actions by the federal agency constitute actions of federal officers in violation of the Appointments Clause and other constitutional doctrines. The court concludes these provisions are severable without interfering with the function of the statute or will of Congress, and grants the plaintiff's motion in part, denies it in part, and severs the unconstitutional provisions of the statute.

## I.    STATEMENT OF FACTS

### A.    Procedural Background

On September 8, 2023, New England Fishermen's Stewardship Association (NEFSA) and Jerry Leeman, commercial fisherman and CEO of NEFSA, filed a complaint against Gina Raimondo, in her official capacity as U.S. Secretary of Commerce; the National Marine Fisheries Service (NMFS); Janet Coit, in her official capacity as Assistant Administrator for Fisheries at NMFS; and Samuel D. Rauch III, in his official capacity as Deputy Assistant Administrator for Regulatory Programs at NMFS. *Compl.* (ECF No. 1). In their complaint, Plaintiffs sought declaratory and injunctive relief to remedy alleged violations of the Appointments Clause and the president's removal power, and, in the alternative, alleged violations of the non-delegation doctrine. *Id.* at 1, 47-58. On September 22, 2023, NEFSA filed an amended complaint terminating Jerry Leeman as a party. *Am. Petition for Review and Compl.* (ECF No. 13) (*First Am. Compl.*). On November 2, 2023, Defendants answered the amended complaint. *Answer* (ECF No. 38).

On September 20, 2023, Plaintiffs filed a motion to expedite proceedings. *Mot. to Expedite Proc.* (ECF No. 12). Defendants responded on October 10, 2023, stating that they did not oppose expedited resolution but requesting, to the extent necessary, a hearing pursuant to 16 U.S.C. § 1855(f)(4) following the conclusion of briefing on the merits. *Defs.' Resp. to Mot. to Expedite Proc.* at 1 (ECF No. 24). On October 16, 2023, parties filed a joint motion for approval of Local Rule 56(h) to propose a briefing schedule and process for filing of the administrative record. *Joint Mot. to Set Briefing*

*Schedule and for Other Relief* (ECF No. 26) (*Joint Mot. for Approval of Local Rule 56(h) Sch.*). After the Court sought clarifying details, on October 23, 2023, the parties supplemented their joint motion:

> [T]he parties respectfully submit that the Court may dispense with the Statements of Fact typically filed with summary-judgment motions pursuant to Federal Rule of Civil Procedure 56 and District of Maine Local Rule 56. The factual record before the Court will be limited to (1) the administrative record compiled by Defendants and (2) the standing declaration(s) submitted by Plaintiff with its motion.

*Supp. to the Parties' Joint Mot. to Set a Briefing Schedule and for Other Relief* at 3 (ECF No. 34) (*Supp. to Joint Mot. for Approval of Local Rule 56(h) Sch.*); *see also Order re Joint Mot. for Approval of Local Rule 56(h)* (ECF No. 33) (*Local Rule 56(h) Clarifying Order*). The Court granted the joint motion for approval of Local Rule 56(h) schedule on October 23, 2023. *Order Granting Mot. for Approval of Local Rule 56(h) Schedule* (ECF No. 35) (*Local Rule 56(h) Final Order*). On October 24, 2023, the Court granted the motion to expedite proceedings. *Order Granting Mot. to Expedite Proc.* (ECF No. 36).

On November 8, 2023, NEFSA filed a motion for summary judgment, which included as attachments sworn declarations submitted by NEFSA members David Osier and Devyn Campbell in support of NEFSA's organizational standing. *Pl.'s Mot. for Summ. J.* (ECF No. 39) (*Pl.'s Mot.*); *Pl.'s Mot.*, Attach. 1, *Decl. of David Osier* (*Osier Decl.*); *Pl.'s Mot.*, Attach. 2, *Decl. of Devyn Campbell* (*Campbell Decl.*). Defendants filed a cross-motion for summary judgment and response to the Plaintiff's motion for summary judgment on December 1, 2023. *Defs.' Cross-Mot. for Summ. J. and Resp. to Pl.'s Mot. for Summ. J.* (ECF No. 41) (*Defs.' Mot.*). NEFSA responded to

3

Defendants' cross-motion on December 19, 2023, which also served as a reply in support of its own motion for summary judgment. *Pl.'s Resp. to Defs.' Cross-Mot. for Summ. J. and Reply in Support of Pl.'s Mot. for Summ. J.* (ECF No. 43) (*Pl.'s Resp.*). Defendants replied to the plaintiff's motion for summary judgment on January 10, 2024, which also included a reply to the plaintiff's response in opposition to their cross-motion for summary judgment. *Defs.' Reply in Support of Cross-Mot. for Summ. J.* (ECF No. 45) (*Defs.' Reply*).

In the subsequent months, Defendants filed two notices referring the Court to recent decisions made by other courts in analogous cases: *Arnesen v. Raimondo*, No. 1:23-cv-160-TBM-RPM, 2024 U.S. Dist. LEXIS 16775 (S.D. Miss. Jan. 31, 2024), and *Lofstad, et al. v. Raimondo, et al.*, Case No. 3:22-cv-07360-RK-TJB, 2024 U.S. Dist. LEXIS 34112 (D.N.J. Feb. 28, 2024). *Notice of Suppl. Auth.* (ECF No. 49); *Notice of Recent Dev.* (ECF No. 50). More recently, on October 2, 2024, the Defendants filed an additional notice of supplemental authority, informing the Court of the decision of the Third Circuit in *Lofstad v. Raimondo*, Case No. 24-1420, 2024 U.S. App. LEXIS 24317 (3d Cir. Sep. 25, 2024).[1]

On October 29, 2024, the Court held an oral argument on the cross motions for summary judgment. *Min. Entry* (ECF No. 58).

---

[1]    The Third Circuit vacated its original order in *Lofstad* on September 26, 2024, and ordered the court clerk to file an amended opinion. *Lofstad v. Raimondo*, No. 24-1420, 2024 U.S. App. LEXIS 24434 (3d Cir. Sep. 26, 2024). The amended opinion, filed on September 26, 2024, did not affect the judgment of the original order. *Lofstad v. Raimondo*, Case No. 24-1420, slip op. (3d Cir. Sep. 26, 2024).

## II.    FACTUAL BACKGROUND[2]

### A.    The Magnuson-Stevens Fishery Conservation and Management Act: Regional Fishery Management Councils, Fishery Management Plans, and Implementing Regulations

In 1976, Congress passed the Magnuson-Stevens Fishery Conservation and Management Act (MSA or "the Act"), 16 U.S.C. § 1801 *et seq.*, to regulate the nation's territorial waters between three miles offshore, where the states' domain ends, and 200 miles offshore.  *Pl.'s Mot.* at 2.  The Act was Congress' first comprehensive regulation of fishing in federal territorial waters.  *First Am. Compl.* ¶ 3.  Adopted in response to "foreign fleets [] entering federal waters" and "fear[s] that new technologies could trigger unsustainable overfishing," *id.*, Congress designed the MSA to impose "conservation and management measures" through the creation of Fishery Management Plans (FMPs).  *Id.* ¶ 6 (citing 16 U.S.C. § 1853).  As additional guidance, Congress "set[] forth required provisions for FMPs, including that FMPs must contain measures 'necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery."  *Defs.' Mot.* at 3 (citing 16 U.S.C. § 1853(a)(1)(A)).  Congress further required that FMPs contain measures "consistent with the national standards, the other provisions of this Act, . . . and any other applicable law."  16 U.S.C. § 1853(a)(1)(C).  As

---

[2]    In the parties' joint motion for approval of Local Rule 56(h) schedule, parties requested to "dispense with the Statements of Fact typically filed with summary-judgment motions," asking the Court to limit the factual record to "(1) the administrative record compiled by Defendants and (2) the standing declaration(s) submitted by Plaintiff with its motion."  *Supp. to Jt. Mot. for Approval of Local Rule 56(h) Sch.* at 3.  The Court granted this motion.  *Local Rule 56(h) Final Order.*  For purposes of the cross motions for summary judgment, the Court considered the facts in the administrative record and standing declarations.

referenced in this section, the MSA sets forth ten national standards for fishery management:

(1) Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry.

(2) Conservation and management measures shall be based upon the best scientific information available.

(3) To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination.

(4) Conservation and management measures shall not discriminate between residents of different States. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

(5) Conservation and management measures shall, where practicable, consider efficiency in the utilization of fishery resources; except that no such measure shall have economic allocation as its sole purpose.

(6) Conservation and management measures shall take into account and allow for variations among, and contingencies in, fisheries, fishery resources, and catches.

(7) Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication.

(8) Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities by utilizing economic and social data that meet the requirements of paragraph (2), in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

(9) Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch.

6

(10) Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea.

16 U.S.C. § 1851(a) (capitalization altered).  The statute compels the Secretary to establish advisory guidelines, based on the national standards, to assist in the development of FMPs.  16 U.S.C. § 1851(b).

As part of its statutory scheme, "the [MSA] established eight regional fishery management councils (Councils), 16 U.S.C. § 1852(a), that 'enable the State, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of [FMPs].'"  *Defs.' Mot*. at 3 (quoting 16 U.S.C. § 1801(b)(5)(A)); *accord Pl.'s Mot*. at 2.  Congress charged the Councils with "exercis[ing] sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of" FMPs.  16 U.S.C. § 1801(b)(5)).  Typically, the Councils hold the primary responsibility for drafting FMPs and amendments, which are subsequently submitted to the Secretary of Commerce (Secretary).  16 U.S.C. § 1852(h).

The Secretary must, within five days of receipt, "commence a review of the plan or amendment to determine whether it is consistent with the national standards . . . and any other applicable law," "publish in the Federal Register a notice stating that the plan or amendment is available," and solicit public comment of interested persons for a sixty-day period.  16 U.S.C. § 1854(a)(1).  The Secretary is statutorily required to "approve, disapprove, or partially approve a plan or amendment," and notify the Council of its decision in writing, within thirty days of the end of the public comment period.  16 U.S.C. § 1854(a)(3).  If the Secretary responds to a submission with

disapproval or partial approval, the notice to the Council must include: "(A) the applicable law with which the plan or amendment is inconsistent; (B) the nature of such inconsistencies; and (C) recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law." *Id.* Upon such a notice, "the Council may submit a revised plan or amendment to the Secretary for review." 16 U.S.C. § 1854(a)(4). If, however, the Secretary takes no action within thirty days, "then such plan or amendment shall take effect as if approved." 16 U.S.C. § 1854(a)(3). Once promulgated, "[t]he Secretary may repeal or revoke a fishery management plan for a fishery under the authority of a Council only if the Council approves the repeal or revocation by a three-quarters majority of the voting members of the Council." 16 U.S.C. § 1854(h).

While the Councils develop most FMPs, the MSA also contains mechanisms for the Secretary to draft and publish FMPs directly in certain circumstances. *See* 16 U.S.C. § 1854(c). The statute contemplates three scenarios where the Secretary would assume this primary role:

> (A) the appropriate Council fails to develop and submit to the Secretary, after a reasonable period of time, a [FMP] for such fishery, or any necessary amendment to such a plan, if such fishery requires conservation and management;
>
> (B) the Secretary disapproves or partially disapproves any such plan or amendment, or disapproves a revised plan or amendment, and the

> Council involved fails to submit a revised or further revised plan or amendment; or
>
> (C) the Secretary is given authority to prepare such plan or amendment under this section.

16 U.S.C. § 1854(c)(2).  However, in such circumstances, the Secretary remains subject to additional restrictions.  First, the Secretary may not prepare a FMP containing "a provision establishing a limited access system, including any limited access privilege program, unless such system is first approved by a majority of the voting members, present and voting, of each appropriate Council."  16 U.S.C. § 1854(c)(3).  Second, the Secretary must "submit such plan or amendment to the appropriate Council for consideration and comment," publish the plan or amendment in the Federal Register, and solicit public comment for a sixty-day period.  16 U.S.C. § 1854(c)(4).  If the Secretary has prepared a FMP or amendment pursuant to 16 U.S.C. § 1854(c)(4)(A), the appropriate Council must submit any comments and recommendations within the sixty-day comment period.  16 U.S.C. § 1854(c)(5).

The process for promulgating regulations implementing a particular FMP or amendment follows the same process for the initial preparation of a FMP in many respects.  "Proposed regulations which the Council deems necessary or appropriate" to implement an FMP must be "submitted to the Secretary simultaneously with the plan or amendment."  16 U.S.C. § 1853(c)(1).  After submission, the Secretary is compelled by statute to "initiate an evaluation of the proposed regulations to determine whether they are consistent with the [FMP], plan amendment, this Act

and other applicable law" within five days, and to make a determination within fifteen days of initiating its evaluation. 16 U.S.C. § 1854(b)(1).

If the Secretary disapproves of the Council's proposed regulations, the Secretary must "notify the Council in writing of the inconsistencies and provide recommendations on revisions that would make the proposed regulations consistent with the [FMP], plan amendment, this Act, and other applicable law." 16 U.S.C. § 1854(b)(1)(B). "Upon receiving a notification under paragraph (1)(B), the Council may revise the proposed regulations and submit them to the Secretary for reevaluation." 16 U.S.C. § 1854(b)(2). Should the Secretary reach an affirmative determination with regard to the Council's proposed regulations, the MSA mandates publication in the Federal Register for a public comment period between fifteen and sixty days, after which the Secretary "shall promulgate final regulations within 30 days after the end of the comment period." 16 U.S.C. § 1854(b)(1)(A), (b)(3). However, "[t]he Secretary shall consult with the Council before making any revisions to the proposed regulations, and must publish in the Federal Register an explanation of any differences between the proposed and final regulations." 16 U.S.C. § 1854(b)(3).

As with FMPs, the MSA again provides a mechanism for the Secretary, via NMFS, to assume the drafting role for regulations in certain situations. Specifically, "[t]he Secretary may propose regulations in the Federal Register to implement any plan or amendment prepared by the Secretary" by submitting them to the Council along with the plan or amendment, as well as providing a public comment period of sixty days. 16 U.S.C. § 1854(c)(6). The Secretary must promulgate final regulations

10

within thirty days of the end of the public comment period and include in the Federal Register "an explanation of any substantive differences between the proposed and final rules." 16 U.S.C. § 1854(c)(7).

Finally, the respective roles of the Secretary and Councils change in emergency situations. "If the Secretary finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery, he may promulgate emergency regulations or interim measures necessary to address the emergency or overfishing, without regard to whether a fishery management plan exists for such fishery." 16 U.S.C. § 1855(c)(1). If, however, "a Council finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery within its jurisdiction," the Secretary is compelled to promulgate emergency regulations or interim measures if the Council requests such an action "by unanimous vote of the members who are voting members." 16 U.S.C. § 1855(c)(2)(A). If the Council's emergency designation vote is not unanimous, then the Council may only request the Secretary issue such emergency regulations. 16 U.S.C. § 1855(c)(2)(B).

### B.    New England Fishery Management Council Membership

As noted earlier, the MSA established eight Councils, dividing the nation's federal fisheries into zones for management by regional authorities. 16 U.S.C. § 1852(a). As relevant here:

> The New England Fishery Management Council shall consist of the States of Maine, New Hampshire, Massachusetts, Rhode Island, and Connecticut and shall have authority over the fisheries in the Atlantic Ocean seaward of such States (except [for any highly migratory species fishery]). The New England Council shall have 18 voting members,

including 12 appointed by the Secretary in accordance with subsection
(b)(2) (at least one of whom shall be appointed from each such State).

16 U.S.C. § 1852(a)(1)(A).  The statute instructs who will constitute the eighteen

voting members in subpart (b), stating the voting members must be:

(A) The principal State official with marine fishery management
responsibility and expertise in each constituent State, who is designated
as such by the Governor of the State, so long as the official continues to
hold such position, or the designee of such official.

(B) The regional director of the National Marine Fisheries Service for
the geographic area concerned, or his designee, except that if two such
directors are within such geographical area, the Secretary shall
designate which of such directors shall be the voting member.

(C) The members required to be appointed by the Secretary in
accordance with paragraphs (2) and (5).

16 U.S.C. § 1852(b)(1).

The New England Council's eighteen-person membership can be divided into

three categories.  First, one member is "[t]he regional director of the National Marine

Fisheries Service for the geographic area concerned."  16 U.S.C. § 1852(b)(1)(2).  In

this instance, Michael W. Pentony fills this position in his capacity as Regional

Administrator for the Greater Atlantic Region. *See* Administrative Record ("A.R.")

6264.  Mr. Pentony is a career Senior Executive Service (SES) official, *id.* at 6265, a

position that comes with protections against removal unless the relevant agency

identifies "misconduct, neglect of duty, malfeasance, or failure to accept a direct

reassignment."  *See* 5 U.S.C. §§ 3592, 7541-43.

Second, each of the five states that make up the New England Fishery sends

one member: "[t]he principal State official with marine fishery management

responsibility and expertise in each constituent State, who is designated as such by

12

the Governor of the State . . ., or the designee of such official." 16 U.S.C. § 1852(b)(1)(A). Because these officials serve on the New England Council by virtue of their state-held office, their membership lasts "so long as the official continues to hold such position." *Id.*

Finally, the third category of Council members consists of "members required to be appointed by the Secretary in accordance with paragraphs (2)."[3] 16 U.S.C. § 1852(b)(1)(C). In the New England Council, twelve members constitute this category of membership, and "at least one of whom shall be appointed from each such State." 16 U.S.C. § 1852(a)(1)(A). Paragraph (2) provides robust specifications and processes for the twelve members nominated and appointed under this subsection. Regarding their qualifications, the statute provides:

> The members of each Council required to be appointed by the Secretary must be individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned. Within nine months after the date of enactment of the Fishery Conservation Amendments of 1990 [enacted Nov. 28, 1990], the Secretary shall, by regulation, prescribe criteria for determining whether an individual satisfies the requirements of this subparagraph.

16 U.S.C. § 1852(b)(2)(A). The statute explains the nomination and appointment process as:

> The Secretary shall appoint the members of each Council from a list of individuals submitted by the Governor of each applicable constituent State. A Governor may not submit the names of individuals to the Secretary for appointment unless the Governor has determined that each such individual is qualified under the requirements of

---

[3]    The full phrase is "members required to be appointed by the Secretary in accordance with paragraphs (2) and (5)." 16 U.S.C. § 1852(b)(1)(C). Paragraph (5) applies to the Pacific Council and is not relevant to this case.

13

> subparagraph (A) and unless the Governor has, to the extent practicable, first consulted with representatives of the commercial and recreational fishing interests of the State regarding those individuals. Each such list shall include the names and pertinent biographical data of not less than three individuals for each applicable vacancy and shall be accompanied by a statement by the Governor explaining how each such individual meets the requirements of subparagraph (A). The Secretary shall review each list submitted by a Governor to ascertain if the individuals on the list are qualified for the vacancy on the basis of such requirements. If the Secretary determines that any individual is not qualified, the Secretary shall notify the appropriate Governor of that determination. The Governor shall then submit a revised list or resubmit the original list with an additional explanation of the qualifications of the individual in question.

16 U.S.C. § 1852(b)(2)(C).  The statute makes clear that these members "are not employed by the Federal Government," and, unlike federal employees, "shall receive compensation at the daily rate . . . when engaged in the actual performance of duties for such Council."  16 U.S.C. § 1852(d).  The MSA further provides two express scenarios in which "[t]he Secretary may remove for cause" a member of a Council within this third category: first, if the Secretary finds the member violated the Act's financial conflict of interest provision, or second, if "the Council concerned first recommends removal by not less than two-thirds of the members who are voting members and submits such removal recommendation to the Secretary in writing together with a statement of the basis for the recommendation."  16 U.S.C. § 1852(b)(6).

### C.    The Northeast Multispecies Fishery Management Plan and Framework Adjustment 65[4]

The New England Council "promulgated the first Northeast Multispecies Fisheries Management Plan in 1985 in an effort to curb the decline of groundfish stock in the Gulf of Maine." *Gulf of Me. Fishermen's All. v. Daley*, 292 F.3d 84, 86 (1st Cir. 2002). "The [New England] Fishery is composed of thirteen bottom-dwelling fish species, inhabiting waters from Maine to the mid-Atlantic, which are divided for management purposes into twenty individual 'stocks.'" *Lovgren v. Locke*, 701 F.3d 5, 14 (1st Cir. 2012). However, the original New England FMP proved insufficient, and "[b]etween 1985 and 1996, the Plan underwent a series of amendments as the groundfish population in that region continued to suffer." *Gulf of Me. Fishermen's All.*, 292 F.3d at 86. As the First Circuit explained, continued failure to protect groundfish populations prompted the Department of Commerce to implement a strategic shift to its management procedure:

> Finally, in 1996, with the population of cod and other groundfish on the verge of collapse, the Commerce Department instituted a new "Framework" rulemaking procedure which allowed the regional regulatory authorities to amend inshore fishing regulations "at any time," thereby responding more quickly to fluctuations in the groundfish population. Under this new, abbreviated procedure, the regional councils are able to adjust their fishing restrictions over the span of two regular monthly meetings, but they must provide timely public notice of any proposed change in regulations and invite public comment prior to and at the second meeting.

---

[4]    The parties do not address in detail the underpinning of the New England Council; however, to complete the picture, the Court supplied some background from First Circuit opinions.

*Id*. NEFSA brings its complaint against one of these so-called Framework Adjustments; specifically, Framework Adjustment 65.[5]

The New England Council submitted Framework Adjustment 65 to the NMFS for review on April 18, 2023, A.R. 5386 *et seq*., after which the NMFS published the plan in the Federal Register as a Proposed Rule on May 31, 2023. A.R. 6074; 88 Fed. Reg. 34810, 34818 (May 31, 2023). Following a comment period by interested parties, which included submitted comment from, among others, NEFSA, A.R. 6086, NMFS issued the Framework Adjustment 65 Final Rule (Final Rule) on August 18, 2023. A.R. 6214; 88 Fed. Reg. 56527 *et seq*. (Aug. 18, 2023). Both the Final Rule published in the Federal Register and the Decision Memorandum certifying the Final Rule's consistency with national standards, the MSA, and other applicable laws are signed by Mr. Rauch, pursuant to his role as the NMFS Deputy Assistant Administrator for Regulatory Programs. *Id*.

---

[5]    On June 17, 2024, Defendants filed a notice of recent development, informing the Court that NMFS had published a Final Rule to implement Framework Adjustment 66, 89 Fed. Reg. 35,755 (May 2, 2024), to the New England FMP. *Not. of Recent Dev.* (ECF No. 50). Defendants aver "Framework 66 sets new catch limits for fishing year 2024 for some of the stocks covered by the FMP while other stock limits remain the same, and it makes several additional management modifications," and asks the Court, should it determine Framework Adjustment 65 is flawed, to provide them with an opportunity to submit additional briefing on remedy in light of this development. *Id*. at 2. Plaintiff did not respond.

Though Defendants do not expressly raise mootness, the Court briefly addresses the potential effect of this development on the current dispute. Here, NEFSA challenges the legality of Framework Adjustment 65 based on the statutorily directed membership of the New England Council and the authority of Defendant Rauch; Framework Adjustment 66 was prepared and promulgated by the same parties and under the same procedures. As such, the Court proceeds to the merits of these legal arguments and considers its analysis and conclusions to apply equally to Framework Adjustment 66. *See Conservation Law Found. v. Evans*, 360 F.3d 21 (1st Cir. 2004)) (discussing a mootness argument based on a subsequent Framework Adjustment and finding that "a more straightforward resolution of the issue is readily available on the facts of this case. NMFS has not shown, as it must, that the alleged procedural deficiency will not recur") (citing *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 189 (2000)).

Framework Adjustment 65 imposed substantive limits on sixteen groundfish stocks; as particularly emphasized by the Plaintiff, it reduces the acceptable biological catch for Georges Bank haddock by 85% and Gulf of Maine haddock by 83% and lowers the white hake catch limit by approximately 13%. *Pl.'s Mot.* at 6 (citing A.R. 6216-17 (Table 2)). Further, Framework Adjustment 65 revises a rebuilding plan for Gulf of Maine cod, A.R. 6215, as statutorily compelled by U.S.C. § 1854(e) for stocks of fish determined to be overfished.[6] Finally, the Final Rule on Framework Adjustment 65 implemented regulatory changes to carry out the revisions to the FMP, pursuant to 16 U.S.C. § 1855(d), and enacted a short-term emergency rule, as requested by the New England Council in light of concerns over economic impact, to reduce the magnitude of its restriction of the Gulf of Maine haddock catch limit to 78% for a minimum of 180 days. A.R. 6214-31; *see also Pl.'s Mot.* at 6; *Defs.' Mot.* at 8.

### D.    Parties

#### 1.    New England Fishermen's Stewardship Association

NEFSA describes itself as "an alliance of commercial fishermen dedicated to educating the public about seafood resource management and protecting the future of local commercial fishing in New England." *First Am Compl.* ¶ 19; *Pl.'s Mot.* at 6-7. Its members include fishermen subject to "the catch limit reductions, cod rebuilding plan, and other regulations contained in Framework Adjustment 65," such

---

[6]    The MSA defines "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34).

as David Osier and Devyn Campbell. *First Am. Compl.* ¶ 20; *Pl.'s Mot.* at 7 (citing *Osier Decl.* ¶¶ 6–17; *Campbell Decl.* ¶¶ 6–20). NEFSA maintains "the catch reductions and other regulations contained in Framework Adjustment 65 and implemented in the Final Rule" harm its members' "ability to profitably harvest haddock, hake, and other groundfish species." *Pl.'s Mot.* at 7 (citing *Osier Decl.* ¶¶ 6–17; *Campbell Decl.* ¶¶ 6–20).

## 2. National Marine Fisheries Service

NMFS is an agency within the United States Department of Commerce, "acting under authority delegated from the Secretary of Commerce." *Defs.' Mot.* at 2; *Pl.'s Mot.* at 5. The NMFS "is responsible for managing fisheries under the [MSA]," which "is accomplished through [FMPs], amendments to those plans, framework adjustments, and implementing regulations." *Defs.' Mot.* at 3.

## 3. Defendants Appearing in their Official Capacity

NEFSA names various federal government officials as additional defendants in this case; specifically, officials at various level of authority whom it alleges hold the responsibility for administering and implementing the MSA. As described by the Plaintiff: "[NMFS] is an agency within the Department of Commerce. The Secretary of Commerce has delegated to the National Oceanic and Atmospheric Administration (NOAA) the authority to administer the relevant portions of the Act; NOAA sub-delegated that authority to NMFS." *First Am. Compl.* ¶¶ 22, 61 (citing NOAA, *NOAA Organizational Handbook: Transmittal No. 61*, U.S. Department of Commerce, at 2–4 (Feb. 24, 2015) (NOAA Handbook). NEFSA continues, "the Assistant Administrator for Fisheries at NMFS . . . has been delegated the power to administer various

18

portions of the [MSA] by the Under Secretary for Oceans and Atmosphere," which NEFSA describes as "the head of NOAA." *First Am. Compl.* ¶¶ 23, 60 (citing NOAA Handbook). Further, NEFSA alleges, "[t]he Assistant Administrator for Fisheries has, in turn, redelegated the authority to sign material generated under the Act for publication in the Federal Register and Code of Federal Regulations to the Deputy Assistant Administrator for Regulatory Programs." *Id.* ¶ 62 (citing NOAA Handbook at 5).

Based on the foregoing, NEFSA brings its claims against three federal officials: the Secretary of Commerce, currently Gina Raimondo; the Assistant Administrator for Fisheries at NMFS, currently Janet Coit; and the Deputy Assistant Administrator for Regulatory Programs at NMFS, currently Samuel D. Rauch III. *First. Am. Compl.* ¶¶ 21, 23, 24; *Defs.' Answer* ¶¶ 21, 23, 24. NEFSA sues these officials in their official capacity. *First. Am. Compl.* ¶¶ 21, 23, 24.

## III.    THE PARTIES' POSITIONS

### A.    Plaintiff's Motion for Summary Judgment

#### 1.    Standing

NEFSA claims standing to sue on behalf of its members and requests the Court to apply the standard for associational standing articulated by the First Circuit in *United States v. AVX Corp.*, 962 F.2d 108 (1st Cir. 1992), in which the court granted standing to an organization based on three factors:

> (1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither

19

the claim asserted nor the relief demanded necessitates the personal participation of affected individuals.

*Pl.'s Mot.* at 35-36 (citing *AVX Corp.*, 962 F.2d at 116).  NEFSA argues it satisfies all three of these elements and, thus, the Court should grant standing.

NEFSA begins by addressing the second and third elements described above, contending it "was formed in part to protect the interests of local commercial fishermen who face onerous regulations like Framework Adjustment 65," *Pl.'s Mot.* at 36 (citing *Osier Decl.* ¶ 4), and "neither NEFSA's claims nor its requested relief requires the participation of individual members."  *Id.* (citing *Warth v. Seldin*, 422 U.S. 490, 515 (1975) (where an "association seeks … prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of [injured] members").  The second and third elements, NEFSA opines, are satisfied. Thus, NEFSA says, "if any of its members would possess standing in his own right," the association should be granted standing.  *Id.*

In its discussion of this first element, NEFSA directs this Court to the Supreme Court's test for Article III standing: "an individual has standing if he (1) suffers a concrete 'injury in fact' that was (2) 'likely caused by the defendant' and (3) 'would likely be redressed by judicial relief.'"  *Id.* (citing *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)).  NEFSA urges the Court to "'assume, for purposes of the standing analysis,' that a plaintiff is 'correct on the merits of [his] claims[s].'"  *Id.* (citing *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019) and *Cutler v. U.S. Dep't of Health & Hum. Servs.*, 797 F.3d 1173, 1179 (D.C. Cir. 2015).  NEFSA then turns to the elements of individual standing.

### a.    Injury

NEFSA argues "[t]he injuries here are concrete." *Pl.'s Mot.* at 36.  NEFSA alleges that "[b]y cutting multiple commercial quotas—including a more[]than 80% cut for haddock and about 13% for white hake—Framework Adjustment 65 reduces harvest opportunities across the board," and in so doing, "denies NEFSA members earnings, profits, and business opportunities derived from groundfishing." *Id.* at 36-37 (citing *Osier Decl.* ¶¶ 6–17; *Campbell Decl.* ¶¶ 6–20).  NEFSA characterizes these "unrecoverable losses" as "the inevitable consequence of compliance with the Final Rule" and asserts that they are "concrete, irreparable injuries." *Id.* at 37 (citing *Reddy v. Foster*, 845 F.3d 493, 500 (1st Cir. 2017); *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996)).  NEFSA argues, "the mere 'subjection to' rules developed and issued by unconstitutionally appointed and insulated officers imposes an independently cognizable 'here-and-now injury.'" *Id.* (citing *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 191-92 (2023)).

### b.    Causation

NEFSA next submits that "NEFSA members' injuries are 'fairly traceable' to Defendants." *Id.* (citing *Collins v. Yellen*, 594 U.S. 220, 224 (2021)).  First, NEFSA cautions that the causation element in the standing analysis "does *not* require evidence that 'the Government's … conduct would have been different in a counterfactual world in which [it] had acted with constitutional authority.'" *Id.* (quoting *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 211 (2020)) (emphasis added by Plaintiff).  Rather, Plaintiff posits, "the relevant inquiry is

whether the plaintiffs' injury can be traced to allegedly unlawful conduct of the defendant, not to the provision of law that is challenged." *Id.* (citing *Collins*, 594 U.S. at 242 (internal quotation marks omitted)).    NEFSA concedes that another district court recently denied plaintiffs had standing in an analogous case but calls that court's decision "plainly wrong and "an obvious legal error" for "faulting plaintiffs for failing to 'allege that a differently structured Council would have voted against' the challenged policy." *Id.* (citing *United Cook Inlet Drift Ass'n v. NMFS* (*UCIDA*), 2022 U.S. Dist. LEXIS 109879, at *50–62 (D. Alaska June 21, 2022)).

Here, NEFSA claims, the promulgation of Framework Adjustment 65 constituted unlawful rulemaking for several distinct reasons.    First, "Defendant NMFS (through Defendants Rauch and Coit) issued the Final Rule pursuant to the Secretary's statutory authority to approve and publish *Council* policies as regulations." *Id.* (citing 16 U.S.C. § 1854(a)–(b); A.R. 6228) (emphasis added by Plaintiff).    NEFSA argues, "[t]he Council purported to wield its power to 'develop annual catch limits' when it 'prepare[d] and submit[ted]' Framework Adjustment 65." *Id.* (citing 16 U.S.C. § 1852(h)(1), (6)).    However, "because the Council lacked *any* lawful authority . . . its members were *powerless* to develop and submit Framework Adjustment 65," and, thus, "NMFS never actually received a valid proposal to review." *Id.* at 37-38 (emphasis added by Plaintiff).    NEFSA insists receipt of a lawful proposal is "a legal and factual predicate to issuing any regulation under § 1854(b)," such that "the Act's constitutional defects short-circuited the regulatory process and denied NMFS any authority to promulgate the Final Rule." *Id.* at 38.    NEFSA claims

22

the process followed by NMFS in this case constitutes "an unlawful act that is currently subjecting NEFSA members to concrete injuries." *Id.*

Second, NEFSA asserts NMFS has an "inflexible statutory *duty*" to reject any proposal from an unconstitutionally appointed Council. *Id.* (citing 16 U.S.C. § 1854(a)(1)(A)) (emphasis added by Plaintiff). By "[n]eglecting that duty," NEFSA says, "NMFS issued Framework Adjustment 65 as a federal regulation—and NEFSA members are now suffering." *Id.* NEFSA again contests *UCIDA* on this point, claiming the court found "that plaintiffs can *never* raise Appointments Clause or removal challenges to the Act because Council rules have 'no legal effect' until 'the agency first promulgat[es] implementing regulations,'" and arguing "[t]hat is wrong—agency action is *not* a prerequisite to Council policy 'tak[ing] effect.'" *Id.* (first citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *53-54; then citing 16 U.S.C. § 1854(a)(3)) (emphasis added by Plaintiff). NEFSA claims the *UCIDA* court further erred by "assum[ing] that the precise scope of the *Council's* authority controls a plaintiff's standing to sue the *agency*." *Id.* (emphasis added by Plaintiff). Rather, NEFSA insists, "[a]t the standing stage, the Court must presume that NEFSA's central merits contention is *correct*—namely, that the Council lacks lawful executive authority, and thus NMFS could not issue the Final Rule." *Id.* at 38-39 (emphasis added by Plaintiff). "If the Council was powerless to act *at all*, NMFS was powerless to issue the Council's policies through a binding federal regulation." *Id.* at 39 (emphasis added by Plaintiff).

Anticipating Defendants' argument that NEFSA cannot sue the federal Defendants as a means of challenging the makeup of the Council, NEFSA asserts "[a] plaintiff can challenge an unconstitutional statute that undergirds a regulatory process in a suit attacking the *product* of that unlawful process." *Id*. (citing *FEC v. Cruz*, 596 U.S. 289, 301–02 (2022)) (emphasis added by Plaintiff). NEFSA suggests that, per *Cruz*, "a plaintiff may contest the *statute's* constitutionality even if the *rule* triggered his injury," and that "[r]ules implementing an 'invalid and unenforceable' statute are void, and a plaintiff harmed by such a rule may 'raise constitutional claims against' the underlying 'statutory provision.'" *Id*. (quoting *Cruz*, 596 U.S. at 301-302) (emphasis added by Plaintiff). "Here, NEFSA's members' injuries are directly 'traceable to the operation of' the Act itself—which is ripe for this challenge." *Id*. (citing *Cruz*, 596 U.S. at 301).

Third and finally, NEFSA claims it satisfies the causation element of the standing analysis by arguing "under the Act's terms, the Council *did* take actions that harmed NEFSA's members." *Id.* (citing *Collins*, 594 U.S. at 258 n. 24) (emphasis added by Plaintiff). Asserting "NMFS approved Framework Adjustment 65, but its substance was developed by the Council," NEFSA takes the position that "Article III is satisfied even under the (false) premise that standing requires subjection to the *Council's* lawless actions, not merely the *agency's*." *Id*. (citing *Dep't of Com. v. New York*, 588 U.S. 752, (2019)) ("Article III requires no more than *de facto* causality") (emphasis added by Plaintiff). NEFSA concludes that it satisfies the causation element of standing because "Defendants engaged in 'conduct' that NEFSA 'allege[s]'

24

is 'unlawful'—and that conduct has caused 'injury' to NEFSA's members." *Id.* (quoting *Collins*, 594 U.S. at 242).

### c. Redressability

Regarding the element of redressability, NEFSA maintains that "[w]hen a party 'challenging the legality of government action … is himself an object of the action[,] there is ordinarily little question' that a 'judgment preventing' that action will redress his injuries." *Id.* at 40 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)).

Here, NEFSA argues the relief requested "would redress its members' injuries by enabling them to fish as if the Framework Adjustment 65 process had not occurred—and thus to catch and sell more groundfish." *Id.* NEFSA again contests the ruling of the *UCIDA* court; while the court in that case "opined that even if it vacated the agency's rule, 'the constitutional issues [plaintiffs] raise regarding the makeup of the Council would not be redressed,'" NEFSA argues "courts redress *injuries*, not 'issues.'" *Id.* (quoting *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *59-61) (emphasis added by Plaintiff). At bottom, NEFSA insists, "Defendants imposed burdensome regulations pursuant to the Act's unconstitutional terms, and the resulting harm to NEFSA's members is entirely redressable." *Id.* Thus, NEFSA concludes, the redressability requirement of the standing analysis is satisfied.

### 2.   Merits

#### a.   Appointments Clause

NEFSA brings a claim pursuant to the Appointments Clause of the United States Constitution, which provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law."  U.S. CONST. art. II, § 2 (Appointments Clause).  The Appointments Clause itself contains the only exception to its general rule: "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."  *Id.*  Plaintiff asserts the Appointments Clause functions to preserve the principle of separation of powers and the executive's accountability to the American public.  *Pl.'s Mot.* at 8.  As such, it is not "mere ... etiquette or protocol," but a "structural safeguard[] of the constitutional scheme."  *Id.* (first citing *Buckley v. Valeo*, 424 U.S. 1, 125 (1976); then citing *Edmond v. United States*, 520 U.S. 651, 659 (1997)).

NEFSA first seeks to establish that members of the New England Council meet the constitutional definition of "officers," and then argues that, as such, they were appointed to this position in violation of Constitutional requirements.  *Id.*

#### i.   Council Members as Officers of the United States

"The Appointments Clause envisions three categories of federal officials: principal officers, inferior officers, and 'lesser functionaries.'"  *Id.* (citing *Buckley*, 424 U.S. at 126 n. 162).  NEFSA articulates a two-part test for identifying federal

"officers:" first, they "hold continuing office[s] established by law," *id.* at 9 (quoting *Lucia v. SEC*, 595 U.S. 237, 247 (2018)), and second, they "exercis[e] significant authority pursuant to the laws of the United States." *Id.* (quoting *Buckley*, 424 U.S. at 126; citing *Aurelius Inv., LLC v. Puerto Rico*, 915 F.3d 838, 856 (1st Cir. 2019)) (outlining officer test). NEFSA addresses each prong of this test in turn.

### 1.     Holding Continuing Offices Established by Law

NEFSA argues "to qualify as an office, the position must not depend on the identity of the person occupying it, and the duties should continue, though the person be changed." *Id.* (quoting *United States v. Donziger*, 38 F.4th 290, 297 (2d Cir. 2022)) (internal quotation marks omitted). The positions must be "established by law" and "continuing and permanent," *id. (*first quoting *Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 881 (1991)); then quoting *Lucia*, 595 U.S. at 245), as opposed to "occasional and intermittent." *Id.* (quoting *United States v. Germaine*, 99 U.S. 508, 511–12 (1879)).

NEFSA argues that Council Members hold "continuing office[s] established by law" and are entrusted with "continuing and permanent duties." *Id.* (quoting *Lucia*, 595 U.S. at 245). It first asserts that "Congress 'created' Council seats 'by statute'— 'down to [their] duties, salary, and means of appointment," *id.* (quoting *Lucia*, 595 U.S. at 248). In support, it directs the Court to 16 U.S.C. § 1852(a)(1) for the statutory creation of Councils, and to 16 U.S.C. § 1852(d), (h), and § 1853(a) for statutory directives regarding Council Members' responsibilities and pay structure. *Id.* Second, NEFSA says, "unlike the surgeons in *Germaine*, who worked only 'when

called on … in some special case,' … Council Members' duties are ongoing." *Id.* (citing *Germaine*, 99 U.S. at 512). Council Members, NEFSA continues, review stock assessments "on a *continuing* basis," "develop *annual* catch limits," and oversee "*multi-year* research." *Id.* (citing 16 U.S.C. § 1852(h)(5)–(7)) (emphases added by Plaintiff). Further, no Member serves on an "occasional or temporary basis": most "serve three-year terms (which can be extended to nine years), and the state-bureaucracy Members and Regional Director hold their Council seats indefinitely." *Id.* (citing 16 U.S.C. § 1852(b)(1), (3) and *Aurelius*, 915 F.3d at 856 (renewable three-year term and restrictions on removal made position an "office")). Third, NEFSA says, Council seats are permanent positions that exist independent of the individuals who fill them. *Id.* (citing *Donziger*, 38 F.4th at 297).

NEFSA seeks to anticipate Defendant's potential argument "that Members drawn from state governments and the private sector are not part of the federal government or subject to Article II at all," by claiming this position would "doom the [MSA] under the private nondelegation doctrine." *Id.* at 10. More to the point, Plaintiff says, "the argument is wrong" because "federal employment is not necessary for the Appointments Clause to apply." *Id.* (citing *Officers of the United States within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 78 (2007)). Instead, it says, "a position, however labeled, is in fact a federal office if (1) it is invested by legal authority with a portion of the sovereign powers of the federal Government, and (2) it is 'continuing.'" *Id.* (quoting the same at 73–74). Plaintiff asserts Council Members

28

meet these criteria, "regardless of a Member's independent status as a state or private employee." *Id.*

### 2.    Exercising Significant Authority

NEFSA next asserts that Council Members exert "significant authority within the meaning of *Buckley* and its progeny. *Id.* (citing *Buckley*, 424 U.S. at 126). Before addressing the Council specifically, NEFSA defines "significant authority" as persons who "perform more than ministerial tasks" and "exercise significant discretion," *id.* (citing *Freytag*, 501 U.S. at 881–82), before offering examples of executive functions such as "rulemaking, [issuing] advisory opinions, and [making] determinations of [benefit] eligibility." *Id* (citing *Buckley*, 424 U.S. at 140-41). Plaintiff further emphasizes that this determination does not consider the duties of the position as a whole, but rather, "if an official wields officer-level authority in exercising *any* of his duties, he qualifies as an 'officer' under the Appointments Clause." *Id.* (citing *Freytag*, 501 U.S. at 822; *Lucia*, 595 U.S. at 247 n. 4) (emphasis added by Plaintiff).

Applying this standard to the Councils, NEFSA argues the "[MSA] vests Members with 'authority over the[ir] fisheries' and charges them to 'exercise sound judgment in the stewardship of fishery resources.'" *Id.* (citing 16 U.S.C. §§ 1801(b)(5), 1852(a)(1)). Turning to the statute itself, Plaintiff focuses on the Councils' role in "adopt[ing] and amend[ing] FMPs for its fisheries," arguing that "the [MSA] leaves these policy decisions to Councils; the Secretary contributes only nonbinding guidance and can repeal an existing Council policy only if three-quarters of the Council agrees." *Id.* at 11 (citing 16 U.S.C. §§ 1851(b), 1854(h)). NEFSA extends this argument to the Councils' authority to "draft[] implementing regulations as it 'deems

29

necessary or appropriate.'" *Id.* (citing 16 U.S.C. § 1853(c)).  NEFSA characterizes the Councils as making "crucial determinations regarding the health of its fisheries and 'develop[ing]' its own 'multi-year research priorities.'"  *Id.* (citing 16 U.S.C. § 1852(h)(5), (7)).  However, the MSA goes further, NEFSA claims, by granting Councils "the power to *compel* the Secretary's imposition of emergency or interim regulations, . . . and an unqualified right to *veto* the creation of any 'limited access system' governing their fisheries."  *Id.* (citing 16 U.S.C. § 1855(c)(2)(A), (c)(3)).  Finally, NEFSA claims the statute grants broad residual power to the Councils to "conduct any other activities. . . which are necessary and appropriate to the foregoing functions."  *Id.* (citing 16 U.S.C. § 1852(h)(9)).

Turning from the statutory directives to the specific actions of the New England Council in the case at bar, NEFSA argues the Council "'develop[ed] annual catch limits' for groundfish species."  *Id.* (citing 16 U.S.C. § 1852(h)(6)).  More specifically, NEFSA alleges "the Council slashed commercial catch limits for haddock by around 80% and imposed other restrictive regulations," based on "fact-finding, internal deliberations, and policy decisionmaking [t]hat take up thousands of pages of the Administrative Record."  *Id.* (citing A.R. 1–5370).  This process constitutes the exercise of significant authority, NEFSA says, because "now that Framework Adjustment 65 has taken effect, the Council must consent to any lifting of its restrictions."  *Id.* (citing 16 U.S.C. § 1854(h)).

NEFSA preemptively rebuts Defendants' argument that NFMS holds the ultimate authority by approving Council policies, arguing "that does not strip Council

Members of officer status, for several reasons." *Id.* at 12.   First, NEFSA posits "Councils unilaterally set the policy agenda through the Act's two-step rulemaking process," such that, for Council-managed fisheries, NMFS "can act unilaterally *only* when a Council chooses not to." *Id.* (citing 16 U.S.C. § 1854(c)(1)(A), (6) (emphasis added by Plaintiff)). "Councils decide when to *begin* the rulemaking process," and "when a Council *does* choose to act, the agency's back-end review is limited to 'consisten[cy] with . . . applicable law." *Id.* (citing 16 U.S.C. § 1854(a)(1), (b)(1) (emphasis added by Plaintiff)).   NEFSA avers "if a Council's course of action is lawful, NMFS 'shall' promulgate it as a final rule," and, even in the event NMFS deems the proposal unlawful, the agency "merely explains that error and 'recommend[s]' revisions." *Id.* (quoting 16 U.S.C. 1854(a)(3)-(4), (b)(1), (3)).   While it concedes NMFS reviews Council proposals, NEFSA argues this "does not render Council Members non-officer employees," and claims "the Final Rule's legal compliance was certified by Regional Administrator Pentony—a Council Member." *Id.* (citing A.R. 6201–05).

NEFSA takes the position that the Supreme Court has "'explicitly reject[ed]' the 'theory that final decisionmaking authority is a *sine qua non* of officer status.'" *Id.* at 12-13 (quoting *Lucia*, 595 U.S. at 245 n. 4).   Rather, NEFSA says, "[a]n official's duties can make him an officer even if his 'opinion counts for nothing unless' another official 'adopts it as his own.'" *Id.* at 13 (quoting *Lucia*, 595 U.S. at 249, and citing *Freytag*, 501 U.S. at 881 (an official who "lack[s] authority to enter a final decision" may still be an officer)).   NEFSA claims the question of "whether or not [an] act may be subject to direction or review" defines the line between primary and inferior

31

officers, but "does not *also* define the line between officers and 'lesser functionaries.'" *Id.* (citing *Edmond*, 520 U.S. at 663; *Buckley*, 424 U.S. at 126 n. 162) (emphasis added by Plaintiff). In support, it draws a comparison to the Private Company Accounting and Oversight Board (PCAOB), which similarly develops policies that cannot "become effective without prior approval of the [Securities and Exchange] Commission [(SEC)]." *Id.* (quoting 15 U.S.C. § 7217(b)(2)). Further, PCOAB policies are reviewed by the SEC, which *"shall* approve a proposed rule, if it finds that the rule is consistent with the requirements of this Act,*"* and has "broad authority to 'abrogat[e], delet[e], or add[]' to PCOAB rules." *Id.* (quoting 15 U.S.C. § 7217(b)(3), (5)) (emphasis added by Plaintiff). The Supreme Court, NEFSA says, found PCOAB to "exercise significant executive power" in *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 477 (2010). *Id.*

NEFSA argues the Supreme Court's holding in *Free Enterprise Fund* applies with even greater force to the MSA's Councils, as their policies "may 'take effect' *without* NMFS approval." *Id.* (emphasis added by Plaintiff). NEFSA points to *Lucia*, where the Supreme Court concluded that SEC administrative law judges (ALJs) were federal officers because "the SEC could 'decline[] [to] review' a judge's ruling, thereby making it 'final.'" *Id.* (citing Lucia, 595 U.S. at 249). NEFSA compares this holding to the MSA, which provides, if the Secretary does not "notify a Council within 30 days … of the approval, disapproval, or partial approval of a plan or amendment, then such plan or amendment *shall take effect as if approved*." *Id.* (quoting 16 U.S.C. § 1854(a)(3)(C) (emphasis added by Plaintiff). NEFSA claims this "gives Councils even *more* authority than the adjudicators in *Lucia*, where the SEC had to affirmatively

'issue an opinion' declining to review a particular decision before that decision would take effect." *Id. a*t 14 (citing *Lucia*, 595 U.S. at 249) (emphasis added by Plaintiff).

Moving to their second piece of evidence for a Council's significant authority, NEFSA argues the MSA "plainly *does* empower Council Members to make various final decisions affecting the rights and obligations of fishermen." *Id.* (emphasis added by Plaintiff). It lists four statutory examples it claims constitute significant authority:

> [A] Council can: **(1)** make any policy choices that are "consistent" with the Act and other relevant statutes, 16 U.S.C. § 1854(a)(1); **(2)** unilaterally and indefinitely veto, on any grounds, an attempt by the agency to "repeal or revoke" a FMP, *id*. § 1854(h); **(3)** exercise its policy judgment to "find[] that an emergency exists or that interim measures are needed to reduce overfishing," and thereby *order* the Secretary to issue regulations, *id*. § 1855(c)(2)(A); and **(4)** make an unreviewable decision on whether to implement a "limited access system" to govern any of its fisheries—*even* where NMFS would otherwise have leeway to impose its own rule, *id*. § 1854(c)(3).

*Id*. (emphasis added by Plaintiff).

NEFSA's third point evidencing the Council's significant authority is their "prepar[ing] proposed findings," and "'shap[ing] the administrative record' upon which their policy determinations and NMFS review are based." *Id*. (first citing *Freytag*, 501 U.S. at 874; then citing *Lucia*, 595 U.S. at 247-48). NEFSA argues that, "even if . . . NMFS *could* review Council policies *de novo*," the Councils possess "officer-level authority" because the MSA authorizes them to "detail[] the factual basis for a FMP or amendment, collect[] public comments, and incorporat[e] input from its advisory committees." *Id*. (citing 16 U.S.C. §§ 1852(g), (h)(3); 1853(a)) (internal citations omitted) (emphasis added by Plaintiff).

NEFSA contests the characterization of the Councils as mere "advisory bodies," arguing that "Congress knows how to create advisory bodies . . . [and] it did so elsewhere in the Act," but "never describes the Councils or their policies in such terms." *Id.* at 14-15 (citing 16 U.S.C. 1852(g)(1)–(3), (5)). Rather, Plaintiff says, the MSA "repeatedly directs the *Secretary* to offer advisory recommendations to the *Councils*—not the other way around." *Id.* (citing 16 U.S.C. §§ 1851(b)(1)(B); 1854(a)(3)(C), (b)(1)(B), (e); 1855(b)(1)) (emphasis added by Plaintiff). NEFSA urges the Court to ignore a recent ruling on this point from the District of New Hampshire, arguing that court's determination that "Councils do not exercise 'significant' authority" was mere dicta and, further, a "conclusory observation" in which "[t]he court did not assess the full range of Council authority under the Act or the nature of NMFS review, and it did not have the benefit of *Lucia*, decided in 2018." *Id.* at 15-16 (citing *Goethel v. Pritzker*, No. 15-cv-497-JL, 2016 U.S. Dist. LEXIS 99515, at *27-29 (July 29, 2016)). Deeming its arguments to have sufficiently established Council Members as constituting federal officers, NEFSA turns to explaining why their appointment violated the federal Constitution.

### ii.    Council Members as Principal Officers

NEFSA first avers that Council Members constitute "principal officers" who have been appointed to their positions in violation of the express constitutional requirements. *Id.* at 16. To distinguish between principal and inferior officers, the Plaintiff directs the court to consider "how much power an officer exercised free from control by a superior" by applying three factors: "*First*, does a principal officer exercise sufficient 'administrative oversight' of the officer in question? *Second*, may a principal

officer freely remove him from office?  *Third*, can a principal officer 'review the [relevant officer's] decisions'?"  *Id.* (quoting *United States v. Arthrex, Inc.,* 594 U.S. 1, 13 (2021) (emphasis added by Plaintiff)).  NEFSA claims Council Members satisfy all three *Arthrex* factors.

First, NEFSA claims, "no principal officer oversees the Councils."  *Id.*  It informs the Court "this factor is met where a superior can 'prescribe uniform rules of procedure' for, or 'formulate policies and procedure in regard to,' the subordinate officer's duties," or where "a principal officer 'fixes the [officer's] rate of pay,' 'controls the decision whether to' initiate his work, or can 'select[]' the subordinate officer to perform particular tasks."  *Id.* (first quoting *Edmond*, 520 U.S. at 663, 664–65; then quoting *Arthrex*, 594 U.S. at 13).  Applying these standards to the present case, NEFSA argues "the Councils are subject to only minimal NMFS oversight," because "[t]hey control their own procedures, policy priorities, research agendas, and staffing decisions," "[n]o superior controls their pay," and nobody "other than a Council itself decide[s] whether to initiate the Act's policymaking process."  *Id.* at 16-17 (citing 16 U.S.C. §§ 1852(d), (e)–(i); 1854(a)(1).  NEFSA states these parameters are "insulate[d]" by the statute.  *Id.* at 17 (citing 16 U.S.C. § 1851(b)).

Second, NEFSA avers, "no principal officer—nor even the President—may remove Council Members at will," and argues these "nearly impenetrable removal protections [] violate the Constitution in their own right" or, at least, "clearly deny any principal officer the power to freely remove Members."  *Id.*  Third, NEFSA posits "no principal officer can veto a Council's policy decisions," citing *Arthrex* to support

35

its argument that principal officers direct decisions on matters of both law and policy. *Id.* (citing 594 U.S. at 18). NEFSA argues the MSA limits NMFS' review authority to legal defects only, and further that its review is not compulsory because "Council policies 'shall take effect as if approved' if the agency fails to act. *Id.* (quoting 16 U.S.C. § 1854(a)(3)(C)). NEFSA concludes its principal officer argument by directing the Court to other examples of the Council's unreviewable authority, such as the ability to deny the President's request to revoke an existing plan by a vote of five Members, the decision to "force the Secretary to impose emergency regulations," and a "Council's unilateral judgment that its fishery shall not be governed by a 'limited access system.'" *Id.* (citing 16 U.S.C. §§ 1854(a)(3)(C), (c)(3); 1855(c)(2)(A)).

### iii.    Council Members as Inferior Officers

Should the Court determine Council Members are not principal officers, NEFSA argues the Court should alternatively find them to be inferior officers appointed in violation of the process described by the federal Constitution. *Id.* While Plaintiff notes Article II of the Constitution "authorizes Congress to 'vest the Appointment' of 'inferior officers' in 'the President alone, in the Courts of Law, or in the Heads of Departments,'" *id.* (quoting U.S. CONST. art. II, § 2, cl. 2), it claims "[n]either the President nor any court selects Council Members," and "17 of 18 Members are not appointed by [Heads of Departments]." *Id.* NEFSA addresses the two categories of Council Members it alleges are unconstitutionally appointed in turn.

### 1.    State Bureaucracy Members

Reminding the Court that the MSA "reserves Council seats for '[t]he principal State official with marine fishery management responsibility and expertise in each

constituent State, who is designated as such by the Governor of the State,' or his 'designee,'" *id.* at 18 (quoting 16 U.S.C. § 1852(b)(1)(A)), NEFSA argues the Appointments Clause nowhere permits Congress "to delegate the *federal* appointment power to *state* officials." *Id.* NEFSA posits this process contravenes the purpose of the Appointments Clause "to provide clear 'lines of accountability," *id.* (citing *Arthrex*, 594 U.S. at 16), because "*state* officials are accountable, if at all, only to *state* electorates" and "[s]uch officials cannot wield the *federal* power to appoint officers whose authority transcends state borders." *Id.* (emphasis added by Plaintiff). By "empower[ing] state officials to appoint federal officers," NEFSA says, the MSA diffuses Executive accountability and leaves state fishermen "*zero* political recourse against a significant portion of its members," a "plainly unconstitutional" result. *Id.* (citing *Free Enter. Fund*, 561 U.S. at 497) (emphasis added by Plaintiff).

## 2.   Governor-nominated Members

Turning to the twelve members of the New England Council that "are nominated by governors and selected from curated lists by the Commerce Secretary," NEFSA argues "this procedure does not allow the Secretary to choose whomever she (or the President) prefers," as instructed by the Constitution. *Id.* By compelling the Secretary to "pick from a closed set of candidates nominated by a state official," without any time restraints or mechanism to bypass the Governors' selections, Plaintiff says the statute puts state governors in control of the process. *Id.* at 18-19. NEFSA argues this process "'limit[s] selection' and 'trench[es] upon executive choice'" in violation of the Constitution, which contravenes the Executive Branch's right to "exclude officials with 'different views of policy.'" *Id.* at 19 (first quoting *Myers v.*

37

*United States,* 272 U.S. 52, 128 (1926); then quoting *Collins*, 594 U.S. at 256). NEFSA takes issue with the "[MSA] assign[ing] an essential role in officer selection to *separate sovereigns*," which it deems to be "a wanton 'diffusion of the appointment power' that assaults 'the Constitution's structural integrity.'" *Id.* (citing *Freytag*, 501 U.S. at 878 (emphasis added by Plaintiff)). NEFSA bases its position "that the appointment power is not shared, divided into phases, or otherwise diluted" on the text of the Constitution, which instructs, "[f]or inferior officers, Congress must '*vest*' the power in one of a short list of decisionmakers—meaning the President, court, or department head 'alone' must wield the authority." *Id.* (for the latter, citing U.S. CONST. art. II, § 2, cl. 2 (emphasis added by Plaintiff)).

### iv.    Effect of Appointments Clause Violation on Final Rule

Whether principal or inferior officers, NEFSA concludes that "[b]ecause the Council's Members were appointed in violation of the Appointments Clause, the Council lacked authority to develop Framework Adjustment 65." *Id.* The Council's dearth of authority, NEFSA says, means "Framework Adjustment 65 is thus 'void *ab initio*,' as are NMFS rules implementing it." *Id.* (citing *Collins*, 594 U.S. at 257). Because Framework Adjustment 65 was void, NEFSA continues, NMFS "should have rejected it as illegal under 16 U.S.C. § 1854(a)(1)(A). *Id.* at 19-20. Instead, NMFS adopted the Council's policies, making them binding regulation. *Id.* at 20. For these reasons, NEFSA avers, "the Final Rule must be vacated and its enforcement enjoined." *Id.* (citing 16 U.S.C. § 1855(f)(1)(B); *Lucia*, 595 U.S. at 251; *Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1342 (D.C. Cir. 2012)).

38

### b.      Council Members' Insulation from Removal

As a supplement to its Appointment Clause claim, NEFSA similarly argues that, as federal officers, the Council Members' and Defendant Rauch's protections against removal by the President violate the "Vesting" and "Take Care" Clauses of the United States Constitution. *See* U.S. CONST. art. II, § 1, cl. 1, and § 3). NEFSA asserts "the 'executive Power'—all of it—is 'vested in a President,' who must 'take Care that the Laws be faithfully executed.'" *Id.* at 20 (citing *Seila Law*, 591 U.S. 203 (quoting U.S. CONST. art. II, § 1, cl. 1, and § 3)). Pursuant to these clauses, Plaintiff asserts "[t]he President must retain "the ability to remove executive officials," because "otherwise, the President 'could not be held fully accountable for discharging his own responsibilities.'" *Id.* (first quoting *Seila Law*, 591 U.S. at 203; then quoting *Free Enter. Fund*, 561 U.S. at 514). Following the Supreme Court's holding in *Seila Law*, Plaintiff characterizes "the Constitution's default rule" as "the President must be able to remove executive officials at will." *Id.* (citing 591 U.S. at 203).

NEFSA notes that *Seila Law* recognized that its general rule does not apply to "(1) multimember agencies that lack "executive power" and (2) certain inferior officers,"; however, NEFSA argues that even for these two exceptions, "Congress cannot abrogate all presidential control." *Id.* at 20-21 (citing *Seila Law*, 591 U.S. at 216-18). For example, NEFSA observes, for-cause provisions may be tolerated in some cases, but they impermissibly interfere with the Executive's constitutional authority "when Congress imposes an *additional* layer of such protection," such as tenure protections. *Id.* at 21 (first citing *Humphrey's Executor v. United States*, 295

39

U.S. 602, 619 (1935); then citing *Free Enter. Fund.*, 561 U.S. at 495–96, 503) (emphasis added by Plaintiff).

### i. Recognized Exceptions to the Constitutional Removal Doctrine

Applying the constitutional removal doctrine to the Councils, NEFSA argues their Members fail to qualify for either exception to *Seila Law*'s general rule requiring such officials to be subject to the President's removal power. The first exception, which the Supreme Court articulated in *Humphrey's Executor* and subsequently recognized in *Seila Law*, applies to "for-cause removal protections [given] to a multimember body of experts, balanced along partisan lines, that performed legislative and judicial functions and was said not to exercise any executive power." *Id.* (quoting *Seila Law*, 591 U.S. at 216-17). NEFSA says the Councils do not qualify for the *Humphrey's Executor* exception because "the [MSA] lacks partisan-balance requirements, and Council Members exercise the *executive* function of rulemaking— not the legislative function of advising Congress nor any adjudicatory role [as in *Humphrey's Executor*]." *Id.* (emphasis added by Plaintiff).

The second exception, created by the Supreme Court in *Morrison v. Olson*, 487 U.S. 654, 672 (1988), and later respected in *Seila Law*, permits removal protections for "certain *inferior* officers with narrowly defined duties." *Id.* (quoting *Seila Law*, 591 U.S. at 204). In *Morrison*, the official in question was an "independent counsel— a prosecutor 'appointed … to accomplish a single' criminal investigation." *Id.* (quoting *Morrison*, 487 U.S. at 672). In that case, the Supreme Court permitted removal protections because the independent counsel "lacked policymaking or administrative

40

authority" based on the narrow grant of investigative authority to "actors identified by others, and was confined to a specified matter." *Id.* (quoting *Seila Law*, 591 U.S. at 219). Applying the *Morrison* exception to Councils, NEFSA argues their Members do not fit because "they are *principal* officers," "bear no resemblance to the time-limited, narrow-in-scope independent counsel," and "their extensive 'duties' under the Act 'are far from limited.'" *Id.* at 22 (quoting *Seila Law*, 591 U.S. at 199). Plaintiff concludes neither exception to the constitutional removal doctrine applies, such that "the President must be free to remove Members *at will.*" *Id.* (emphasis added by Plaintiff).

Finally, NEFSA argues that, even if the Court determines Council Members fit within one of the two exceptions, "the Act's extraordinary and unprecedented removal protections would still be unconstitutional," because "[t]he President is utterly powerless to remove five Council Members: the state bureaucrats appointed by other state officials . . . [who] serve 'so long as' they occupy their predicate state positions." *Id.* (citing 16 U.S.C. § 1852(b)(1)(A)). Because "*[n]o federal official* can remove such a Member," NEFSA argues that the vesting of removal power "for officers wielding the executive power of the United States" in a "*separate sovereign*" violates the Constitution. *Id.* (citing *Free Enter. Fund*, 561 U.S. at 503) (emphasis added by Plaintiff).

Addressing the "12 governor-nominated Members," NEFSA points out that while "[t]he Secretary may remove these Members only 'for cause,'" the "Act provides just one scenario in which the Secretary can remove a Member unilaterally: after a

41

formal hearing finds the Member violated a specific conflict-of-interest provision" governing disclosures and recusals based on financial interests. *Id*. (citing 16 U.S.C. §§ 1852(b)(6); 1857(1)(O)). NEFSA argues the President must be permitted to remove a Member for other failures, including "inefficiency, neglect, criminality, nepotism, embarrassing conduct, undermining the President's policies, or anything else," but the statute limits the President from doing so unless the Council's membership "'first recommends removal' by a two-third vote." *Id* at 23. (citing 16 U.S.C. § 1852(b)(6)(A)). Plaintiff describes this statutory process as constituting "two layers" of removal protection, as was rejected in *Free Enterprise Fund*, and in so doing, "imped[ing] the President's ability to perform his constitutional duty." *Id*. (first citing *Free Enterprise Fund*, 561 U.S. at 495-96; then quoting *Seila Law*, 591 U.S. at 217).

### ii.    Entitlement to Relief

Plaintiff specifically addresses the propriety of its requested relief based on its insulation from removal claim, arguing it is entitled to relief for two reasons: "*First*, because the Act's rulemaking system cannot be severed from the Councils' unconstitutional removal protections, the Final Rule must be vacated and enjoined. *Second*, NEFSA is entitled to vacatur and declaratory relief even if this Court could somehow re-write the Act to create a constitutionally compliant Council." *Id*. (emphasis added by Plaintiff).

Beginning with its assertion that the unconstitutional protection from removal "cannot be severed from Congress's grant of authority," NEFSA distinguishes the present case from *Free Enterprise Fund*, in which the Court's "ability to sever the

relevant statute's for-cause removal provision enabled the Board to keep running." *Id*. at 23-24 (quoting *Axon Enter.*, 598 U.S. at 189).  Here, though, Plaintiff says the Court cannot sever the unconstitutional provision because "the statute created in its absence is legislation that Congress would not have enacted."  *Id*. at 24 (quoting *Seila Law*, 591 U.S. at 234).  It directs the Court to the two-step inquiry the Supreme Court applied in *Seila Law*: first, "consider[] whether the law's 'surviving provisions [are] capable of "functioning independently."'"  *Id*.  (quoting *Seila Law*, 591 U.S. at 234) (quoting *Free Enter. Fund*, 561 U.S. at 509).  Second, if the law survives the first step, the Court "examines [the law's] 'text [and] historical context' to determine whether Congress would have passed it without its 'invalid' components."  *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 509).  Plaintiff argues the Council's structure fails at both steps of this inquiry.

Regarding step one, NEFSA argues Council Members' tenure protections are fundamentally intertwined with the Council system set up in the MSA, which "contains *no* removal provisions for Members appointed from state bureaucracies, who 'shall be' Members by virtue of their state employment."  *Id.* (citing 16 U.S.C. § 1852(b)(1)(A) (emphasis added by Plaintiff)).  NEFSA makes the same argument for the Regional Administrator, who "serves on the Council due to his appointment to a career NMFS position; his tenure protections arise from statutes *outside* the Act," and, therefore, there is "no provision in the Act this Court could excise to cure the defect."  *Id.* (emphasis added by Plaintiff).  Without the ability to sever a removal-specific provision, Plaintiff says, "the only remedy would be to erase these six Council

Members from the Act *entirely*," which would contravene Congress's intention for the "Act's Council-based policymaking system." *Id.* at 24-25 (for the latter, citing *Alaska Airlines, Inc.*, 480 U.S. at 685) (emphasis added by Plaintiff).

NEFSA argues the complicated structure of the removal protections of the twelve governor-nominated Members similarly resists straightforward judicial severance, as it remains unclear if the Court should excise "[its] restriction to conflict-of-interest violations, the formal hearing rule, the supermajority requirement, the Council's prerogative to 'recommend removal,' or all of the above." *Id.* at 25 (citing 16 U.S.C. § 1852(b)(6)). It compares this structure to the "discrete for-cause provisions" severed by the courts in *Free Enterprise Fund* and *Seila Law*, arguing that doing so here would "usurp[] 'editorial freedom' that 'belongs to the Legislature.'" *Id.* (citing *Seila Law*, 591 U.S. at 238)). Plaintiff posits "[t]here is simply too much guesswork to ensure the revised Act will 'remain[] fully operative' in the manner Congress intended." *Id.* (citing *Free Enter. Fund.*, 561 U.S. at 509; *Alaska Airlines, Inc.*, 480 U.S. at 685).

Turning to the second step of the severability analysis, NEFSA argues that, even if the Court could rewrite the MSA to make Council Members removable by the President, the statute's text and history bely Congress's intent to leave fishery policy development to the states. *Id.* It was the opposition of state governments and the fishing industry that prompted Congress to put states in charge of the Council system, Plaintiff says, referencing earlier drafts of the statute that called for, in the Senate's version, "Members to be appointed by the President in consultation with

44

Governors, then confirmed by the Senate," or, in the House's version, for "three federal officials, a gubernatorial appointee from each state, and at-large seats filled by the Commerce Secretary from lists prepared by the other Members." *Id.* (first citing S. Rep. No. 961, 94th Cong., 1st Sess. (1975); then citing H.R. Rep. No. 94-445, 94th Cong., 1st Sess. (1975)). In addition to these earlier drafts, NEFSA quotes from hearings before the Senate Committee on Commerce raising concerns regarding federal control of fishery policy. *Id.* (citing *Hearings Before the Senate Committee on Commerce on S. 961*, 94th Cong., 1st Sess., 468 (1975) (Sen. Stevens)). NEFSA credits these concerns and "political pressures" with the changes made to the final version of the Act, which granted greater authority to state entities over developing fishery policy, such that "Congress would never have enacted a federally controlled regulatory regime." *Id.* at 26-27. Because Congress did not seek or intend to create fully federal Councils, Plaintiff concludes, neither should the Court through severing governor-nominated Members. *Id.* at 27.

Finally, NEFSA argues that prospective relief is warranted even if removal protections were severable, because Framework Adjustment 65 and the Final Rule "represent an exercise of federal power free from presidential control . . . [a]nd a successful plaintiff is generally entitled to relief from the imposition of such power." *Id.* Plaintiff tells the Court "its members are subject to the Council's ongoing authority. . . [which] is 'illegitimate,' 'cannot be undone' and requires 'meaningful judicial relief,'" and claims the "obvious remedy . . . would be to dismiss the agency's

action—*i.e.*, to vacate it." *Id.* (first citing *Axon Enter.*, 598 U.S. at 191-92; then citing *Seila Law*, 591 U.S. at 232).

Alternatively, NEFSA seeks a declaration from the Court "that the Act's removal restrictions are unconstitutional and the Final Rule is unlawful," which it asserts is "'appropriate' to 'declare the rights' of a party" in the event of an "actual controversy." *Id.* at 27-28 (citing 28 U.S.C. § 2201(a)).  NEFSA concludes by citing *Collins* to support its argument that declaratory relief is appropriate if a plaintiff "is impacted by the *conduct* of an illegally insulated official—'not [by] the provision of law that is challenged.'" *Id.* at 28 (citing *Collins*, 594 U.S. at 258-59 n.24).

### c.    Private Non-Delegation Doctrine

In the event the Court finds Council Members do not constitute federal officers, NEFSA brings an alternative claim for a violation of the private non-delegation doctrine by arguing this constitutional doctrine "permits only the federal government to exercise federal power."  *Id.* at 28-29 (citing *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 880 (5th Cir. 2022)).  Any role delegated to private entities "must be an 'advisor[]'—nothing  more." *Id.*  (citing *Oklahoma v. United States*, 62 F.4th 221, 229 (6th Cir. 2023)).

NEFSA draws an extensive comparison to another statutory scheme the Fifth Circuit declared invalid pursuant to the non-delegation doctrine.  First, Plaintiff describes the structure of the Horseracing Integrity and Safety Act (HISA), which created the Horseracing Integrity Safety Authority as a "private, independent, self-regulatory, nonprofit corporation" to "develop[] regulatory program[s]" and submit

them to the Federal Trade Commission (FTC). *Id.* (citing 15 U.S.C. §§ 3052(a), 3053(a)). Pursuant to the HISA, the proposed regulations do not take effect until approved and published in the Federal Register by the FTC; however, the statute instructs the FTC to approve any proposed rule "consistent" with HISA. *Id.* (citing 15 U.S.C. § 3053(b)(1)-(2), (c)(2)). When challenged, the Fifth Circuit identified three constitutional flaws in HISA: "*First*, HISA gave the Authority 'sweeping' policymaking power over 'myriad' aspects of the industry," *"[s]econd*, the court emphasized the FTC's 'limited review' for 'consistency' with HISA,*"* and "*[t]hird*, the court stressed the FTC's inability to 'abrogate' or 'modify' Authority rules." *Id.* at 30 (citing *Black*, 53 F.4th at 882-88) (emphasis added by Plaintiff).

After Congress amended the HISA to give the FTC "sweeping power to . . . create rules that 'abrogate, add to, and modify the rules of the Authority,'" *id.* (citing *Oklahoma*, 62 F.4th at 227) (quoting 15 U.S.C. § 3053(e)), the Sixth Circuit upheld the constitutionality of HISA in a subsequent challenge based on two key reasons: "*[f]irst*, it allowed the FTC to unconditionally and unilaterally 'abrogate' or 'modify' the Authority's proposed and enacted rules," and *"[s]econd*, it 'grant[ed] the FTC a comprehensive oversight role,' ensuring that its newfound 'power to write and rewrite the rules' would "'span[] the [Authority's] whole jurisdiction.'" *Id.* (quoting *Oklahoma*, 62 F.4th at 227-31) (emphasis added by Plaintiff).

NEFSA likens the MSA to the original version of HISA declared unconstitutional by the Fifth Circuit, arguing the Councils enjoy similar "sweeping" authority, "exercise their policy judgment to 'develop' and 'prepare' fishery rules"

47

before submitting them to a federal agency for review and promulgation, and are compelled to approve policies if "consistent" with the statute. *Id.* (citing 16 U.S.C. §§ 1852(h)(1), (6); 1854(a)(1)(A), (a)(3)). Further, as with the HISA, "identifying an inconsistency does not empower the reviewing agency to take unilateral action, but triggers a remand accompanied by 'recommendations.'" *Id.* (citing 16 U.S.C.§ 1854(a)(3)(C)). NEFSA points out that the Act also "expressly *bars* NMFS from 'repeal[ing] or revok[ing]' a Council's plan without its consent," which it argues distinguishes it from the amended HISA found constitutional by the Sixth Circuit. *Id.* (citing 15 U.S.C. § 3053(e); *Oklahoma*, 62 F.4th at 230) (emphasis added by Plaintiff).

Plaintiff argues the MSA goes even further than the HISA by providing that "Council rules 'shall take effect' if NMFS *fails* to act," and leaves crucial decisions, such as enacting a limited access system or issuing emergency regulations, "to the Councils *alone.*" *Id* at 31-32 (citing 16 U.S.C. §§ 1854(a)(3)(C), (c)(3); 1855(c)(2)(A)) (emphasis added by Plaintiff). Finally, Plaintiff claims NMFS "lacks the 'comprehensive oversight' —across the Councils' 'whole jurisdiction'—that the Sixth Circuit found dispositive" in its ruling on the amended HISA. *Id.* at 32 (citing *Oklahoma*, 62 F.4th at 230). Based on the foregoing, NEFSA concludes that, if the Councils are deemed private actors, this statutory structure violates the private non-delegation doctrine by granting executive power to a private actor. *Id.*

48

### d.     Defendant Rauch's Insulation from Removal

NEFSA brings a separate constitutional claim against Defendant Rauch as being unconstitutionally insulated from removal. *Id.* at 32. Reiterating the need for executive accountability, Plaintiff notes Congress "created an insulated cadre of 'Senior Executive Service' [SES] officers who *by definition* 'exercise[] important policy-making, policy-determining, or other executive functions.'" *Id.* (citing 5 U.S.C. § 3132(a)(2)(E)) (emphasis added by Plaintiff). These SES officials "can be suspended or terminated only for 'misconduct, neglect of duty, malfeasance, or failure to accept a directed reassignment or to accompany a position in a transfer of function'—and only with robust procedural protections and appellate rights." *Id.* (citing 5 U.S.C. §§ 7542–43, 7512–13). Plaintiff contests SES removal protections as "wholly 'incompatible with the Constitution's separation of powers.'" *Id.* (quoting *Free Enter. Fund*, 561 U.S. at 498). This insulation, it says, "impede[s] the President's prerogative to remove those 'who disobey his commands, [or for other reasons]'" *id.* (citing *Collins,* 594 U.S. at 256), regardless of if some in the SES are "relatively low on agency organizational charts." *Id.* (citing *Arthrex*, 594 U.S. at 18).

Applying its criticisms to Defendant Rauch, an SES official, NEFSA argues he "wields substantial executive power" by overseeing NMFS regulatory programs and actions, while "enjoy[ing] powerful removal protections that follow SES status." *Id.* at 34. First, regarding "Mr. Rauch's authority to issue rules," NEFSA argues "[t]he Supreme Court has held that, under the Constitution, only 'Officers' . . . have [that] power." *Id.* (quoting *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 41 (D.D.C. 2017)).

49

In this case, Plaintiff says, Defendant Rauch "issues rules by executing and publishing Council FMPs, amendments, and regulations in the Federal Register and CFR as final rules," and "signed the official internal 'decision memorandum' certifying the rules legality," and he does so "across *all* federally managed fisheries— those under Councils and those under NMFS." *Id.* (citing A.R. 6205) (emphasis added by Plaintiff).

NEFSA also clarifies that Defendant Rauch does not fit either of the exceptions to the Constitution's removal rules under *Humphrey's Executor* or *Morrison*, as he is a "purely executive official[]" who exercises policymaking or administrative authority. *Id.* at 35 (citing *Seila Law*, 591 U.S. at 218). As such, his insulation from removal is unconstitutional, making his exercise of authority "illegitimate" and the rules he signed void, unless the unconstitutional protections are severable. *Id.* (citing *Axon Enter.*, 598 U.S. at 191). However, on this point, NEFSA argues that severance is impossible because insulation from removal is "the *whole point* of the SES regime," *id.* (citing *Seila Law*, 591 U.S. at 233-34) (emphasis added by Plaintiff), and thus, the Court should declare Defendant Rauch's issuance of the Final Rule unlawful, vacate it, and enjoin its enforcement. *Id.* In the alternative, should the Court find Defendant Rauch's removal protections severable, Plaintiff asks the Court to, at minimum, declare his insulation from removal unconstitutional. *Id.* (citing *Seila Law*, 591 U.S. at 233-34).

## B.    Defendants' Cross-Motion for Summary Judgment

### 1.    Standing

Defendants begin by reminding the Court that federal court jurisdiction is limited to "actual 'cases' and 'controversies'" under Article III of the United States Constitution. *Defs.' Mot.* at 9 (citing U.S. CONST. art. III, § 2). Defendants then summarize the three elements of standing articulated by the Supreme Court in *Lujan v. Defenders of Wildlife*, writing "[f]irst, the plaintiff must have suffered an 'injury in fact,' meaning an invasion of a legally protected interest that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citing *Lujan*, 504 U.S. at 560; *Spokeo, Inc. v. Robins*, 578 U.S. at 339 (2016)). The second required element, Defendants assert, is "a causal connection between the injury and the conduct complained of," continuing that "the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Id. at* 9-10 (citing *Lujan*, 504 U.S. at 560). Third, "it must be 'likely,' not merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Id.* at 10 (citing *Lujan*, 504 U.S. at 561.

The Defendants place on NEFSA "the burden of alleging facts that 'affirmatively' demonstrate standing," and assert this burden must be met "for each claim it brings." *Id.* (first quoting *FW/PBS v. City of Dall.*, 493 U.S. 215, 231 (1990); then quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006) (internal quotation marks omitted)). Recognizing the different standard for determining the standing of an associational plaintiff, Defendants inform the Court that an association "may have standing if at least one of its members has standing in his or her own right, the interests served by the suit are pertinent to the mission of the

organization, and relief does not require the presence of the members in the suit." *Id.* (quoting *Town of Norwood v. FERC*, 202 F.3d 392, 405-06 (1st Cir. 2000)).

Having established the standard they deem applicable to NEFSA, Defendants argue it lacks associational standing "because none of its members has standing in his or her own right;" more specifically, NEFSA fails to satisfy causation "because Plaintiff's members allege injury from the Final Rule promulgated by NMFS, yet nearly all Plaintiff's merits arguments center on the alleged unconstitutionality of the New England Council, whose actions have 'no legal effect whatsoever.'" *Id.* (quoting *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *53-54).

### a.   Standing for Claims Relating to the Structure of the New England Council

Beginning by addressing NEFSA's assertion of standing to challenge the New England Council, Defendants characterize NEFSA's case as "a two-pronged argument," writing "[f]irst, Plaintiff asserts that the New England Council violates the Constitution's Appointments Clause for multiple reasons. Second, Plaintiff contends that it has suffered injuries from NMFS's Final Rule, namely financial losses and 'subjection to' a rule issued by 'unconstitutionally appointed and insulated officers.'" *Id.* at 11 (citing *Pl.'s Mot.* at 37) (quoting *Axon Enter.*, 598 U.S. at 190-91). Accepting, for the sake of argument, "that Plaintiff has provided sufficient allegations to show injury-in-fact from the second prong," Defendants aver the purported injuries "are not traceable to any constitutional infirmities articulated in the first prong." *Id.* Defendants restate "Plaintiff has not 'sustain[ed]' an injury 'from an [act by the

52

Council] that allegedly exceeds the [Council's] authority.'" *Id.* (citing *Seila Law*, 591 U.S. at 202, 210-11 (2020) (internal quotation marks and citations omitted)).

### i.    Causation

Defendants cite cases from other circuits to support their claim that "a plaintiff lacks standing where, as here, a plaintiff fails to connect the injury allegedly caused by NMFS's duly-issued regulation to the Council." *Id.* (citing *Northwest Envt'l Def. Ctr. v. Brennen*, 958 F.2d 930, 937 (9th Cir. 1992) (finding the Pacific Council's regulations setting harvest limits for Oregon coastal coho salmon did not cause plaintiffs' injury because the Secretary implemented the regulations in question, such that "[w]hatever constitutional infirmity may inhere in the Council's structure has not caused the injury of which [plaintiff] complains"); *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *56 (finding "a Council's proposal has no legal effect whatsoever without the agency first promulgating implementing regulations"). Defendants collect additional caselaw in which courts found, in the context of the MSA, that "only the Secretary (acting through NMFS) has the authority to approve and implement an FMP, FMP amendment, framework adjustment, or specifications through regulations or other actions that have the effect of law." *Id.* at 11-13 (citing *J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1157-59 (E.D. Va. 1995); *Conservation Law Found. of New England v. Franklin*, 989 F.2d 54, 60 (1st Cir. 1993); *Gulf Restoration Network v. NMFS*, 730 F. Supp. 2d 157, 174 (D.D.C. 2010); *Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 436 (D.D.C. 2014). This is because "the Council is not

53

an 'agency' under the APA." *Id.* at 13. (citing *Flaherty v. Ross*, 373 F. Supp. 3d 97, 104-10 (D.D.C. 2019).

After this recitation of caselaw, Defendants address NEFSA's arguments distinguishing the present case from *Brennen* and *UCIDA*. *Id.* at 14. Specifically, Defendants' assert NEFSA's reliance on these cases is "misplaced" because their standing fails, not for the "'counterfactual world' in which a differently structured Council would have reached a different decision, . . . but because any proposal by the Council is only that—a proposal." *Id.* (citing *Seila Law*, 591 U.S. at 210-11). Thus, Defendants take the position that "there is no world in which the Council's proposals cause injury to Plaintiff." *Id.* Defendants also distinguish *Collins* and *Seila Law* from the present case by arguing that, "in both[,] the injury was traceable to the action taken by the allegedly unconstitutional agency." *Id.* (citing *Collins*, 594 U.S. at 242 (challenging the Federal Housing Finance Agency's "adoption and implementation" of an action); *Seila Law*, 591 U.S. at 210-11 (challenging "an executive act that allegedly exceed[ed] the official's authority)). Defendants aver these actions can be distinguished from the present case because "Councils under the [MSA] are simply advisory bodies and have no legal authority." *Id.* (citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *59). Defendants argue the injury here fails to satisfy the causation element of standing, which "demands more than incidental effects; the injury must be fairly traceable to the challenged action." *Id.*

Defendants next respond to NEFSA's "assertion that the [MSA's] 'constitutional defects short-circuited the regulatory process and denied NMFS any

authority to promulgate the Final Rule,'" which they argue "rests on the flawed premise that the Council's proposal had a legal effect." *Id.* at 15 (quoting *Pl.'s Mot.* at 38). Defendants note that NEFSA cites 16 U.S.C. § 1854(a)(1)(A)) to support its contention that "NMFS could have rejected Framework 65—and indeed was required to reject it." *Id.* Defendants argue that while "the Framework was not proposed under § 1854(a), the provision "undercuts the Plaintiff's own position" by requiring the Secretary to "independently review whether the Council's recommendation is 'consistent with the national standards, the other provisions of this chapter, and any other applicable law.'" *Id.* (citing 16 U.S.C. § 1854(a)). As such, Defendants say, the Secretary possesses "wide discretion" under the statute to determine "whether and how to move forward with any action proposed by the councils." *Id.*

Defendants next respond to NEFSA's argument that "NMFS's action is not necessarily a prerequisite to Council recommendations taking effect." *Id.* at 16 (citing *Pl.'s Mot.* at 38). Calling this argument "a red herring," Defendants posit "whether the Secretary affirmatively acts on an FMP amendment is of no moment from a legal perspective, as these have no legal effect without implementing regulations, which the Secretary—not the Council—issues." *Id.* at 15-16 (citing 16 U.S.C. § 1854(b)). Further, Defendants characterize "the Secretary's choice to take no action on a proposed amendment under § 1854(a)(3)" as "itself a deliberate decision." *Id.* However, Defendants argue that "the Court need not reach this issue" because "Framework 65 was not submitted under § 1854(a)," and "the Secretary, through AA Coit as the head of NMFS, did determine that the Council's Framework 65

55

regulations are consistent with the FMP, the statute, and other applicable laws pursuant to § 1854(b)(1)(A)." *Id.* at 16. As such, Defendants say, "Plaintiff has suffered no injury because of the Council's Framework 65 'tak[ing] effect *as if approved*.'" *Id.* (citing 16 U.S.C. § 1854(a)(3) (emphasis added by Defendants).

Defendants further contest NEFSA's reliance on *Cruz*, arguing the Supreme Court's holding in that case is inapposite because of differences in the underlying statute. *Id.* (citing *Cruz*, 596 U.S. at 301). Defendants emphasize the *Cruz* Court's finding that "a litigant cannot, 'by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him.'" *Id.* (quoting *Cruz,* 596 U.S. at 301). "Whereas in *FEC* the Court determined the appellees were challenging 'one Government action that cause[d] their harm[,]' Plaintiff here seeks to challenge an action that did not injure it—the Council's proposal of Framework Adjustment 65—via a claim to have been injured by NMFS's Final Rule implementing that Framework." *Id.* at 17. Defendants reiterate that "[c]ourts have refused to recognize challenges to the Council's recommendations because they have no legal effect and are not final agency actions." *Id.* (citing *Gulf Restoration Network*, 730 F. Supp. at 174).

Addressing NEFSA's argument that "the Council's proposals did cause harm to its members because, while NMFS approved Framework 65, 'its substance was developed by the Council,'" Defendants posit that "the Secretary, through AA Coit, had the ultimate discretion to approve or disapprove of Framework Adjustment 65, after considering the National Standards and applicable law, among other factors."

56

*Id.* Defendants argue Defendant Coit affirmatively chose to approve Framework 65 and implement it through final regulations following her consideration of public comments. *Id.* "This independent decision by the Secretary—and not the Council's proposal—is the cause of any injuries allegedly incurred by Plaintiff." *Id.* Defendants dispute NEFSA's analogy to *Department of Commerce v. New York*, arguing this case "did not disturb the Court's 'steady refusal' to find standing where the chain of causation is broken by 'independent decisionmakers' exercising their judgment." *Id.* (citing *Dep't of Com. v. New York*, 588 U.S. at 768 (2019)).

### ii. Redressability

Turning to redressability, Defendants aver the causation analysis colors this element. *Id.* at 17-18 (citing *West v. Lynch*, 845 F.3d 1228, 1235-36 (D.C. Cir. 2017) (noting that redressability and causation are "'closely related' like 'two sides of a . . . coin.'" (citation omitted)). Defendants say declaratory or injunctive relief provide no relief in the present case "[b]ecause the Council has no authority to issue regulations." *Id.* (citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *59-61). While "Plaintiff asserts that vacatur of the Final Rule would redress its alleged injury," Defendants argue "Plaintiff has not mounted a challenge to the substance of the Final Rule . . . , and thus would not redress the claimed injuries." *Id.* (citing *Alaska Factory Trawler Ass'n v. Baldrige*, 831 F.2d 1456, 1464 (9th Cir. 1987).

Finally, with respect to its claims against actions by the Council, Defendants argue NEFSA also lacks standing for its alternative claim that the Council violates the private non-delegation doctrine because "the Council's proposals have no legal

effect without an implementing regulation or an action published in the Federal Register [and] [t]hus, any injury to Plaintiff flows from actions taken by NMFS, and not from any proposal by the Council." *Id.*

> ### b. Standing for Claim Relating to the Actions of Defendant Rauch

Defendants next argue NEFSA lacks standing for its claim involving Defendant Rauch, observing that the association bases its standing in this regard on two "incorrect assumptions," those being: "(1) DAARP Rauch has the 'authority to issue rules'; and (2) [Defendant Rauch] used that authority to issue the Final Rule in this case." *Id.* at 19 (citing *Pl.'s Mot.* at 34-35). In doing so, Defendants say, "Plaintiff misunderstands the nature of NMFS's rulemaking process and DAARP Rauch's role in that process." *Id.* Defendants assert Defendant Rauch "has no authority to issue regulations and, consistent with this lack of legal authority, did not issue the Final Rule . . . [i]nstead, [Assistant Administrator] Coit, a properly appointed inferior officer, issued the Final Rule." *Id.* To support this contention, Defendants cite the Administrative Record, which shows, on May 17, 2023, Defendant Coit "received correspondence asking for her review of the proposed rule to implement Framework 65," to which she "responded that she 'approve[d]' the proposed rule." *Id.* (citing A.R. 6072-73). Defendant Coit further "received correspondence with the Final Rule for her review," on August 2, 2023, and approved the Final Rule the following day. *Id.* at 20 (citing A.R. 6212-13).

Defendants support the propriety of Defendant Coit's actions because she "is an 'inferior officer' properly appointed under the Appointments Clause. . . [with] the

authority to issue this rule." *Id.* (first citing Reorganization Plan No. 4 of 1970, 84 Stat. 2090 (1970) (providing that the Assistant Administrator "shall be appointed by the Secretary, subject to approval of the President"); then citing *Massachusetts v. Pritzker*, 10 F. Supp. 3d 208, 212 n.4 (recognizing that NMFS, as the Secretary's designee, has authority to promulgate certain regulations under the MSA)). Defendants point out that NEFSA does not argue "that [Assistant Administrator] Coit's appointment is unconstitutional or that she lacked legal authority to issue the Final Rule," instead focusing its argument on delegation of such authority to the Deputy Administrative Assistant for Regulatory Programs, Defendant Rauch, pursuant to the NOAA Organizational Handbook. *Id.* (citing *Pl.'s Mot.* at 5).

Defendants insist NEFSA misrepresents the contents of the NOAA Organizational Handbook in its claim that "the [AA] has subdelegated the power to issue rules for publication in the Federal Register and Code of Federal Regulations to [DAARP Rauch]." *Id.* (citing *Pl.'s Mot.* at 5) (citing A.R. 6248). Defendants argue the only authority delegated to Defendant Rauch is for the "*signature* of material for publication in the Federal Register and the Code of Federal Regulations." *Id.* (citing A.R. 6245) (emphasis added by Defendants). Defendants distinguishes the power of signature from the power to issue rules, describing the former as a "ministerial task" and "not a significant exercise of authority" that can be lawfully performed by a non-officer. *Id.* (citing *Freytag,* 501 U.S. at 881). According to the Defendants, NEFSA's "alleged injury does not stem from DAARP Rauch issuing the Final Rule, and is instead traceable to Assistant Administrator Coit," such that NEFSA "has not

'sustain[ed]' an injury 'from an [act by Defendant Rauch] that allegedly exceed [his] authority.'" *Id*. at 21 (for the latter, quoting *Seila Law*, 591 U.S. at 211.

Defendants claim their argument regarding NEFSA's failure to prove the actions of Defendant Rauch caused their alleged injury similarly applies to the element of redressability, because "any favorable judgment directed at DAARP Rauch as the allegedly unconstitutional employee would not redress their injuries." *Id*.

Finally, Defendants also dispute NEFSA's asserted standard for the judicial inquiry at the summary judgment stage, arguing NEFSA "must set forth by affidavit or other evidence specific facts" in support of standing and cannot "premise its standing on an erroneous legal conclusion." *Id*. at 19 (first citing *Lujan*, 504 U.S. at 561; then citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

### 2. Merits

Turning from standing to the merits of NEFSA's claims, Defendants argue that, on the merits, "the Court should grant Defendants summary judgment in full," because Council Members are not federal officers, the statutory structure of the MSA does not violate the non-delegation doctrine, and Defendant Rauch did not issue the Final Rule. *Id*. at 21.

### a. Appointments Clause

#### i. Council Members as Officers of the United States

Defendants contest NEFSA's characterization of the Council Members as federal officers. *Pl.'s Mot*. at 21-34. Describing the same two types of officers and their respective appointment processes articulated by the Plaintiff, Defendants assert

"[p]rincipal officers must be appointed by the President with the advice and consent of the Senate, while inferior officers may be, if authorized by Congress, appointed by the President alone, the head of the department, or a court." *Id.* at 21 (citing *Arthrex*, 594 U.S. at 10) (citing U.S. CONST. art. II, § 2, cl. 2). However, Defendants argue the Court need not determine which type of officer a Council Member would be, because they do not constitute federal officers at all based on their lack of a "continuing" position or "significant authority." *Id.* at 22 (citing *Lucia*, 595 U.S. at 237). Rather, they conclude the Councils serve as advisory committees to NMFS. *Id.* at 33.

### 1.    Holding Continuing Offices Established by Law

Beginning with the first factor, "continuing office," Defendants describe the Council Member duties as "episodic and temporary," arguing that the Council meets "five to six times a year," for periods of approximately three days. *Id.* at 22 (citing A. R. 2561-65; 5030-42; 5333-36). As such, Council Members work "only when called upon at discrete moments during the year." *Id.* (citing 16 U.S.C. § 1852(e)(3)). Defendants distinguish these "temporary assignments" from the "career appointments" of SEC ALJs that NEFSA points to in *Lucia. Id.* Council Members' compensation is similarly limited, Defendants say, as the twelve governor-nominated New England Council Members are expressly "not employed by the Federal Government," and receive daily compensation only for the times when they "engaged in the actual performances of duties for such Council. *Id.* at 22-23 (citing 16 U.S.C. § 1852(a)(1)(A), (b)(1), (b)(2)(B), (d)). The five Council Members who derive their

positions through their state government positions are also not federal employees and "receive no compensation at all from the Federal Government." *Id.* at 23.

Defendants argue that the "limited terms," "episodic nature," and "limited 'daily rate' compensation" all distinguish Council Members from the types of officials that courts have deemed federal officers, such as the SEC ALJs in *Lucia* or the FTC special trial judges in *Freytag*. *Id.* (citing *Lucia*, 595 U.S. at 247-48; *Freytag*, 501 U.S. at 880-82). Rather, Defendants insist the Council Members have more in common with the civil surgeon appointed in *Germaine*, which that court deemed to not be an officer because "the tenure, duration, emolument, and duties of the job were merely occasional and temporary." *Id.* (citing *Germaine*, 99 U.S. at 512). Defendants further direct the Court to a decision by the D.C. Circuit Court, which found that ""[t]he Appointments Clause governs the selection of public officers—it says nothing about the exercise of public power by private persons." *Id.* at 23-24. (citing *Melcher v. Fed. Open Mkt. Comm.*, 644 F. Supp. 510, 521 (D.D.C. 1986)).

Responding to NEFSA's argument that "federal employment is not necessary," *Pl.'s Mot.* at 10, Defendants assert that, while employment is certainly not required to a federal officer, this "is a factor that weighs in favor of finding the Council Members to be officers," and is not present in this case. *Id.* at 24.

## 2. Exercising Significant Authority

Defendants next dispute Plaintiff's characterization of the Councils' authority, arguing that its members "cannot exercise 'significant authority'" because "no action taken by the Council is self-executing" and "the Secretary—acting through the AA— has the sole authority to promulgate binding regulations." *Id.* at 24-25. Claiming

"Plaintiff has advanced not only an as applied challenge to the Final Rule, but also a general challenge to Councils," Defendants direct the Court to two statutory provisions as "clear evidence of the Secretary's ultimate responsibility for fisheries management:"

> First, in 16 U.S.C. § 1854, Congress described a wide array of authorities, including reviewing FMPs (§ 1854(a)), reviewing regulations (§ 1854(b)), preparing FMPs for highly migratory species and for other species when a Council fails to develop an FMP (§ 1854(c), (g)), and determining when a species is overfished and requires rebuilding (§ 1854(e)). Second, in 16 U.S.C. § 1855, Congress articulated in capacious language NMFS's "general responsibility to carry out any [FMP] or amendment" and to promulgate regulations "as may be necessary to discharge such responsibility or to carry out any other provision of this chapter." That section also vests NMFS with authority to implement emergency or interim measures. *Id*. § 1855(c).

*Id*. at 25. Describing the review pursuant to 16 U.S.C. § 1854(a) as "no rubber stamp," Defendants insist "[t]he Secretary must independently review whether the Council's recommendation is 'consistent with the national standards, the other provisions of this chapter, and any other applicable law.'" *Id*. at 26 (for the latter, quoting 16 U.S.C. § 1854(a)(1)(A)).

Defendants first point to the National Standards, which they argue "require the Secretary to exercise discretion and judgment in balancing' several competing factors." *Id*. (quoting *All. Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996)). Defendants assert "the Secretary may not promulgate an implementing regulation that, in her judgment, is inconsistent with the ten National Standards," and "retains ultimate discretion" in determining an FMP's consistency. *Id*. at 26-27 (citing *Conservation Law Found. v. Mineta*, 131 F. Supp. 2d 19, 27 (D.D.C. 2001)). Further, Defendants say, the Secretary serves a front-end role in FMP development "through

63

the National Standard advisory guidelines, which the statute required the Secretary to publish." *Id.* at 27 (16 U.S.C. § 1851(b)).

Defendants next focus on the Secretary's determination of "whether a Council proposal is consistent with 'other applicable law.'" *Id.* (citing 16 U.S.C. § 1854(a)(1)(A), (b)(1)). Defendants assert this "independent evaluation" reviews for consistency with numerous other federal environmental laws and executive orders and was completed with regard to the Final Rule at issue here according to A.R. 6201-11. *Id.* Defendants claim "the Secretary's statutory authority to disapprove the Council's plan or amendments shows that the Council does not wield 'significant authority.'" *Id.* (citing *Estes v. U.S. Dep't of the Treasury*, 219 F. Supp. 3d 17, 38 (D.D.C. 2016)). Further, Defendants say, only the Secretary holds "[t]he power to alter a proposed regulation before it becomes final," a supposedly significant discretionary authority subject only to the requirements that she "consult with the Council" and include an explanation of the revision in the rule's publication to the Federal Register. *Id.* at 28. Finally, Defendants point the Court to the Secretary's ability to "promulgate 'emergency regulations or interim measures necessary to address [an] emergency or overfishing'" based on her determination that such measures are necessary to reduce overfishing, *id.* (citing 16 U.S.C. § 1855(c)(1)), which they argue is "legally and historically distinct from [the Secretary's] power to issue rules to implement FMPs and amendments." *Id.* (citing *Assoc. Fisheries of Me. v. Evans*, 350 F. Supp. 2d 247, 255 (D. Me. 2004)).

64

Seeking to differentiate the statutory scheme of the MSA from the roles found by courts to exercise significant authority in cases cited by NEFSA, Defendants first argue the FEC members found to be unconstitutional in *Buckley* had "'primary and substantial responsibility for administering and enforcing the [Federal Election Campaign] Act,' record-keeping, disclosure, and investigative functions, as well as extensive rule making and adjudicative powers." *Id.* at 28-29 (citing *Buckley*, 424 U.S. at 109). Defendants juxtapose this role with that of the Councils, which they contend is "solely advisory." *Id.* at 29 (citing signing statements accompanying amendments and reauthorizations of the MSA by Presidents Trump, Bush, and Clinton, respectively). Defendants bolster this position by citing numerous cases in which other courts determined Council proposals have no legal authority without implementing regulations promulgated by NMFS. *Id.* at 29-30 (citing, e.g., *J.H. Miles & Co.*, 910 F. Supp. at 1157-59; *Goethel*, 2016 U.S. Dist. LEXIS 99515; *Flaherty*, 373 F. Supp. 3d at 104-10; *Yakutat, Inc. v. Evans*, No. C02-1052R, 2003 WL 1906336, at *3 (W.D. Wash. Apr. 10, 2003); *Nw. Env't. Def. Ctr. v. Evans*, No. Civ. 87-229-FR, 1988 U.S. Dist. LEXIS 8977, at *20 (D. Or. Aug. 12, 1988); *Fishing Co. of Alaska v. Gutierrez*, 510 F.3d 328, 333 (D.C. Cir. 2007)).

Defendants argue NEFSA ignores this robust jurisprudence and, instead, "leans heavily on *Lucia* and *Freytag*," which Defendants posit are inaccurate comparisons. *Id.* Regarding the SEC ALJs at issue in *Lucia*, Defendants argue these officials "'exercise[d] significant discretion' in the course of 'tak[ing] testimony, conduct[ing] trials, rul[ing] on the admissibility of evidence, and . . . enforc[ing]

compliance with discovery orders,'" id. (citing *Lucia*, 595 U.S. at 246-47), such that the Supreme Court determined these officials "exercised 'nearly all the tools of federal trial judges'" and, further, "issued opinions that could be 'deemed the action of the [SEC]' without further review." *Id* at 30-31 (citing *Lucia*, 595 U.S. at 249). Similarly, Defendants say, "the Tax Court special trial judges in *Freytag* had 'the power to enforce compliance with discovery orders' and to 'punish contempts by fine or imprisonment.'" *Id.* at 31 (citing *Freytag*, 501 U.S. at 882, 891). Defendants note that, in *Freytag*, "the government *conceded* that they acted as inferior officers in cases in which they could enter final decisions," which led to the Supreme Court's ruling that "[s]pecial trial judges are not inferior officers for purposes of some of their duties under [the statute] but mere employees with respect to other responsibilities." *Id.* (citing 501 U.S. at 891) (emphasis added by Defendants). Comparing the officials in *Lucia* and *Freytag* to the Councils, Defendants assert the Council "possesses no power to enter final decisions" based on the Secretary's authority to review their proposals and lack of legal force until "*after* the Secretary chooses to promulgate a regulation," such that the Councils do not wield significant authority. *Id.* (emphasis added by Defendants).

Defendants continue by responding to NEFSA's invocation of 16 U.S.C. § 1854(h), under which NEFSA argues "now that Framework Adjustment 65 has taken effect, the Council must consent to any lifting of its restrictions." *Id.* (quoting *Pl.s' Mot.* at 11). Defendants note "Framework 65 has no independent legal effect without the implementing regulations that only the Secretary can promulgate," and argue

66

NEFSA mischaracterizes this statutory provision as a restriction on the Secretary; rather, Defendants say, the section "limits the ability of the *Council* to repeal or revoke its own FMP by a three-quarters majority," but "does not speak to the Secretary's significant authority to, for example, prepare her own Secretarial plan and implementing regulations, independent of the Council." *Id.* at 32 (first citing 16 U.S.C. §§ 1854(h) ("The Secretary may repeal or revoke a fishery management plan for a fishery *under the authority of a Council* only if the Council approves.") (emphasis added by Defendants); then citing 16 U.S.C. §1854(c), (g)).

Defendants also respond to NEFSA's argument that Council Members "are 'vested with the *general* rulemaking authority,'" *id.* (quoting *Pl.'s Mot.* at 12), by arguing the statute instead grants NMFS with the "'general responsibility to carry out any [FMP] or amendment' and to promulgate regulations 'as may be necessary to discharge such responsibility or to carry out any other provision of this chapter.'" *Id.* (quoting 16 U.S.C. § 1855(d)).  Similarly, Defendants contest Plaintiff's assertions that "Council Members 'make various final decisions affecting the rights and obligations of fishermen,'" *id.* (citing *Pl.'s Mot.* at 14), by arguing each of the four examples leveraged by Plaintiff actually "contemplate a subsidiary role for the Council," writing:

> (1) proposals that are consistent with the Act and other laws only become final through action by NMFS; (2) the repeal or revocation of an FMP only occurs after NMFS has implemented an FMP and only after NMFS has decided that repeal or revocation is appropriate; (3) Councils do not "order" NMFS to issue emergency regulations; rather, they can request that such an action be taken by NMFS; and (4) the Council must "first approve" and submit any proposed limited access system to NMFS,

> but such discretionary systems are part of an FMP, and an FMP is only
> implemented by NMFS.

*Id.* at 32-33.

Defendants also reject Plaintiff's argument "that the Councils cannot be advisory because Congress 'never describes the Councils or their policies in such terms,'" *id.* at 33 (quoting *Pl.'s Mot.* at 15), alleging NEFSA "ignores the purposes section of the statute, which indicates that Councils will 'advise on' the establishment of FMPs," "places form over substance," and that Congress explicitly "exempted the Councils from the Federal Advisory Committees Act," which implies the Councils fit the definition of an advisory committee. *Id.* (citing 16 U.S.C. §§ 1801(a)(3); 1824(b)(5)-(6); 1852(i)(1)). Finally, Defendants urge the Court to consider *Goethel*, which they argue "properly determined that the Appointments Clause challenge to an FMP amendment failed '[b]ecause the Councils do not exercise 'significant authority.'" *Id.* (quoting *Goethel*, 2016 U.S. Dist. LEXIS 99515, at *27-29).

Defendants conclude Council Members should not be deemed federal officers because "[t]hey do not occupy continuing positions," "they do not wield significant authority," and "the Council has no power to execute law." *Id.* at 34. They argue this "doom[s] Plaintiff's Appointments Clause claims," *id.*, such that "the Court need not reach Plaintiff's second claim that they are unlawfully insulated from removal." *Id.* at 34 n.8.

### b.    Private Non-Delegation Doctrine

Turning to NEFSA's assertion that the MSA violates the private non-delegation doctrine, Defendants argue this constitutional canon applies "if a private

entity were to have the final word over how delegated authority is used over other private entities." *Id* (citing *Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936)). Defendants raise several reasons why the instant case does not violate the private non-delegation doctrine.

First, Defendants dispute the characterization of Councils as "private," arguing "the Council is made up of both private individuals and individuals working in the public sector, specifically for state and federal agencies," such that the private non-delegation doctrine facially does not apply. *Id.* at 34-35 (citing *Kerpen v. Metro. Wash. Airports Auth.*, 907 F.3d 152, 162 (4th Cir. 2018) ("There has been no unlawful delegation of 'government power' to a private entity in this case for the simple reason that [the entity in question] is not a private entity"). Further, Defendants urge the Court to focus on "subordination," arguing the private non-delegation doctrine is not violated when the entity "operate[s] as an aid to the [agency]," "is subject to [the agency's] pervasive surveillance and authority," or the supervising agency "retains the discretion to 'approve[], disapprove[], or modif[y] [proposals].'" *Id.* at 35 (citing *Oklahoma*, 63 F.4th at 230; *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940); *Black*, 53 F.4th at 880; *Am. R.R.s v. U.S. Dep't of Transp.*, 721 F.3d 666, 671 n.5 (D.C. Cir. 2013)).

Applying the doctrine to this case, Defendants argue "the Council functions subordinately to NMFS," and as such, "Plaintiff's claim here fails as a matter of law." *Id.* Responding to NEFSA's comparison of the MSA to the HISA, Defendants argue the oversight by FTC provided by the amended statute and upheld by the Sixth

69

Circuit "is like the role of the Secretary in the [MSA]: it is NMFS that has the 'final say' over decisions." *Id.* (citing *Oklahoma*, 63 F.4th at 225; *Black*, 53 F.4th at 880). Defendants compare the HISA to the MSA, positing statutory similarities include: the ability of the Horseracing Authority and Councils to submit proposals that do not take effect until the supervising agency (the FTC and Secretary, respectively) determine the proposal's consistency with the statutory directives; the process of the supervising agency issuing the proposed rule for public comment and publishing a final rule in the Federal Register with any changes explained, or else returning an inconsistent proposal to the Authority or Council, respectively, with recommendations for its improvement; and the ability of the FTC or Secretary, respectively, to abrogate, add, or modify rules in certain scenarios. *Id.* at 36-37.

Defendants also look elsewhere for analogous support—in the securities context, the SEC's private self-regulatory organizations (SROs) were upheld against a private non-delegation doctrine claim by the Second Circuit. *Id.* at 37-38 (citing *R.H. Johnson & Co. v. SEC*, 198 F.2d 690, 695 (2d Cir. 1952)); *see also id.* (citing *Adkins*, 310 U.S. at 388 (permitting private industry's regulatory involvement based on supervision by the Coal Commission); *Currin v. Wallace*, 306 U.S. 1, 15-16 (1939) (upholding delegation of power to tobacco growers as lawfully "prescrib[ing] the conditions of [the law's] application"); *Sierra Club v. Lynn*, 502 F.2d 43, 59 (5th Cir. 1974) (permitting delegation of statutory responsibilities under the National Environmental Policy Act to a developer)). Defendants take the position that NEFSA "misunderstands the relationship between NMFS and the Councils," in its contention

that NFMS review is limited to consistent with the MSA alone, and further "disregards the basic precept that statutes should be interpreted to avoid constitutional problems, not to create them." *Id.* at 38 (for the latter, citing *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001)).

At bottom, Defendants insist "the Council functions subordinately to NMFS, which is the rule-maker," and, accordingly, the Act complies with the non-delegation doctrine. *Id.*

### c.   Claim Against Defendant Rauch

Defendants dispute NEFSA's claim that the Final Rule was "improperly 'issued'" by Defendant Rauch, arguing "[a]s a threshold matter, any Appointments Clause challenge to DAARP Rauch has been forfeited because it was not raised during the rulemaking proceedings." *Id.* Defendants acknowledge comments received during the public comment period raised alleged Appointments Clause violations against Council Members," *id.* at 38-39 (citing 88 Fed. Reg. at 56540), but claim no such comment was made against Defendant Rauch despite his signing of the Proposed Rule. *Id.* at 39 (citing 88 Fed. Reg. at 34819). As such, Defendants contend "NMFS was deprived of the opportunity to contemporaneously address any error." *Id.* (citing *Pepperell Assocs. v. EPA*, 246 F.3d 15, 27 (1st Cir. 2001); *In re DBC*, 545 F.3d 1373, 1377 (Fed. Cir. 2008); *Lucia*, 595 U.S. at 251).

Should the Court determine NEFSA did not forfeit this claim, Defendants argue NEFSA's description of Defendant Rauch as a federal officer unconstitutionally insulated from removal claim misapprehends his role by erroneously assuming that

he has "authority to issue rules" and "issues regulations. . . as he did here." *Id.* (citing *Pl.'s Mot.* at 34). Defendants argue "AA Coit is a properly appointed inferior officer who serves as the head of NMFS and issued the Final Rule." *Id.* at 39-40.

### d.    Entitlement to Relief

Defendants argue no remedy is warranted for Plaintiff's claims, but asks the Court, should it identify a flaw in the Final Rule, for "the opportunity to offer supplemental briefing on remedy, including severability." *Id.* at 40 (citing *Ayotte v. Planned Parenthood of N. New Engl.*, 546 U.S. 320, 328-329 (2006) and *Arthrex*, 594 U.S. at 23-24). Defendants contend "the appropriate remedy will turn on the contours of any ruling on the merits," such that it cannot yet determine how to best provide a properly tailored remedy. *Id.* However, should the Court find Defendant Rauch's removal protections to be unconstitutional, it posits the "appropriate remedy is ratification of the Final Rule by a duly appointed officer whose appointments and authority are undisputed." *Id.* (citing *Guedes v. ATF*, 920 F.3d 1, 13 (D.C. Cir. 2019); *Alfa Int'l Seafood*, 264 F. Supp. 3d at 30-32).

### C.    Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment and Reply in Support of Plaintiff's Motion for Summary Judgment

#### 1.    Standing

##### a.    Standing for Claims Relating to the Structure of the New England Council

NEFSA asserts Defendants "mischaracterize[] Plaintiff's claims and its theory of standing," by "complaining that Plaintiff has not proven its standing to sue *the Council* in this suit against NMFS and the Secretary." *Pl.'s Resp.* at 3 (emphasis

added by Plaintiff). NEFSA argues that, in proceeding in this manner, Defendants "effectively concede[] that Plaintiff *does* have standing to challenge the Final Rule," because "Defendants' allegedly unlawful act—*i.e.* promulgating the Final Rule— caused concrete harm to Plaintiff's members." *Id.* (emphasis added by Plaintiff).

On the element of causation, Plaintiff reiterates that "Defendants issued the Final Rule pursuant to the Secretary's statutory authority to approve and publish *Council* policies as regulations," which they claim Defendants do not dispute. *Id.* (citing A.R. 6228 (issuing Rule under 16 U.S.C. § 1854(b)(1)(A)); *Pl.'s Mot.* at 37–38 (citing § 1854(b)). NEFSA depicts the statutory mechanism as "a lock that requires a sequence of keys," such that "[t]he Council turns the first key by exercising its prerogative to develop and submit a regulation. NMFS then determines whether applicable law compels it to turn its own key by promulgating that submission as a rule." *Id.* (citing 16 U.S.C. §§ 1853(c), 1854(b)(1)). NEFSA argues that NMFS's issuance of the Final Rule "purported to turn that second key." *Id.* NEFSA considers the Defendants to have thus "concede[d] two of the three elements of Article III traceability: 'conduct of the defendant' that causes a concrete 'injury,'" *id.* at 4 (quoting *Collins*, 594 U.S. at 242), through its purported admission that "Plaintiff's members are suffering injuries as a *result* of that Final Rule." *Id.* (citing *Defs.' Mot.* at 11, 17) (emphasis added by Plaintiff). NEFSA argues that "the Council never turned its 'key' in the rulemaking 'lock' because . . . it lacked constitutional authority to do so. Thus, NMFS never received a valid Council submission. And without that prerequisite to rulemaking, the agency could not legally turn its *own* key." *Id.* (citing

16 U.S.C. § 1854(b)(1) (NMFS acts only "[u]pon transmittal" of Council's submission)) (emphasis added by Plaintiff).

NEFSA asserts the Final Rule was unlawful because "Congress expressly *required* NMFS to reject unlawful Council policies," which NEFSA argues includes "a rule developed and submitted by unconstitutional interlopers," such as the New England Council. *Id.* (emphasis added by Plaintiff). Responding to the Defendants' claim that NMFS exercised its discretion in reviewing the Council's Framework Adjustment 65 proposal and adopting the Final Rule, NEFSA dismisses this claim as "irrelevant to standing," asserting that its "merits position (accepted at this stage) is that the Council lacked *any* constitutional authority to submit Framework Adjustment 65, and thus that Defendants *never* received a submission to promulgate." *Id.* at 5 (emphasis added by Plaintiff).

NEFSA also addresses the third element of traceability, "whether that 'conduct' is 'allegedly unlawful'," *id.* at 4 (citing *Yellen*, 594 U.S. at 242-43), by reiterating that it "*has* alleged that Defendants' promulgation of the Final Rule was unlawful and seeks relief on that basis." *Id.* (citing *Am. Compl.* ¶¶ 18, 129–33, 144, 157; *Pl.'s Mot.* At 19–20, 23–28, 35, 37–39) (emphasis added by Plaintiff). It informs the Court that, at the standing stage, it "must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiff[] would be successful." *Id.* (quoting *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003) (per curiam) (citing *Warth v. Seldin*, 422 U.S. 490, 502 (1975)). NEFSA characterizes the question of whether the Final Rule is

constitutionally invalid as "a classic *merits* question," which the Court "cannot decide . . . at the standing stage." *Id.* (emphasis added by Plaintiff).

NEFSA rejects Defendants' remaining arguments describing the Council as a "powerless advisory body whose policies have no practical or legal effect" as "patently false." *Id.* at 5. Plaintiff argues the Final Rule "is law today *because of* the Council's development of Framework Adjustment 65." *Id.* (emphasis added by Plaintiff). Further, NEFSA says, the Court need not address the question of the Council's authority because "Plaintiff did not sue the Council," thus, "[t]he relevant question is whether Plaintiff's members' "injur[ies] can be traced to allegedly unlawful conduct of the defendant[s]." *Id.* (citing *Collins*, 594 U.S. at 242). NEFSA offers its affirmative answer to this question: "[t]hey can—namely, to Defendants' unlawful promulgation of the Final Rule." *Id.* Finally, NEFSA concludes its causation arguments by again rejecting Defendants' usage of *Brennen* and *UCIDA. Id. a*t 6 (citing *Collins*, 594 U.S. at 242).

Regarding the element of redressability, NEFSA says that, because Defendants "*agree*[] that those injuries are the results of the Defendants' issuance of the Final Rule," they thus "cannot credibly dispute that a judicial order vacating the Final Rule or enjoining its enforcement would remedy those uncontested harms." *Id.* (for latter, citing *Lujan*, 504 U.S. at 561-62) (emphasis added by Plaintiff). It distinguishes the cases cited by Defendants to support their contention that courts decline to invalidate NMFS rules based on procedural issues at the Council level as "fundamentally different," arguing that these minor "irregularities" like "closed

mealtime gatherings" do not compare to the "lack of statutory prerequisite to rulemaking" that Plaintiff asserts here, likening the procedural issue in this case to "an agency that failed to issue a notice of proposed rulemaking." *Id.* at 6-7 (citing *Baldrige*, 831 F.2d at 1466.

### b. Standing for Claim Relating to the Actions of Defendant Rauch

NEFSA separately argues Defendants have "improperly blend[ed]" the standing and merits inquiries with regard to Defendant Rauch, asserting that "[a]t the standing stage, the sole question is whether Plaintiff's members were 'harmed by [Mr. Rauch's] action." *Id.* at 15 (citing *Collins*, 594 U.S. at 258-59 n.24). NEFSA argues "Mr. Rauch's signature on the Final Rule gave it effect," *id.* (citing A.R. 6229), so that even if "Defendant Coit also played some role in approving Framework Adjustment 65 . . . the Final Rule took effect *only* with Mr. Rauch's formal execution." *Id.* (emphasis added by Plaintiff).

### 2. Merits

### a. Appointments Clause

NEFSA submits Defendants "stake[] [their] case on the threshold question of officer status," *id.* at 7, asserting that by doing so they have waived their right to contest the unconstitutional insulation from removal claims by "ignor[ing] Plaintiff's argument that Congress cannot vest state officials with the exclusive power to remove federal officers," and failing to "explain why Congress can allow the Council itself to veto removal in all but the narrowest of circumstances." *Id* at 7 n.5.

i.    **Council Members as Officers of the United States**

NEFSA reiterates that the Court should deem Council Members federal officers based on the two factors provided by *Lucia*, 595 U.S. at 246-47.

1.    **Holding Continuing Offices Established by Law**

Addressing the first factor, "continuing positions established by law," NEFSA raises four discrete points.  First, it argues "Congress 'created' permanent Council seats 'by statute, down to [their] duties, salary, and means of appointment,'" *id.* (quoting *Lucia*, 595 U.S. at 247-48), and "bestow[ed] continuing responsibilities" on Council Members.  *Id.* (citing 16 U.S.C. § 1852(a)(1)).  Responding to Defendants' assertion that the Councils meet only episodically, *Defs.' Mot.* at 22, NEFSA claims "the number of times the Council chooses to meet has no bearing on officer status," and, further, the MSA "empowers the Council to set its own meeting schedule," such that the Councils could meet more often should they so choose.  *Id.* (citing 16 U.S.C. § 1852(e)(3)).  NEFSA contests Defendants' assertion that the periodic nature of meetings makes the Councils analogous to the civil surgeons in *Germaine*, arguing that those officials served "when called on by [another official] in some special case," *id.* at 7-8 (citing *Germaine*, 99 U.S. at 512), as compared to the Councils who were "assigned permanent, ongoing duties" by Congress.  *Id.* at 8.

Second, regarding employment and compensation, NEFSA asserts "the relevant question is whether Members' compensation is *set by statute*, not how *much* they receive."  *Id.* (citing Lucia, 595 U.S. at 248; 16 U.S.C. § 1852(d)) (emphasis added by Plaintiff).  Further, Plaintiff  insists "federal employment [is not] a prerequisite to

77

officer status." *Id.* (citing *Free Enter. Fund*, 561 U.S. at 484-85; *Braidwood Mgmt. Inc. v. Becerra*, 627 F. Supp. 3d 624, 643 (N.D. Tex. 2022); *Buckley*, 424 U.S. 126).

Third, NEFSA maintains that the state-bureaucrat and governor-appointed Council Members should be deemed federal officers because the Councils "[are] part of the *federal* government, comprised of *federal* offices, that develop[] *federal* policies." *Id.* (emphasis added by Plaintiff). NEFSA further refutes Defendants' argument that the Appointments Clause should not apply to these categories because "the Appointments Clause governs the selection of public officers—it says nothing about the exercise of public power by private persons." *Id.* (quoting *Defs.' Mot.* at 23-24).

Fourth, NEFSA responds to Defendants' claim that "[m]embers' statutory tenures are simply too short to confer officer status," *id.* (citing *Defs.' Mot.* at 23), submitting the appropriate inquiry "is whether their '*positions* are fixed by statute and will continue indefinitely.'" *Id.* at 9-10 (quoting *Braidwood Mgmt.*, 627 F. Supp. 3d at 643; *Donziger*, 38 F.4th 290 at 97) (emphasis added by Plaintiff). Here, NEFSA says, the "Council *seats* are statutorily created and last forever, and "some Council Members serve *indefinitely* (as far as federal law is concerned), while other serve renewable three-year terms." *Id.* at 10 (emphasis added by Plaintiff). Plaintiff juxtaposes these "statutory tenures within continuing offices" to the "*qui tam* relators, who serve only as long as their civil cases last," which the Fifth Circuit upheld as constitutional in *Riley v. St. Luke's Episcopal Hosp.*, 252 F.3d 749, 755 (5th Cir. 2001) (en banc). *Id.*

## 2.     Exercising Significant Authority

NEFSA reasserts that the MSA "vests Council Members with 'authority over the[ir] fisheries' and charges them to 'exercise sound judgment in the stewardship of fishery resources,'" *id.* (citing 16 U.S.C. §§ 1801(b)(5), 1852(a)(1)), and accuses Defendants of emphasizing the Secretary's role "[i]nstead of grappling with the *Council's* full range of authority." *Id.* (emphasis added by Plaintiff). NEFSA reiterates that "the Act's plain text confines NMFS review to errors of law, and thus preserves for the Council an exclusive zone of legal policy judgments." *Id.* at 10.

NEFSA claims the Secretary's authority pursuant to 16 U.S.C. § 1854, including her authority over "highly migratory species," ability to act unilaterally when the Council fails to regulate a fishery, and authority to unilaterally develop rules and regulations in those circumstances, actually serve to "*support[]* Plaintiff's position," *id.* (emphasis added by Plaintiff), by highlighting the contrast to the other statutory circumstances in which "the Councils have presumptive control over the rulemaking process." *Id.* (citing 16 U.S.C. §§ 1852(a)(3); 1854(c)(4)–(5)). NEFSA extends this argument to the Secretary's powers under 16 U.S.C. § 1855, including to "carry out" existing FMPs and amendments and to promulgate temporary regulations in emergencies, *id.* at 11 (citing 16 U.S.C. § 1855(c)(1), (d)), claiming this "[does] not dilute or confine the *Council's* authority." *Id.* (emphasis added by Plaintiff). Rather, it informs the Court that "[t]his is not a zero-sum game: [m]ultiple actors under a statutory scheme can be 'Officers of the United States.'" *Id.* (citing U.S. CONST. art. II, § 2, cl. 2).

Posing "the only relevant question: whether the *Council* wields significant authority," NEFSA disputes Defendants' interpretation of 16 U.S.C. § 1854(h) as a limit on Council authority, arguing the statutory phrase "under the authority of a Council" merely means "within a Council's regulatory ambit," and asserts the dubious constitutionality of the Secretary's inability to repeal an FMP under this provision has been noted previously at the highest levels of the Executive branch. *Id.* (quoting 1996 U.S.C.C.A.N. 4120, 4120–21, 1996 WL 787969 (Oct. 11, 1996)) (President Clinton's signing statement with regard to the Sustainable Fisheries Act, in which he noted "[t]he prohibition … on the Secretary of Commerce's ability to repeal a [FMP] without [Council] approval … raises serious concerns under the Appointments Clause").

NEFSA contests the Defendants' description of the Council's emergency powers as "requests," *id.* (citing *Defs.' Mot.* at 33), submitting a "request" from a unanimous Council "amounts to an order" based on the mandatory meaning of the word "shall." *Id.* (first citing 16 U.S.C. § 1855(c)(2)(A) ("The Secretary *shall* promulgate emergency regulations or interim measures … to address the emergency or overfishing") (emphasis added by Plaintiff); then citing *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 172 (2016)). NEFSA suggests the same to be true with regard to adopting a "limited access system," but in the inverse: "the Secretary *may not include*" such a system "in any" FMP or amendment that she "prepare[s] . . . *unless* such system is first approved by" the Council." *Id.* at 12 (quoting 16 U.S.C.§ 1854(c)(3) (emphasis added by Plaintiff).

NEFSA continues by responding to Defendants' assertion that, even if the NMFS fails to review a Council proposal within 30 days, such proposals "have no legal effect without implementing regulations, which the Secretary—not the Council—issues." *Id.* (quoting *Defs.' Mot.* at 15-16).  Plaintiff directs the Court to the statutory directive that, in such circumstances, the proposal "shall take effect as if approved," *id.* (citing 16 U.S.C. § 1854(a)(3)), and argues that, once in effect, the plans and amendments "control[] which 'implementing regulations' the Secretary can lawfully issue" pursuant to 16 U.S.C. § 1854(b)(1), thereby "dictat[ing] the content of federal fishery policy." *Id.*  NEFSA avers the presidential signing statements cited by Defendants fail to demonstrate the advisory capacity of the Councils and argues the statute cannot be rewritten by either the President or the courts.  *Id.* at 13 (citing *Jennings*, 583 U.S. 281, 298 (2018)).

Plaintiff concludes that Councils "*do* make various unreviewable decisions" and that, even if they do not, an official's "lack [of] authority to enter a final decision" does not deny him officer status.  *Id.* (citing *Freytag*, 501 U.S. at 881; *Free Enter. Fund*, 561 U.S. at 514) (emphasis added by Plaintiff).

### b.    Private Non-Delegation Doctrine

NEFSA calls Defendants' position inconsistent, noting that they assert "the Council is obviously not a private entity," *id.* (quoting *Defs.' Mot.* at 34), while simultaneously claiming "its Members are private individuals exempt from the appointment and removal strictures of Article II." *Id.* (citing *Defs.' Mot.* at 23-24).  Plaintiff next turns to the merits of its private non-delegation doctrine claim,

reasserting its comparison to the HISA and arguing that the statute in the present case remains analogous to the original HISA version rejected by the Fifth Circuit as unconstitutional.  *Id.* (citing *Black*, 52 F.4th 869; *Oklahoma*, 62 F.4th at 227, 230).

While Defendants claim that "NMFS itself can promulgate rules without the Council's participation whenever doing so is necessary to serve the [Act's] purposes," *id.* (citing *Defs.' Mot.* at 37), NEFSA disputes the breadth of this assertion by arguing "Section 1855(d) simply empowers the Secretary to implement *existing* FMPs—not to unilaterally abrogate or alter them," *id.* (citing 16 U.S.C. § 1855(d) (emphasis added by Plaintiff)); noting "the Act expressly prohibits NMFS from 'repeal[ing] or revok[ing]' a Council's FMP without its consent," *id.* (citing 16 U.S.C. § 1854(h)); and asserting Section 1854(c)(6) is "wholly irrelevant" because it only permits NMFS "to propose regulations … [and] to implement any plan or amendment *prepared by the Secretary.*"  *Id.* (citing 16 U.S.C. § 1854(g) (emphasis added by Plaintiff).

### c.   Claim Against Defendant Rauch

NEFSA first responds to Defendants' assertion that it forfeited its constitutional claim against Defendant Rauch by failing to raise it during the public comment period on the Proposed Rule.  *Id.* (citing *Defs.' Mot.* at 38).  Plaintiff complains this "position requires plaintiffs to object to *future* unconstitutional acts," because its claim against Defendant Rauch derives from their belief that he "unlawfully exercised executive power *after* the comment period closed by signing and publishing the Final Rule in his own name.  *Id.* (emphasis added by Plaintiff). Second, it insists "constitutional challenges to agency authority generally need not be

preserved before that same agency." *Id.* (citing *Carr v. Saul*, 593 U.S. 83, 91-92 (2021); *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975); *Mobility Workx, LLC v. Unified Patents, LLC*, 15 F.4th 1146, 1151 (Fed. Cir. 2021)).  Even if it had raised the issue at the Proposed Rule stage, NEFSA says, "Mr. Rauch could not have disavowed his tenure protections or declined to sign and publish the Rule." *Id.* (citing *Carr*, 593 U.S. at 93-94; A.R. 6248).  In the event the Court determines Plaintiff should have raised its concerns at the Proposed Rule stage, NEFSA requests the Court "to exercise its discretion to consider the claim." *Id.* at 15 (citing *Freytag*, 501 U.S. at 878).

NEFSA next responds to Defendants' standing arguments with regard to its claim against Defendant Rauch, arguing Defendants have "improperly blended" merits and standing issues, and asking the Court to solely consider "whether Plaintiff's members were 'harmed by [Mr. Rauch's] action,'" *id.* (citing *Collins*, 594 U.S. at 258-59 n.24), to which it offers the answer "[t]hey clearly were, as Mr. Rauch's signature on the Final Rule gave it effect." *Id.* (citing A.R. 6229).  It argues Defendant's position that Defendant Coit played a role in approving Framework Adjustment 65 to be inapposite, because "the Final Rule took effect *only* with Mr. Rauch's formal execution." *Id.* (emphasis added by Plaintiff).

Finally, Plaintiff reasserts the merits of its claim against Mr. Rauch, pointing out that Defendant Rauch "signed both the Final Rule and its internal 'Decision Memorandum,'" *id.* (citing A.R. 2605, 6229), and directing the Court to Defendant Rauch's ability to "exercise[] important policy-making, policy-determining, or other executive functions" by virtue of "oversee[ing]' all NMFS] 'regulatory actions and

programs.'" *Id.* (citing 5 U.S.C. § 3132(a)(2)(E)).  Thus, Plaintiff concludes, Defendant

Rauch's insulation from removal violates Article II of the federal Constitution.  *Id.*

### D.    Defendants' Reply in Support of Cross-Motion for Summary Judgment

#### 1.    Standing

##### a.    Causation by the Structure of the New England Council

Defendants reiterate their prior arguments that the Court should apply the

standard for causation in the context of standing from *Lujan*, 504 U.S. at 560, and

join other courts that "have determined that a plaintiff alleging injury from a NMFS

rule but complaining about the composition of a Council does not have standing."

*Defs.' Reply* at 3 (citing *Brennen*, 958 F.2d at 937; *UCIDA,* 2022 U.S. Dist. LEXIS

109879, at *59-61).    Defendants respond to NEFSA's arguments seeking to

distinguish *Brennen* and *UCIDA* from the present case, asserting that NEFSA's focus

the lack of a counterfactual Council proposal in *Brennen* "misses the crux of the case,

which turned on the key fact that '[a]lthough the Council proposed the challenged

fishery regulations, those regulations were implemented by the Secretary after

review.'"  *Id.* (citing *Brennen,* 958 F.2d at 937).

Next, Defendants argue that NEFSA's assertion that the *UCIDA* court did not

address the unconstitutionality of any Council policy argument raised here "cannot

be squared with the court's opinion: the plaintiffs 'allege[d] that the Council is de

facto in charge of making policy decisions and implementing regulations,' which is

the same argument advanced in this case.  *Id.* (quoting *UCIDA*, 2022 U.S. Dist.

LEXIS 109879, at *55-56).  Defendants redirect the Court to cases where courts found

"Councils have "no 'authority' to do anything," *Id.* (citing *J.H. Miles & Co.*, 910 F. Supp. at 1157-59), arguing that this lack of authority "is critical because it breaks the causal chain between the complained-of conduct and the alleged harm." *Id.* at 4.

Defendants reject NEFSA's conception of the MSA as "a lock requiring two keys," pursuant to 16 U.S.C. § 1854(b)(1), because "Congress authorized NMFS to prepare a [FMP] or an amendment on its own if the Council fails to develop and submit a proposal to NMFS when conservation requires," and "NMFS retains the discretion to reject or revise proposals." *Id.* (citing 16 U.S.C. §§ 1854(c)(1)(A), 1854(b)(3)). Defendants also reemphasize the discretion granted to the Secretary by statute, directing the Court "in particular [to] § 1854(a) – (c), which authorize[] the Secretary to independently review council recommendations, and § 1855(d), which authorizes the Secretary to establish regulations that may be necessary to discharge her 'general responsibility' or to carry out Secretarial approved FMPs and 'any other provision' of the Act." *Id.* at 5 (citing 16 U.S.C. §§ 1854, 1855).

Defendants argue that their "standing arguments do not depend on disputing the merits of Plaintiff's claims," but, instead, "ask whether Plaintiff can show that it has 'sustain[ed]' an injury 'from an [act by the Council or DAARP Rauch] that allegedly exceeds [the Council's or DAARP Rauch's] authority.'" *Id.* (for the latter, quoting *Seila Law*, 591 U.S. at 210-11). Defendants assert NEFSA cannot show any such injury because "[e]ven if the Council and DAARP Rauch are unconstitutionally installed, any harm Plaintiff suffered is traceable only to the Final Rule—which they do not substantively challenge, and . . . which [was] issued by [Defendant] Coit." *Id.*

at 5-6.  Defendants note *Brennan* and *UCIDA* "dismissed essentially identical claims about a Council for lack of standing, even assuming the plaintiffs' constitutional concerns had merit."  *Id.* (citing *Brennen*, 958 F.2d at 937).

Defendants characterize NEFSA's allegations as based on the Council's unconstitutionality and yet alleging injury from the Final Rule, which they describe as "a fundamental disconnect."  *Id.*  They assert that, despite whatever role the Council had in developing Framework Adjustment 65, the rule "is the law because NMFS promulgated a regulation now codified in the Code of Federal Regulations, not because of anything the Council did."  *Id.* (citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *55-56 (noting the council's action have "no legal effect whatsoever") and *Gulf Restoration Network*, 730 F. Supp. 2d. at 174).  Defendants reject NEFSA's argument that it remedied this causation issue because "it did not sue the Council."  *Id.* (quoting *Pl.'s Resp.* at 5).

### b.    Causation by the Actions of Defendant Rauch

Defendants assert that "[e]ven if DAARP Rauch is improperly insulated from removal, he did not issue the Final Rule, and thus Plaintiff cannot show that any unconstitutional act by DAARP Rauch caused its alleged harms."  *Id.* at 6.  Rather, Defendants claim any injuries "are traceable to [Defendant] Coit, who approved the Final Rule and whose legal authority the Plaintiff does not challenge."  *Id.*  As such, Defendants say, NEFSA has failed to demonstrate any injury that derives from an action by Defendant Rauch in excess of his lawful authority.  *Id.* at 6-7 (citing *Seila Law*, 591 U.S. at 210-11).

86

Defendants reassert that "Plaintiffs cannot rely on 'mere allegations' concerning [Defendant] Rauch's role in causing its alleged harms—it 'must set forth by affidavit or other evidence specific facts' supporting standing." *Id.* at 7 (citing *Lujan*, 504 U.S. at 555). Defendants claim NEFSA has failed to produce any facts, based on the administrative record, which would contravene Defendants' evidence that Defendant Coit, not Rauch, approved and issued the Final Rule. *Id.* Instead, Defendants say, "Plaintiff claims that DAARP Rauch's ministerial act of signing the Final Rule for publication only 'gave it effect' and is therefore sufficient for standing." *Id.* (citing *Pl.'s Resp.* at 15). Defendants dispute this characterization of legal effect, arguing that "[Defendant] Coit's approval marked the culmination of the rulemaking process; DAARP Rauch's signature and the Federal Register's consequent publication merely marked the procedural steps to provide notice to the public." *Id.* (citing A.R. 6212).

### c.    Redressability

Jointly addressing Plaintiff's allegations of injury derived from the structure of the New England Council and the actions of Defendant Rauch, Defendants assert "Plaintiff raises two flawed arguments." *Id.* "First, Plaintiff's assertion that vacating the Final Rule would remedy the harm rests on a mismatch between the claims asserted and the relief sought." *Id.* (citing *Pl.'s Resp.* at 6). While Plaintiff brings its complaint with regard to the Council's lack of constitutional authority to propose Framework Adjustment 65, the requested remedies of vacatur of the Final Rule and declaratory relief would not address these purported issues in the Council's membership. *Id.* (citing *UCIDA*, 2022 U.S. Dist. LEXIS 109879, at *59-61; *Brennen*,

958 F.2d at 937).  Defendants extend this argument to the Plaintiff's requests for injunctive relief, arguing that vacating the Final Rule or "enjoining its enforcement" would not fit the alleged harm here because it would fail to address either the unconstitutional membership of the Council or Defendant Rauch's purported lack of constitutional authority.  *Id.* at 8 (citing *Salazar v. Buono*, 559 U.S. 700, 718 (2010); *Pl.'s Resp.* at 6).

Defendants again direct the Court to *Baldrige* as support that "[a] decision finding that Framework Adjustment 65 itself was invalid would not justify invalidating the Final Rule."  *Id.* (citing *Baldrige*, 831 F.2d 1456).  They seek to rebut Plaintiff's attempts to distinguish *Baldrige* from the case at bar, arguing that, at bottom, the Ninth Circuit's determined that any procedural flaws "did not result in any improper material being added to the administrative record," and "provided an opportunity for every interested person or group to present arguments to the Secretary."  *Id.* (citing *Baldrige*, 831 F.2d at 1466).  Defendants direct the Court to caselaw from other circuits in which courts declined to invalidate rules based on procedural deficiencies at the Council level so long as the errors "did not materially affect the Secretary's decisionmaking."  *Id.* (quoting *Trawler Diane Marie, Inc. v. Brown*, 918 F. Supp. 921, 928 (E.D.N.C. 1995), *aff'd sub nom. Trawler Diane Marie, Inc. v. Kantor*, 91 F.3d 134 (4th Cir. 1996)).

Defendants argue NEFSA has failed to show how the purported "constitutional issues materially affected NMFS's decision to promulgate the Final Rule."  *Id.* Defendants conclude the redressability section of their argument by positing that

Plaintiff's argument that "NMFS did not receive a valid submission from a legitimate Council' is misplaced because the Council's proposals have no legal effect without implementing regulations issued by NMFS." *Id.* (quoting *Pl.'s Resp.* at 7) (internal citations omitted).

### 2.    Merits

#### a.    Appointments Clause

Turning to the merits of Plaintiff's claims, Defendants maintain that a grant of summary judgment is warranted because NEFSA misconstrues the contents of the MSA with regard to its Appointments Clause and non-delegation doctrine claims against Council Members, and has forfeited its claim against Defendant Rauch or else fails based on the Final Rule's promulgation by Assistant Administrator Coit, despite the signature by Defendant Rauch. *Id.* at 9.

##### i.    Council Members as Officers of the United States

###### 1.    Holding Continuing Offices Established by Law

First, Defendants describe a position's "continuing" nature as a spectrum from fleeting to permanent, asserting that Council Member positions "are far closer to the 'occasional and intermittent' end of the spectrum." *Id.* (citing *Germaine*, 99 U.S. at 512). Defendants rejoin NEFSA's argument that "nothing prevents [a Council] from meeting more often," *id.* (citing *Pl.'s Resp.* at 7), emphasizing this argument is "suppositional" and does not dispute the Council currently meets only episodically. *Id.* (citing A.R. 2561-65, 5030-42, 5333-36). Defendants reiterate the statute's daily compensation structure as evidence of "the intermittent nature of the position," and

89

points out NEFSA "fails to rebut the point that not all the members receive compensation." *Id.* They insist that, while Plaintiff focuses on Council Member terms being set by statute, "[the terms] are markedly less definite than a career appointment," and thus, are not "continuing." *Id.* at 10.

Defendants also take issue with NEFSA's contention that "actions taken by non-federal actors automatically run afoul of the private nondelegation doctrine," *id.* (citing *Pl.'s Resp.* at 8), arguing this presumption ignores the test developed by courts to determine "what counts as too much private participation in a federal regulatory scheme." *Id.*

## 2. Exercising Significant Authority

Defendants reiterate that "Congress created a system in which the Councils play an important *advisory* role by providing scientific and experience-based recommendations," arguing NEFSA "ignores that the Council's role is subordinate to the Secretary" as "the only one who can exercise rulemaking authority over Federal fisheries." *Id.* (emphasis added by Defendants). Defendants flag Plaintiff's failure to acknowledge the explicit exemption of the Councils in the Federal Advisory Committees Act, *id.* (citing 16 U.S.C. § 1852(i)(1)). Turning to the statutory text, Defendants first say NEFSA relies on 16 U.S.C. § 1852(a)(1), which they argue "does nothing more than distinguish the geographical scope of the New England Council's purview," without "demonstrat[ing] any decisionmaking or rulemaking authority." *Id* at 10-11 (citing 16 U.S.C. § 1852(a)(1)). NEFSA's second textual support, Defendants claim, relies on 16 U.S.C. § 1801(b)(5), which describes the Council's "judgment" in terms of "preparation, monitoring, and revision of [FMPs] under

circumstances [] which will enable the States, the fishing industry, consumer and environmental organizations, and other interested persons *to participate in*, and *advise on*, the establishment and administration of [FMPs]." *Id.* at 11 (quoting 16 U.S.C. § 1801(b)(5) (emphasis added by Defendants). Defendants insist Council roles described as "participatory and advisory" fail to constitute significant authority. *Id.*

Responding to Plaintiff's argument that the Act limits NMFS to reviewing for legality, Defendants claim the MSA does authorize the Secretary to make policy determinations, *id.* (citing 16 U.S.C. §§ 1855(d)) (granting the Secretary the "general responsibility to carry out any [FMP] or amendment" and issue regulations), and argue prior court rulings on the MSA and analogous statutes support this interpretation. *Id.* at 11-12 (citing *Babbitt v. Sweet Home Chapter of Cmty. for a Great Or.*, 515 U.S. 687, 708 (1995) (finding similar language in the Endangered Species Act conferred "broad administrative and interpretive power"); *Franklin*, 989 F.2d at 60 (finding the MSA "unequivocally vests the Secretary with the discretion to determine whether a Council's progress on conservation and management is reasonable"). Further, Defendants say, the authority to review Council proposals "extends beyond legal compliance" by including the National Standards. *Id.* at 12 (citing 16 U.S.C. § 1854). "Compliance with the national standards requires balancing by the agency and the exercise of discretion and judgment." *Id.* (quoting *Lovgren*, 701 F.3d at 32); *see also Mass. ex rel. Div. of Marine Fisheries v. Daley*, 170 F.3d 23, 30 (1st Cir. 1999) ("Given an internal conflict in the statute's mandates, the

job of the courts and the administrator is to implement the central aim of the statute").

Defendants reassert that various statutory scenarios—the regulation of highly migratory species, the authority to act unilaterally when a Council fails to act, and Council proposals taking effect when NMFS fail to review—reveal discretionary authority held by NMFS and reject Plaintiff's arguments that these provisions highlight such power being held by the Councils in other provisions. They emphasize "the Secretary through § 1854(c), is authorized to make rules. The inverse is not true because a Council cannot promulgate a rule." *Id.* at 12-13 (citing 16 U.S.C. § 1854(c), (g); *Goethel*, 2016 U.S. Dist. LEXIS 99515, at *27-29.  Defendants concede Councils "can help shape policy," but argue their proposals fall short of "dictat[ing]" it.  *Id.* at 13 (quoting *Pl.'s Resp.* at 12).

Defendants extend this argument to the statutory scenarios in which the Secretary is required to gain initial approval or a particular designation from the Council prior to taking action; to wit: needing a three-quarters majority of the relevant council to revoke an FMP, requiring initial approval by a Council to impose a limited access system, and requiring a predicate determination from a Council to implement temporary emergency regulations.  *Id.* at 13 (citing 16 U.S.C. §§ 1854(h), (c)(3); 1855(c)(2)(A)).  Defendants argue these provisions do not reveal significant authority on behalf of the Councils because, respectively, "§ 1854(h) only applies to FMPs, and not to implementing regulations" and "the Secretary is still the entity making the final decision;" for § 1854(c)(3), "initial approval by the Council does not

92

take away the Secretary's authority to decide whether to include the system;" and, for § 1855 (c)(2)(A), the Secretary "is not required to adopt whatever the Council proposes, thus preserving her discretionary authority." *Id.* Defendants conclude, for the above stated reasons, "Council members do not wield significant authority and thus are not officers." *Id.*

### b.    Private Non-Delegation Doctrine Claim

Defendants maintain the proper judicial inquiry in evaluating a private non-delegation doctrine claim "is whether the entity in question in subordinate to a federal actor," *id. a*t 14 (citing *Oklahoma*, 62 F.4th at 230), and posits that, here, "the Secretary acting through NMFS, is the rule-maker, and the Council functions in a subordinate role." *Id.* Defendants describe Plaintiff's assertion that "the Council must either be situated within the Federal government in violation of the Appointments Clause or be a private entity that violates the nondelegation doctrine" as a "false choice," because the Council lacks the ability to execute regulations. *Id.* (citing *Pl.'s Resp.* at 13). They also explain their previous claim that "the Council is not obviously a private entity," claiming the private non-delegation doctrine only applies when federal power is delegated to "true private entities," which it argues NEFSA has not proven. *Id.* at 14 n.5 (citing *Kerpen*, 907 F.3d at 162).

Defendants also respond to NEFSA's attempt to distinguish the MSA from the HISA based on the latter's "abrogate, add to, and modify" language, arguing multiple provisions of the MSA authorize the Secretary to add or modify rules, *id.* (citing 16 U.S.C. §§ 1854(b), (c)(1), (c)(6), (g); 1855(d)), and the Secretary holds "ultimate

authority" to repeal an FMP, even if this must involve consideration by Council.  *Id.*
As such, Defendants insist, the difference between HISA and the MSA "is a difference
of degree, not of kind".  *Id.*  "Congress gave the Secretary the final say," Defendants
claim, such that the Act comports with the private non-delegation doctrine.  *Id.* at 15.

### c.  Claim against Defendant Rauch

Defendants insist Plaintiff forfeited its claim against Defendant Rauch by
failing to raise it at the public comment stage, arguing his signature of the Proposed
Rule provided sufficient notice for NEFSA to address this alleged constitutional issue
at that time.  *Id.*  Defendants also address Plaintiff's standing to bring this claim,
claiming they properly focused on "his 'power to issue rules," *id.* (citing *Pl.'s Resp.* at
14-15), because this power constituted "the thrust of Plaintiff's merits argument."  *Id.*
(citing *Pl.'s Mot.* at 34-35).  Finally, Defendants argue the merits of the claim against
Defendant Rauch fail because he merely "performed the 'ministerial task[]' of signing
the Federal Rule for publication," while "[Assistant Administrator] Coit issued the
rule."  *Id.*  As such, Defendants submit Defendant Rauch did not act as an officer and
the claim should be dismissed.  *Id.*

## IV.  LEGAL STANDARD FOR SUMMARY JUDGMENT

Both parties bring their motions for summary judgment pursuant to Rule 56
of the Federal Rules of Civil Procedure.[7]  FED. R. CIV. P. 56. The First Circuit has

---

[7]    After articulating the standard governing judicial review under the APA, NEFSA adds a
footnote that it "also raise[s] claims *directly* under the constitution to enjoin unlawful executive
action."  *Pl.'s Mot.* at 7 n.3 (emphasis added by Plaintiff).  It notes the claims are "substantively
identical," and "may be evaluated on the same record," but does not articulate how raising a direct
claim under the Constitution should be evaluated differently than a constitutional claim through the
APA.  *Id.*

described in detail the appropriate judicial inquiry to be applied to a motion for summary judgment when the underlying dispute involves a challenge to agency rulemaking, doing so specifically in the context of the MSA:

> [Summary judgment] has a special twist in the administrative law context. The Magnuson Act incorporates the familiar standard of review associated with the Administrative Procedure Act (APA). Where the APA standard obtains, a court may set aside an administrative action only if that action is arbitrary, capricious, or otherwise contrary to law. Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow. Consequently, our brief -- like that of the district court -- is only to determine whether the Secretary's decision to promulgate the fishery regulation was consonant with his statutory powers, reasoned, and supported by substantial evidence in the record.

*Associated Fisheries v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997) (internal citations omitted).  While a narrower review than a typical Rule 56 motion, the APA provides specific examples of what the court must "hold unlawful and set aside," which includes, as relevant here, agency actions, findings, or conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege, or immunity," or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(A)–(C).

As requested by the parties in the supplement to the parties' joint motion for approval of Local Rule 56(h) and granted in the Court's Local Rule 56(h) final order,

---

Here, the Court's inquiry under the APA reviews whether the actions taken were "contrary to constitutional right [or] power," and accordingly it agrees with the Plaintiff that determining the MSA's structure and grants of authority at issue to be unconstitutional "whether viewed through the lens of the [MSA] and its APA standards or the Constitution itself [] would entitle Plaintiff to all the relief requested in the Amended Complaint."  *Id.*

the Court has "dispense[d] with the Statements of Fact typically filed with summary-judgment motions" and "[t]he factual record before the Court will be limited to (1) the administrative record compiled by Defendants and (2) the standing declaration(s) submitted by Plaintiff with its motion." *Supp. to Jt. Mot. for Approval of Local Rule 56(h)* at 3; *Local Rule 56(h) Final Order*. However, the Court will "afford no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative.'" *Tropigas De P.R. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord. Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

Because, here, the parties have filed cross-motions for summary judgment, the court must evaluate each motion independently and "determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Matusevich v. Middlesex Mut. Assurance Co.*, 782 F.3d 56, 59 (1st Cir. 2015) (citing *Barnes v. Fleet Nat'l Bank, N.A.*, 370 F.3d 164, 170 (1st Cir. 2004)). As such, for cross-motions for summary judgment, the standard of review is applied to each motion separately, *Libertarian Party of N.H. v. Gardner*, 759 F. Supp. 2d 215, 221 (D.N.H. 2010), *aff'd*, 638 F.3d 6 (1st Cir. 2011), to ensure the presence of cross-motions for summary judgment "neither dilutes nor distorts" the summary judgment standard. *Mandel v. Bos. Phoenix, Inc.*, 456 F.3d 198, 205 (1st Cir. 2006).

## V.   ASSOCIATIONAL STANDING

### A.   Legal Standard

"Standing is a threshold issue in every federal case." *Me. Springs, LLC v. Nestlé Waters N. Am., Inc.*, No. 2:14-cv-00321-GZS, 2015 U.S. Dist. LEXIS 33259, at *13 (D. Me. Mar. 18, 2015) (citing *Pagan v. Calderon*, 448 F.3d 16, 26 (1st Cir. 2006)) (stating that "[a] federal court must satisfy itself as to its jurisdiction, including a plaintiff's Article III standing to sue, before addressing his particular claims"). "To satisfy the 'irreducible constitutional minimum of standing,' Plaintiff must show (1) that they have suffered an injury in fact, (2) that the injury is fairly traceable to the [Defendant's] allegedly unlawful actions, and (3) that 'it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Nulankeyutmonen Nkihtaqmikon v. Impson*, 503 F.3d 18, 27 (1st Cir. 2007) (quoting *Lujan*, 504 U.S. at 560-61 (1992)).

The Supreme Court has described an "injury in fact" as "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (internal citations, footnote, and quotation marks omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements," *Me. Springs, LLC*, 2015 U.S. Dist. LEXIS 33259, at *13 (quoting *Lujan*, 504 U.S. at 561), and must meet this standard "for each claim it brings." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. at 352.

While these threshold standing requirements apply to all plaintiffs, an organizational litigant suing on behalf of its members must satisfy an additional standard to be granted so-called "associational standing":

> (1) at least one of the members possesses standing to sue in his or her own right; (2) the interests that the suit seeks to vindicate are pertinent to the objectives for which the organization was formed; and (3) neither the claim asserted nor the relief demanded necessitates the personal participation of affected individuals.

*AVX Corp.*, 962 F.2d at 116 (citing *UAW v. Brock*, 477 U.S. 274, 281-82 (1986); *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977)).

## B.    Discussion

As a threshold matter, the parties dispute the appropriate inquiry for a court to undertake at the summary judgment stage.  Plaintiff emphasizes the Supreme Court's instruction that "[f]or standing purposes, we accept as valid the merits of appellees' legal claims."  *Cruz*, 596 U.S. at 298; *see also Warth*, 422 U.S. at 500 ("standing in no way depends on the merits of the plaintiff's contention that particular conduct is illegal").  The Court will of course follow the process outlined by the Supreme Court, and thus assume at the standing stage that NEFSA's legal contentions are correct that any grant of federal power to the Council or Defendant Rauch is unconstitutional.[8]

However, Defendants correctly point out that, while accepting the legal arguments, the Court must determine whether "the challenger 'sustain[s] injury'

---

[8]    Defendants direct the Court to *Papasan*, 478 U.S. 265, in support of their position that NEFSA cannot "premise its standing on an erroneous legal conclusion."  *Defs.' Mot.* at 19.  However, *Papasan* reviewed standing under a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim, not Rule 56 summary judgment, and thus presents an inapposite standard of review for the present case.  *Papasan*, 478 U.S. at 286.

from an executive act that allegedly exceeds the official's authority." *Seila Law*, 591 U.S. at 211 (quoting *Bowsher v. Synar*, 478 U. S. 714, 721 (1986)). At the summary judgment stage, the Supreme Court explained: "the plaintiff can no longer rest on such 'mere allegations,' but must 'set forth' by affidavit or other evidence 'specific facts,' FED. RULE CIV. PROC. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561. The Court thus reviews the motions and Administrative Record for specific facts to support NEFSA's assertions that the actions of the Council or Defendant Rauch, in excess of their lawful authority, caused their alleged injury. Before subjecting NEFSA's claims to standing analysis, the Court first addresses the elements of standing undisputed by the Defendants in either their motion or reply, and thus deemed waived. *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) (finding "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

With regard to the elements of associational standing, Defendants do not contest that the interests the suit seeks to vindicate are germane to NEFSA's purpose nor that its claims and requested relief do not require the participation of individual members based on the benefit of its requested prospective relief to all members. *Pl.'s Mot.* at 36 (citing *Warth*, 422 U.S. at 515). Accordingly, the Court deems Defendants to have also conceded that NEFSA satisfies these elements.

Instead, Defendants' standing arguments rely on their rebuke of the remaining element of associational standing: standing of its members to sue in their own right. *See AVX Corp.*, 962 F.2d at 116. Determining the standing of an individual member

99

to sue directs the Court to apply the traditional standing inquiry: (1) injury-in-fact, (2) causation, and (3) redressability. *See Lujan*, 504 U.S. at 560-61.

Among these traditional standing elements, Defendants seem to concede that NEFSA's allegations of its members' injury, which it describes as lost earnings, profits, and business opportunities stemming from compliance with the dramatic reductions in commercial groundfishing quotas under the Framework 65 Final Rule and implementing regulations, including a "more-than 90% cut for haddock and about 13% for white hake." *Defs.' Mot*. at 36-37 (citing *Osier Decl*. ¶¶ 6–17; *Campbell Decl*. ¶¶ 6–20). Defendants forcefully assert that the injury cannot be traced to the actions of NMFS or Defendant Rauch, and further cannot be redressed by the relief requested by the Plaintiff. As the crux of the parties' standing dispute hinges on these two elements—causation and redressability—the Court refines the scope of its analysis by focusing on the relevant jurisprudence and current state of the law on these elements before applying these details to each of NEFSA's claims.

First, regarding the element of causation, the "relevant inquiry is whether the plaintiffs' injury can be traced to 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged." *Collins*, 594 U.S. at 243 (quoting *Allen v. Wright*, 468 U. S. 737, 751, (1984)). The Supreme Court distinguished fair traceability from the "but-for" variety of causation elsewhere in the law, explaining "[proximate cause] wrongly equates injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett v. Spear*, 520 U.S. 154, 168-69 (1997)). Rather, fair traceability

100

in this context includes "injury produced by determinative or coercive effect upon the action of someone else." *Id.* at 169.

On the element of redressability, the Supreme Court has instructed that plaintiffs must establish "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Laidlaw*, 528 U.S. at 181. As applied to a challenge to government action, the Supreme Court explained, where "the plaintiff is himself an object of the action . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it." *Lujan*, 504 U.S. at 561-62. The Plaintiff bears the burden of establishing the presence of these two disputed elements for each of its claims. *See Me. Springs, LLC*, 2015 U.S. Dist. LEXIS 33259, at *13 (quoting *Lujan*, 504 U.S. at 561); *DaimlerChrysler Corp.*, 547 U.S. at 352.

With these preliminary matters in mind, the Court turns to the claims brought by NEFSA in the present case.

### 1. Standing for Counts I-III - Claims Relating to the Structure of the New England Council

#### a. Causation

NEFSA posits that the New England Council exercises executive power in violation of the Appointments Clause and non-delegation doctrine, and in so doing, NMFS had the obligation to reject the proposed Framework Adjustment 65 as contrary to law. *Pl.'s Mot.* at 8-31. By instead accepting the proposal and proceeding forward with the Final Rule and implementing regulations, NEFSA asserts the Defendants violated the MSA by promulgating a final rule without ever receiving a

101

lawful proposal, which Plaintiff insists is "a legal and factual predicate to issuing any regulation under § 1854(b)." *Id.* at 37-38. NEFSA argues this unlawful action by NMFS and the Defendant Officials caused their members' injuries.

Defendants characterize the case differently, arguing that NEFSA's injury cannot be fairly traced to any unconstitutionality in the Council because NMFS exercised independent judgment in accepting the Council's proposed Framework Adjustment 65 and proceeding with the rulemaking process. *Defs.' Mot.* at 11-17. Defendants claim that Council proposals have no legal effect and that NEFSA does not dispute the authority of NMFS, through Defendant Coit, to issue the Final Rule, such that Plaintiff has failed to trace its injury to any act that exceeded lawful authority. *Id.*

Pursuant to the Supreme Court's directive in *Cruz*, the Court accepts NEFSA's legal argument regarding the unconstitutional structure of the New England Council for the purposes of evaluating standing. *Cruz*, 596 U.S. at 298. Stated clearly, NEFSA alleges the acceptance and subsequent promulgation of the constitutionally deficient proposal constituted an act by the Defendants that was "'contrary to [Plaintiff's] constitutional right[s]' and 'in excess of [the Secretary's] statutory jurisdiction, authority, or limitations, or short of [the Secretary's] statutory right." 5 U.S.C. § 706(2)(B)-(C). The Court thus proceeds to examine the record to determine if NEFSA has established that the Council's proposed Framework Adjustment 65, accepted as unconstitutionally produced, had a "determinative or coercive effect" on the Defendants' act of promulgating the Final Rule. *Bennett*, 520 U.S. 154, 168-69.

Defendants insist the "Councils under the [MSA] are simply advisory bodies and have no legal authority," claiming that any constitutional infirmity in the Council's development process did not cause the alleged injuries because the Secretary independently reviews and retains the discretion to approve or reject Council proposals. *Defs' Mot.* at 11-14.

The Court agrees with NEFSA that this argument "mischaracterizes Plaintiff's claims and its theory of standing." *Pl.'s Resp.* at 3. Plaintiff does not bring a claim against the Council nor do they derive their injury from its development of Framework Adjustment 65; at least, not in the manner described by the Defendants. Rather, they allege *the Defendants* acted unlawfully by *accepting* the proposal and by adopting its contents as a Final Rule and implementing regulations. The Court views these actions as distinct from asserting a claim against the Council for its development of the proposal. In fact, while Defendants cite *UCIDA* and *Brennan* as support for their position, those courts recognized the same distinction The Court is not bound to follow this Ninth Circuit precedent, but further it agrees with analysis recently performed on this issue by its sister court in the District of New Jersey to grant standing to bring constitutional challenges to fishery regulations in *Lofstad, et al. v. Raimondo, et al.*, Case No. 3:22-cv-07360-RK-TJB, 2024 U.S. Dist. LEXIS 34112 (D.N.J. Feb. 28, 2024), *rev'd on other grounds*, Case No. No. 24-1420, slip op. (3d Cir. Sep. 26, 2024). In *Lofstad*, the District Court explained: "*Brennen* cites no authority for its implied finding that the constitutional deficiency the plaintiffs identify—rather than the rule challenged in the suit—must have caused the plaintiffs' injury," and

expressed its concern that this finding contravenes the Supreme Court's fair traceability instruction in *Lujan*. *Id.* at 21. Further, *Brennan* based its denial of standing in part on the plaintiffs' failure to prove a constitutionally appointed Council would have passed different, less injurious regulations; the *Lofstad* court notes the Supreme Court expressly rejected any such requirement in *Seila Law*, published decades after *Brennen*. *Id.* (citing *Brennen*, 58 F.2d at 937). Finally, the *Lofstad* court states: "[t]he *UCIDA* decision likewise is silent on the heart of the parties' standing disagreement in this matter—whether the relevant actor's conduct for the causation analysis is the Secretary's or the Council's." *Id.* This describes much the same disagreement as the case presently at bar before this Court. The Third Circuit, in its review of the District Court's *Lofstad* decision, agreed with the standing analysis and upheld this portion of the opinion. *Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. (3rd Cir. Sep. 26, 2024).

This Court's own analysis of the relevant caselaw reaches the same conclusion as in *Lofstad*. First, as previously discussed, the fair traceability inquiry for the purpose of standing imposes a standard distinct from traditional proximate cause. The Supreme Court clearly stated that the unlawful action need not be "the very last step in the chain of causation," but rather must only have a "determinative or coercive effect" on the cause of injury. *Bennett*, 520 U.S. at 168-69. The Court concludes the unlawful action alleged here—that is, NMFS's acceptance of an unconstitutional Framework Adjustment 65—had a "determinative or coercive effect" on the actions alleged by Plaintiff to have caused their injuries. *See id.* To put a finer point on the

104

matter, once a Council proposal is accepted, the Act compels NMFS to proceed with rulemaking and adopt implementing regulations. *See* 16 U.S.C. § 1854(b)(1)(A), (b)(3) (if an affirmative decision is made on a Council Proposal, the Secretary "shall promulgate final regulations within 30 days after the end of the comment period"). The Supreme Court has found "*de facto* causality" in the context of compulsory third party action, so long as the theory of standing "does not rest on mere speculation" and "relies instead on the predictable effect of Government action on the decisions of third parties." *Dep't of Commerce v. New York*, 588 U.S. 752, 768 (2019). Here, there is no third party, but the mandatory structure of the Act makes the effect of NFMS action equally predictable: once accepted, the Secretary is required to proceed with promulgating some version of the Council's proposal as law. *See, accord, Arnesen*, 2024 U.S. Dist. LEXIS 16775, at *26.

Finally, Defendants beseech the Court to apply the principle that "a litigant cannot, 'by virtue of his standing to challenge one government action, challenge other governmental actions that did not injure him.'" *Defs.' Mot.* at 16 (citing *Cruz*, 596 U.S. at 301-02) (quoting *DaimlerChrysler*, 547 U.S. at 353 n.5). However, as Plaintiff correctly notes, this sentence misses the crux of the Supreme Court's holding in *Cruz*: "[h]ere, however, appellees seek to challenge the *one* Government action that causes their harm: the FEC's threatened enforcement of the loan-repayment limitation, through its implementing regulation. In doing so, they may raise constitutional claims against Section 304, the statutory provision that, through the agency's regulation, is being enforced." 596 U.S. at 302 (emphasis in original). Based on the

foregoing, the Supreme Court in *Cruz* upheld the plaintiff's standing to challenge regulations enforcing the purportedly unconstitutional statute. *Id.*

NEFSA challenges the agency's action of issuing the Final Rule and implementing regulations pursuant to an allegedly unconstitutional statutory scheme; thus, here, the Court reaches the same conclusion as the *Cruz* Court. *See Cruz*, 596 U.S. at 301-02; *accord*, *Arnesen*, 2024 U.S. Dist. LEXIS 16775, at *19-20 (finding "despite the regulation being the 'cause that directly produce[d]' the injury 'and without which' the injury 'would not have occurred,' the statute was still traceable to the injury because the regulation could not have been enacted but for the statute") (citing *Cause*, BLACK'S LAW DICTIONARY (11th ed. 2019)).

Based on its analysis, the Court concludes that Plaintiff sufficiently established, for the purposes of standing, that its injury is fairly traceable to NMFS' acceptance of the Council's Framework Adjustment 65 and subsequent promulgation of the Final Rule and implementing regulations, in violation of its statutory directives under the MSA and APA. The Court proceeds to the second element of standing in dispute: redressability.

### b.    Redressability

NEFSA posits its requested injunctive and declaratory relief would redress the injuries caused by the Framework Adjustment 65's reduced catch limits, as applicable to its members pursuant to the Final Rule and implementing regulations. *Pl.'s Mot.* at 23. It argues the unconstitutional components of the MSA cannot be severed without contravening the will of Congress and rendering the Act inoperable. *Id.* at

25.  Plaintiff further asserts prospective relief should be granted through vacatur to relieve ongoing subjugation to unconstitutional authority and through declaratory judgment to "declare the rights" of its members pursuant to 28 U.S.C. § 2201(a).  *Id.* at 27-28.

Defendants argue NEFSA fails to challenge the substance of the Final Rule, such that vacatur would not redress their claimed injury.  *Defs.' Mot.* at 18. Defendants further claim that a decision finding the Councils are constitutionally infirm would not change the fact that NMFS independently reviewed Framework Adjustment 65 and decided to issue it as law, such that it "would not justify invalidating the Final Rule, and thus would not redress the claimed injuries." *Id.* (citing, e.g., *Baldrige*, 831 F.2d at 1464).

As a starting point, the Court recognizes the Supreme Court's admonition in *Lujan* that where "the plaintiff is himself an object of the [government] action . . . there is ordinarily little question that the action or inaction has caused him injury, and that a judgment preventing or requiring the action will redress it."  504 U.S. at 561-62.  Defendants do not dispute that the Final Rule and implementing regulations govern the conduct of NEFSA's commercial fishermen members, including David Osier and Devyn Campbell.  As such, the Court concurs with NEFSA that vacating Framework Adjustment 65 and enjoining NMFS from enforcing its catch limits would reasonably serve to remedy the harms suffered by its members.

Defendants assert the requested relief constitutes a "mismatch" with the claims asserted, citing the Supreme Court as saying: "[a] court must find prospective

relief that fits the remedy to the wrong or injury that has been established." *Defs.' Reply* at 8 (quoting *Salazar*, 559 U.S. at 718).  Defendants do not explain the basis for this assertion; without more, the Court finds the wrong alleged (NMFS accepting an unconstitutional proposal) and injury (restrictive catch limits) would both be addressed by NEFSA's requested relief of vacating Framework 65 and the Final Rule.

Defendants' reliance on *Baldrige* to claim injunctive relief should not be granted based on procedural deficiencies, *Defs.' Reply* at 8 (citing *Baldrige*, 831 F.2d at 1466), fails for two different reasons.  First, Defendants do not explain why the Court should follow this Ninth Circuit decision, nor do they direct the Court to any similar authority within the First Circuit.  Second, even if the Court accepted the *Baldrige* standard, its prohibition on "improper material being added to the administrative record," rings loudly in this case, as Plaintiff predicates its entire argument on its position that the Council lacked constitutional authority to propose Framework Adjustment 65 and thus the Council's record and proposal should never have been considered by NMFS, nor promulgated as a Final Rule.  *Pl.'s Mot.* at 19. Thus, for the purposes of standing, NEFSA has established that its requested relief would redress its harms.

At bottom, based on conceded elements and the foregoing analysis with regard to causation and redressability, the Court finds NEFSA has standing to brings its claims against the Defendants relating to the unconstitutional structure of the New England Council.

### 2.    Standing for Count IV - Claim Relating to the Actions of Defendant Rauch

#### a.    Causation

NEFSA brings a separate claim against the actions of Defendant Rauch, arguing that his issuance of the Final Rule constituted an executive act in excess of his lawful authority, and in so doing caused its members' injuries. Specifically, it traces its injuries to "Mr. Rauch's signature on the Final Rule [which] gave it effect." *Pl.'s Resp.* at 15. Defendants reject NEFSA's characterization of Defendant Rauch's actions, arguing that any injuries stemming from the Final Rule cannot be fairly traced to Mr. Rauch's signature but, rather, to Assistant Administrator Coit, who Defendants assert truly issued the Final Rule and against whom Plaintiff brings no constitutional claims for improper appointment or insulation from removal.

As relevant to the claim against Defendant Rauch, NEFSA alleges he lacks the constitutional authority to exercise the federal executive power and claims "[a]t the standing stage, the sole question is whether Plaintiff's members were 'harmed by [Mr. Rauch's] action.'" *Pl.'s Resp.* at 15 (citing *Collins*, 594 U.S. at 258-59 n.24). Examining this footnote, however, reveals a citation to *Seila Law*, which requires, in relevant part, "that the challenger 'sustain[s] injury' from an executive act that allegedly exceeds the official's authority. *Seila Law*, 591 U.S. 211 (quoting *Bowsher*, 478 U. S. at 721). Thus, the inquiry has three parts: 1) an injury sustained by the plaintiff, 2) caused by an executive act, and 3) that act allegedly exceeds the official's authority.

The Defendants do not contest Plaintiff's asserted injuries as being subjected to catch limits pursuant to the Final Rule that reduce their constituent fishermen's earnings and business opportunities and, while evaluating standing, the Court will accept the merits of NEFSA's legal contention as true: that Defendant Rauch's insulation from removal violates the Constitution. What remains, then, is whether the injuries in question can be fairly traced to an executive act by Defendant Rauch based on specific facts in the record.

The Administrative Record leaves no ambiguity that Defendant Rauch signed the Proposed Rule, A.R. 6074; Final Rule, A.R. 6214-29; and Internal Memorandum certifying the consistency of Framework Adjustment 65 with the National Standards and other applicable law, A.R. 6201-11. NEFSA alleges these signatures constituted the formal execution of the rule, triggering its entrance into effect and causing the injuries suffered by its members. Defendants, on the other hand, distinguish the act of signature, "a ministerial task," from the executive action of issuing a rulemaking, which they attribute to Assistant Administrator Coit both generally and in the specific case of Framework Adjustment 65. *Defs.' Mot.* at 20.

After reviewing the Administrative Record, the Court agrees with the Defendants that Assistant Administrator Coit held the responsibility for accepting the proposed Framework Adjustment 65 and for issuing the Final Rule and exercised that responsibility here, despite the appearance of signature by Defendant Rauch.

Beginning at a general level, the NOAA Handbook incorporated into the record and referenced by both parties draws clear lines regarding delegations to respective

NMFS officials.  *See* A.R. 4244-54.  Several pages list the broad authority delegated to the Assistant Administrator for Fisheries, a role currently held by Ms. Coit. Multiple grants of authority hold relevance to the current case, beginning with the "Administrative/Management" duties of:

> 1. Signature of material for publication in the Federal Register and the Code of Federal Regulations.
>
> 2. Determinations under Executive Order 12866, for regulations promulgated by NMFS.
>
> 3. Initial decision to deny program information requested from fisheries records under the Freedom of Information Act, 5 U.S.C. 552.
>
> 4. Signature of certificates as Certifying Officer.
>
> 5. Exercise of NOAA's full Civilian Personnel Appointing Authority.

A.R. 6245.  Regarding the MSA specifically, NOAA's Under Secretary broadly authorized the Assistant Administrator to "perform functions relating to" the Act, as well as the additional authority to perform the following as long as the Under Secretary is advised prior to final action:

> i. Establishing guidelines to assist in the development of fishery management plans (1851(b));
>
> ii. Appointing or removing members of the Regional Fishery Management Councils (1852(b)(2) or (5));
>
> iii. Issuing preliminary fishery management plans and implementing regulations, if the Assistant Administrator considers the action to be controversial (1821(h));
>
> iv. Approving, disapproving, partially disapproving, or issuing a fishery management plan or amendment, or issuing implementing or emergency regulations, if the Assistant Administrator considers the action to be controversial (1853 and 1854).

A.R. 6246-47. By contrast, the Deputy Assistant Administrator for Regulatory Programs—Defendant Rauch—warrants only one mention in the eleven pages of delegated authority, for a sub-delegation from the Assistant Administrator for:

> Signature of material for publication in the Federal Register and the Code of Federal Regulations.

A.R. 6248. Defendants emphasize the language of this sub-delegation, which includes none of the verbs used to describe the grant of substantive authority to the Assistant Administrator, such as "establish," "issue," or "approve." A.R. 6246-47. Rather, the Deputy Assistant Administrator may only "sign[] . . . for publication." A.R. 6248.

The rulemaking process of Framework Adjustment 65 and the Final Rule reflects these general boundaries of authority. Plaintiff accurately identifies Defendant Rauch's signature in three places: the Proposed Rule, A.R. 6074; Final Rule, A.R. 6214-29; and Internal Memorandum certifying consistency of the final rule, A.R. 6201-11. *Pl.'s Mot.* at 6; *Pl.'s Resp.* at 14. However, a closer look at the Administrative Record reveals his hand was guided, in each case, by the directives of Assistant Administrator Coit. First, before submitting the proposed Framework Adjustment 65 for public comment on May 24, 2023, email records from May 17, 2023 show the proposal sent to Assistant Administrator Coit requesting her review, who responded: "I approve this moving forward." A.R. 6072-73. Similarly, before the Final Rule was published in the Federal Register on August 10, 2023, Assistant Administrator Coit received via email on August 2, 2023 a copy of the Final Rule and Internal Memorandum certifying consistency with the note:

> As Acting AA, Sam signed these documents indicating his concurrence with the rule and it has since proceeded to review in DOC GC/NOAA

GC. However, his decision was stipulated with the need to be ratified by you, upon your return. I am now sending you the package for your review/clearance.

A.R. 6212. Assistant Administrator responded the next day, stating: "I reviewed and clear this. Approved." *Id.*

NEFSA vigorously protests that Defendant Rauch's signature accompanying the published Final Rule reveals a clear connection between his action and their injuries. While Plaintiff may be correct that publication signals the rule entering into effect, the presence of his signature alone fails to demonstrate that their injuries can be fairly traced to Defendant Rauch. The record shows decisionmaking by Assistant Administrator Coit led to the acceptance of Framework Adjustment 65 and the publication of the Final Rule, not the signature by Defendant Rauch; as Plaintiff itself writes in their response, "Mr. Rauch could not have . . . declined to sign and publish the Rule." *Pl.'s Resp.* at 14. In our modern system of government, officials necessarily rely on their staffs to execute the minutiae of their duties based on their instructions. Here, Assistant Administrator Coit directed Defendant Rauch to sign the Rule for publication and this instruction had "determinative effect"; he exercised no independent judgment in doing so, no more than, for example, his secretary would have in sending his signed copy to the Federal Register or the Office of the Federal Register did in publishing the Rule once received. NEFSA argues "Mr. Rauch's signature on the Final Rule gave it effect," but the record indicates the decision to approve and give effect to the Final Rule was made, not by Defendant Rauch, but by Assistant Administrator Coit, who Plaintiffs do not contest possessed the authority to do so.

Though addressing a different question, the Supreme Court in *Bennett* noted the respondents had "wrongly equate[d] injury 'fairly traceable' to the defendant with injury as to which the defendant's actions are the very last step in the chain of causation." *Bennett*, 520 U.S. at 169-70. Here, the Court finds NEFSA makes a similar error; just because Defendant Rauch's signature accompanied the final act of publication does not inherently mean that act caused the injuries. The Court therefore agrees with the Defendants that "Coit's approval marked the culmination of the rulemaking process," and that NEFSA's injuries cannot be fairly traced to Defendant Rauch's signature. *Defs.' Reply* at 7.

For these reasons, NEFSA has failed to establish the unlawful conduct of Defendant Rauch caused their injury, and thus do not have standing to bring their claims relating to his purported conduct.

### b.    Redressability

Based on its conclusion that Plaintiff failed to establish causation against Defendant Rauch, the Court finds it unnecessary to address the element of redressability at length. However, as previously explained, the Administrative Record provides ample evidence that the acceptance of Framework Adjustment 65 and the publication of the Final Rule can be fairly traced to Assistant Administrator Coit, not Defendant Rauch. Notably, Assistant Administrator Coit, an inferior officer whose constitutional officer status NEFSA does not dispute, holds the same power of "[s]ignature of material for publication in the Federal Register and the Code of Federal Regulations" herself, A.R. 6245, making NEFSA's request to vacate the rule

114

and enjoin enforcement based on Defendant Rauch's signature an exercise in futility or, at least, inefficiency. Accordingly, the Court declines to grant Plaintiff's requested relief of declaring Defendant Rauch to be unconstitutionally insulated from removal or vacating the Final Rule and regulations on that basis.

For these reasons, the Court concludes that NEFSA has failed to establish its injuries can be fairly traced to Defendant Rauch or would be remedied by the relief requested against him, such that Plaintiff lacks standing to bring its claim relating to his allegedly unconstitutional insulation from removal.

## VI.    MERITS

### A.    Counts I, II, and IV - Claims relating to Council Members as Officers under the Appointments Clause and the Take Care/Vesting Clauses

#### 1.    Legal Standard

NEFSA brings several constitutional claims that require the same threshold determination of whether the implicated officials constitute federal officers; as such, the Court addresses these claims together. While the Supreme Court declined to create a brightline rule for the definition of a federal officer, it set out two clear requirements in *Lucia* that will guide the Court's analysis: first, "that an individual must occupy a 'continuing' position established by law," *Lucia*, 585 U.S. at 245 (quoting *Germaine*, 99 U.S. at 511), and second, that "they 'exercis[ed] significant authority pursuant to the laws of the United States.'" *Id.* (quoting *Buckley*, 424 U.S. at 126).

Supreme Court caselaw fills in the details for how a court should consider these two requirements. Regarding "continuing office established by law," the *Freytag*

115

Court noted that "the duties, salary, and means of appointment for that office are specified by statute," distinguishing this from a non-officer position described as "on a temporary, episodic basis, whose positions are not established by law, and whose duties and functions are not delineated in a statute." *Freytag*, 501 U.S. at 881. Similarly, the *Germaine* Court applied "the ideas of tenure, duration, emolument, and duties," to find the defendant in that case not a federal officer because "the duties are not continuing and permanent, and they are occasional and intermittent." *Germaine*, 99 U.S. at 511-12. The Court further considered that "the [official] is only to act when called on by the Commissioner [] in some special case." *Germaine*, 99 U.S. at 512.

With regard to "significant authority," the *Freytag* Court deemed federal officers those who "exercise significant discretion," and "perform more than ministerial tasks." *Freytag*, 501 U.S. at 868. The authority to make final decisions, while a powerful indication of officer status when present, "is [not] [the] *sine qua non* of officer status." *Lucia*, 595 U.S. at 247 n. 4; *see also id.*, 585 U.S. at 249 (finding officials constituted federal officers despite their "opinion count[ing] for nothing unless the regular judge adopts it as his own" because SEC ALJs "take testimony," "receive evidence," "examine witnesses," "conduct trials," "rule on the admissibility of evidence," and "have the power to enforce compliance with discovery orders").

Once a court deems an official a federal officer, the Constitution unambiguously imposes the requirements under which NEFSA brings its claims. First, the Constitution unequivocally assigned the power of appointment to the Executive, stating:

116

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint… all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. CONST. art. II, § 2.  This provision provides for two processes: "Principal officers are selected by the President with the advice and consent of the Senate. Inferior officers Congress may allow to be appointed by the President alone, by the heads of departments, or by the Judiciary."  *Buckley*, 424 U.S. at 132.  The Supreme Court distinguished between the two types of federal officers, primary and inferior, based on whether the officer was "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663.

While not as straightforward in the text of the Constitution itself, Supreme Court precedent articulates just as forcefully a second requirement: that federal officers be subject to removal by the President.  *See, e.g.*, *Myers*, 272 U.S. at 163-64. This power derives from the interplay between two constitutional provisions, often referred to as the Take Care Clause and the Vesting Clause, which state, respectively:

> The executive power shall be vested in a President of the United States of America.

> . . . he shall take Care that the Laws be faithfully executed.

U.S. CONST. art. II, § 1, cl. 1, and § 3.  The Supreme Court has consistently interpreted these Clauses to require the President to retain "the authority to remove those who assist him in carrying out his duties," because "[w]ithout such power, the President

could not be held fully accountable for discharging his own responsibilities." *Free Enter. Fund*, 461 U.S. at 513-14.

However, the Supreme Court has recognized two categories of executive officials exempt from the general rule. "First, in *Humphrey's Executor*, . . . the Court upheld a statute that protected the Commissioners of the FTC from removal except for 'inefficiency, neglect of duty, or malfeasance in office,'" ruling this restriction permissible because the statute required the commission "to be non-partisan," "[its] duties are neither political nor executive, but predominantly quasi-judicial and quasi-legislative" and "its members are called up on to exercise the trained judgment of a body of experts." *Seila Law*, 591 U.S. at 215-16 (quoting *Humphrey's Executor*, 295 U.S. at 620, 624). Second, the Court upheld for-cause removal restrictions for an independent counsel in *Morrison*, finding that the officer's role had "limited jurisdiction and tenure and lack[ed] policymaking or significant administrative authority." *Id.* at 217-18 (quoting *Morrison*, 487 U.S. at 691).

In proceeding with its analysis on the merits of NEFSA's constitutional claims, the Court will first determine if the Council Members and Defendant Rauch, respectively, constitute federal officers under the factors articulated in *Lucia*; if the Court reaches an affirmative determination on this question, it will proceed to distinguishing whether their positions should be considered primary or inferior offices for purposes of adjudicating the lawfulness of their insulation from removal, and, finally, if either of the exceptions recognized in *Humphrey's Executor* or *Morrison* should apply.

118

### 2.    Discussion

#### a.    Counts I and II - Council Members as Officers of the United States

NEFSA asserts the Council Members hold continuing positions established by law and exercise significant authority, such that the Court should consider them to be federal officers. *Pl.'s Mot.* at 8-16.   Plaintiff points out that Council Members failed to follow the constitutional appointment process for primary officers, nor were their positions assigned by the officials constitutionally permitted to appoint inferior officers. *Pl.'s Mot.* at 16-19.  Thus, in Count I, NEFSA insists their positions violate the Appointments Clause.  Plaintiff doubles down on this argument in Count II, arguing that, if federal officers, the President's inability to remove Council Members at will violates the Vesting and Take Care Clauses by interfering with the President's ability to faithfully execute the laws of the United States. *Pl.'s Mot.* at 20-23.

Defendants do not engage with NEFSA's attempts to distinguish between primary and inferior officers; rather, they insist as a threshold matter that Council Members neither hold continuing positions nor wield significant authority, such that they do not constitute federal officers at all, and thus should not be subjected to any constitutional requirements provided for in the Appointments, Vesting, or Take Care clauses or their progeny of Supreme Court caselaw. *Defs.' Mot.* at 21-24.

#### i.    Holding Continuing Offices Established by Law

Based on the plain terms of the MSA, Councils and their Members trace their creation to federal law. *See* 16 U.S.C. § 1852.  Defendants do not seriously contest this point; instead, they focus on the "continuing offices" element.  Guided by the

119

Supreme Court's analysis, this Court considers several factors in evaluating whether Council membership should be deemed "continuing." In *Germaine*, the Court stated, "the term ['officer'] embraces the ideas of tenure, duration, emolument, and duties." 99 U.S. 508 (citing *United States v. Hartwell*, 73 U.S. 385, 393 (1868)); *see also Comm'r v. Ogden*, 62 F.2d 34, 335 (1st Cir. 1932) (citing definition of "officer" from *Hartwell*). The Supreme Court reaffirmed the scope of relevant inquiry in *Lucia*, where it ruled SEC ALJs constituted federal officers because they "receive[] a career appointment," and the statute specified the position's "duties, salary, and means of appointment." *Lucia*, 585 U.S. 248 (citing *Freytag*, 510 U.S. at 881). Accordingly, the Court examines the MSA for its contents regarding the tenure and duration, salary, and ongoing nature of the duties of the Council Members to determine whether they are "continuing."

The Court begins with the first factor: the tenure and duration of the Council Members positions. NEFSA insists that the statute created permanent Council Member positions, commissioned them to perform ongoing duties, and provided for indefinite service by the state bureaucrat appointees, while further allowing the state-nominated Members to serve three-year terms that may be extended to a maximum of nine years. It directs the Court to *Seila Law*, in which the Supreme Court found the CFPB Director's five-year term sufficient to deem him a federal officer. *Seila Law*, 591 U.S. at 207. Defendants reject this characterization, arguing the Council Members serve only periodically and rarely, and that three-year term

120

limits pale in comparison to the career appointments found to constitute officer positions in *Lucia* and *Freytag*. *Defs.' Mot.* at 23-24.

Several of NEFSA's points are compelling. First, Defendants correctly point out that "[t]he Council typically meets five to six times a year, and each meeting lasts around three days." *Defs.' Mot.* at 22 (citing A.R. 2561-65; A.R. 5030-42; A.R. 5333-36). However, the Court looks to what the MSA permits, not merely how the Council has exercised this power; pursuant to 16 U.S.C. § 1852(e)(3), the Council may meet at any time "upon the request of a majority of its voting members." NEFSA fairly distinguishes this from the civil surgeons deemed to not be federal officers in *Germaine*, as those officials worked only "when called on by the Commissioner [] in some special case." *Pl.'s Resp.* at 8 (citing *Germaine*, 99 U.S. 508). As noted above, while the frequency of the civil surgeons' federal work in *Germaine* was limited to the instances in which they were "called on by the Commission," the MSA authorizes the Council Members to meet as often as a majority of its voting members choose. In other words, Council Members do not need a threshold determination from an external source to work and to receive compensation. As such, the statute permits the duration of the Council Member's service to be more frequently and for longer periods, such that the Defendants' argument regarding the brief, infrequent meetings falls short.

Further, the Court remains wary that, as Plaintiff writes, "some Council members serve *indefinitely* (as far as federal law is concerned)," referring to state bureaucrat Members. *Pl.'s Mot.* at 9 (emphasis added by Plaintiff). Examining the

121

statute, the Act provides that state bureaucrat Members serve "so long as the official continues to hold such position." 16 U.S.C. § 1852(b)(1)(B). Defendants raise the example of *qui tam* relators with indefinite terms as not being federal officers, *Defs.' Mot.* at 23, yet these roles inherently terminate upon the resolution of their civil case. The MSA provides for no such natural cessation or required turnover for these state bureaucrat Council Members; their tenure could theoretically persist long past the three-year terms of the governor-nominated Members largely relied upon as evidence by the Defendants.

Turning to the second factor, salary, the statute provides that governor-appointed Council Members "shall receive compensation at the daily rate . . . when engaged in the actual performance of duties for such Council." 16 U.S.C. § 1852(d). Parties dispute the relevant inquiry regarding compensation: Defendants assert the daily rate reveals the role's intermittency and highlights that other Members receive no compensation, while NEFSA claims any compensation expressly provided for in the statute satisfies this factor.

On this, the Court agrees with the Defendants. A "salary" usually refers to an overall sum disbursed at regular intervals, compared to a per-hour or per-day rate structure. *Salary*, BLACK'S LAW DICTIONARY (10th ed., 2014) ("An agreed upon compensation for services – esp. professional or semiprofessional services – usu. paid at regular intervals on a yearly basis, as distinguished from an hourly basis"). Additionally, *Lucia* and *Freytag* both specifically use the operative word "salary" in evaluating whether a position should be deemed "continuing." *Lucia*, 585 U.S. at 246;

122

*Freytag*, 501 U.S. at 881.  Thus, the compensation structure relevant to the nature of the role, and the daily rate provided for in the statute cut in favor of the Defendants' description of the Council Member roles as occasional and intermittent.

Finally, the Court examines whether the duties provided for in the statute contemplate ongoing or discrete actions by the Council.  NEFSA argues the Councils set long-term fishery policy and oversee ongoing research; Defendants fail to respond to these arguments regarding the temporal nature of the Council's duties.

Here, the text of the MSA supports Plaintiff's contention that the Council assumes continuing duties.  Most directly, the statute charges the Councils with the duty to "review on a continuing basis, and revise as appropriate, the assessments and specifications made pursuant to [16 U.S.C. § 1853(a)(3), (4)]," and to "develop, in conjunction with the scientific and statistical committee, multi-year research priorities . . . that are necessary for management purposes, that shall—(A) establish priorities for 5-year periods; (B) be updated as necessary."  16 U.S.C. § 1852(h)(5), (7). Both of these provisions contemplate ongoing roles in which the Council functions "on a continuing basis" and with the vitality to "update[] as necessary."  *Id.*  As such, this factor favors NEFSA.

Based on its analysis of the MSA and relevant Supreme Court precedent, the Court concludes that Council Member positions satisfy the "continuing position established by law" requirement of a federal officer position, and the Court proceeds to the second requirement.

## ii.    Exercising Significant Authority

Both parties cite numerous statutory provisions to support their respective positions; at bottom, Defendants argue the Councils serve a purely advisory role, while NEFSA claims they exercise significant federal authority in specific contexts. Ultimately, the Court views the Councils as exercising significant authority in certain contexts by virtue of the MSA's grant of authority to the Councils to restrict the actions of the Secretary of Commerce.

Most notably, NEFSA draws the Court's attention to statutory circumstances that can be fairly described as instances in which NMFS must predicate its action on a preliminary determination made by the Council; specifically, this includes NMFS' inability to repeal FMPs or to impose a limited access system without prior approval by the Council. *Pl.'s Mot.* at 11, 17 (citing 16 U.S.C. §§ 1854(c)(3), (h)).  In evaluating the inability of the Secretary to unilaterally repeal an FMP or impose a limited access system, the Court considers the Third Circuit's close analysis of this issue in its review of the District Court of New Jersey's decision in *Lofstad v. Raimondo.  See Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 9-11 (3d Cir. Sep. 26, 2024).[9] Likening these provisions to a functional "pocket veto," the Third Circuit emphasized that, by withholding their assent, the Councils "can refuse to let [the Secretary] set up her limited-access fisheries, . . . or repeal a plan." *Id.* at 11.  In so doing, the

---

[9]    The Third Circuit includes a third provision in what it describes as the Council's unconstitutional "pocket veto" powers: the required assent of a Council for the Secretary to delegate fishery management to a state pursuant to 16 U.S.C. § 1856(a)(3)(B).  *See Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 9-11 (3d Cir. Sep. 26, 2024).  As confirmed at oral argument, the Plaintiff in this case has not argued this particular provision constitutes significant authority, and the Court thus declines to address this provision to avoid issuing an advisory opinion on an issue not presented.

Councils exercise a "fearsome power" and "undermine[] the democratic chain of command" by interfering with the President's ability to take care the laws of the United States are faithfully executed, because "no one can override the Council's pocket veto." *Id.* at 10-11.

The Third Circuit's analysis in *Lofstad* presents a compelling case for the ability to unilaterally block executive action as constituting its own affirmative exercise of significant authority. While the First Circuit has had little occasion to address this issue, Judge Gelpí's concurrence in *Federal Oversight and Management Board v. Hernández-Montañez* reflects a similar concern that a Board's "ample veto power" over the elected government serves to erode "the principle of the consent of the governed." *Fin. Oversight & Mgmt. Bd. v. Hernández-Montañez*, 82 F.4th 57, 59 (1st Cir. 2023) (Gelpí, J., concurring). Based on the foregoing, the Court concludes that the unreviewable pocket veto provisions of the MSA grant the Councils the power to exercise significant authority. As Plaintiff's counsel stated at oral argument, based on *Freytag* and other Supreme Court jurisprudence, officials cannot be "an officer on Monday and an employee on Tuesday"; once significant authority is delegated, the official is a federal officer. The Court concludes that the Council Members constitute officers of the United States and must comport with its constitutional requirements. *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 11 (3d Cir. Sep. 26, 2024).

However, the Court is not persuaded that the rest of the powers implicated by NEFSA constitute significant federal authority in their own right. First, NEFSA

challenges the Council's role in developing and drafting plans and amendments, relying on two statutory provisions that, upon close analysis, do not purport to grant the significant authority that Plaintiff claims. NEFSA cites 16 U.S.C. § 1801(b)(5), in which the statute directs Councils to "to exercise sound judgment in the stewardship of fishery resources through the preparation, monitoring, and revision of such plans." *Pl's. Mot.* at 10 (citing 16 U.S.C. § 1801(b)(5)). However, the cited provision reflects Congress's purpose in this grant of authority, contained later in the sentence: to "enable the State, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, *and advise on*, the establishment and administration of such plans." 16 U.S.C. § 1801(b)(5) (emphasis added). Similarly, Plaintiff cites 16 U.S.C. § 1852(a)(1)(A) as "vest[ing] Members with 'authority over the[ir] fisheries.'" *Pl.'s Mot.* at 10. But this argument ignores the purpose of this section in context, which describes the jurisdiction of the New England Council relative to the other Councils described in sections (B) through (H). 16 U.S.C. § 1852(a)(1)(A-H).

Plaintiff also fails to address other unambiguous language in the statute granting general authority, not to the Councils, but to the Secretary. *See* 16 U.S.C. § 1855 ("The Secretary shall have general responsibility to carry out any [FMP] or amendment approved or prepared by him, in accordance with the provisions of this Act"); *see, accord, Franklin*, 898 F.2d at 60 ("The [MSA] also unequivocally vests the Secretary with the discretion to determine whether a Council's progress on conservation and management is reasonable"). The structure of the Act further

makes clear that only the Secretary holds the power to legally effectuate an FMP through implementing regulations.  *See* 16 U.S.C. § 1854(b), (c)(6); *see, accord, N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008) (analyzing the MSA and finding that FMPs "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them").

NEFSA claims "[t]he Act's plain text confines NMFS review to errors of law, and thus preserves for the Council an exclusive zone of legal policy judgments." *Pl.'s Resp.* at 10.  In the Court's view, however, this argument misreads the language of the statute, which directs the Secretary to review any Council-proposed plan or amendment to determine "whether it is consistent with the national standards, the other provisions of this Act, and any other applicable law."  16 U.S.C. § 1854(a)(1)(A). As Defendants counter, the National Standards provide ten broad, and sometimes contradictory, policy directives; by reviewing for consistency, the Secretary must inherently assess and make determinations of policy.

Next, NEFSA correctly notes that the "Supreme Court has 'explicitly reject[ed]' the 'theory that final decisionmaking authority is a *sine qua non* of officer status.'" *Id.* at 12-13 (quoting *Lucia*, 595 U.S. at 247 n. 4) (citing *Freytag*, 501 U.S. at 881-82). Admittedly so.  However, while these principles hold true, the officials deemed federal officers in those two cases wielded substantially different authority than the policy development role of Council Members.  In *Freytag*, the Tax Court's STJ's were authorized, while presiding over adversarial hearings, to "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance

127

with discovery orders." *Freytag*, 501 U.S. at 881-82.  The SEC ALJs held much the same power in *Lucia*.  585 U.S. at 249.  Beyond that, if the SEC issued an order declining to review an ALJ decision, "the ALJ's decision itself 'becomes final' and is 'deemed the action of the Commission.'"  *Id.*  Council Members, however, do not serve in an adversarial setting and lack any power to enforce compliance.  Rather, their policy proposals have no legal effect on private parties without NMFS going through the rulemaking process of accepting the proposal, publishing the proposed rule in the Federal Register and undergoing public notice and comment, and choosing to issue a final version of the rule with implementing regulations.  *See, accord*, *Gulf Restoration*, 730 F. Supp. 2d. at 173-74 (finding an "FMP does not constitute final agency action without promulgation of the corresponding regulations: neither approval of the FMP nor failure to act on it marks the end of the decisionmaking process; nor does the FMP establish any rights or obligations or create any binding legal consequences").

NEFSA insists Councils hold unilateral rulemaking authority in certain contexts, revealing their significant authority.  It directs the Court to 16 U.S.C. § 1854(a)(3), which provides that Council proposals "shall take effect as if approved" if NMFS fails to review it within the thirty-day period provided by statute.  *Id.*  Plaintiff again analogizes the ALJ decisions in *Lucia*, which "take effect" without agency approval, should the SEC decline to review them.  *Pl.'s Mot.* at 13 (citing *Lucia*, 585 U.S. at 249); *see id.* at 13-14 (quoting 16 U.S.C. § 1854(a)(3)(C)) ("If the Secretary fails for any reason to 'notify a Council within 30 days . . . of the approval, disapproval, or

128

partial approval of the plan or amendment, then such plan or amendment *shall take effect as if approved*"') (emphasis added by Plaintiffs).

However, the Court agrees with Defendants that a key factor distinguishes the Council proposals from the decisions of ALJs: without implementing regulations, an FMP has no legal effect affecting private parties. In *Lucia*, ALJs adjudicated the rights of private parties in adversarial contexts, such that the agency declining to review made these decisions final and enforceable. *Lucia*, 585 U.S. at 249. Under the MSA, FMPs lack legal effect in the absence of implementing regulations. *See, e.g.*, *Gutierrez*, 550 F.3d at 17 (finding FMPs "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them").

NEFSA protests that, even if not binding on private parties, an FMP taking effect as if approved limits the scope of regulations that NMFS can promulgate, as regulations legally must be consistent "with the [FMP] [or] plan amendment" they seek to implement. *Pl.'s Resp.* at 12. (citing 16 U.S.C. § 1854(b)(1)). However, the statutory section on regulations contains no mechanism for the Council's proposed regulations to take automatic effect. *See* 16 U.S.C. § 1854(b)(1)). Only the Secretary can promulgate regulations, and accordingly, only NMFS has the authority to issue binding rulemakings. *See, accord*, *Goethel*, 2016 U.S. Dist. LEXIS 99515, at *28 (D.N.H. July 29, 2016), *aff'd* on other grounds, *Goethel*, 854 F.3d 106.

NEFSA also directs the Court to 16 U.S.C. § 1854(b)(3), which it claims mandates the Secretary consult with the Council prior to amending any proposed regulations. Under this provision, Plaintiff says, a Council can refuse to consult and

129

effectively bar NMFS from revising its proposed regulations. The Defendants dispute that this is how the statutory scheme functions in practice. Without more, the Court is not convinced by the NEFSA's argument. The Plaintiff has not presented evidence of a Council's refusal to consult, nor proven that such refusal would indeed prohibit NMFS from revising its proposed regulations, so long as NMFS solicited the Council's feedback and gave it an opportunity to respond. Thus, the Court finds the consultation requirement does not establish an exercise of significant federal authority. *Accord Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 13 (3d Cir. Sep. 26, 2024).

NEFSA also highlights the statutory mechanism under which, by unanimous vote, a Council can require the Secretary to promulgate emergency regulations. 16 U.S.C. § 1855(c)(2)(A)). However, taken in context, this power does not amount to the substantial exercise of authority NEFSA describes. A Secretary who identifies an emergency situation can herself issue such regulations unilaterally, and, even when directed by unanimous vote of a Council, retains total control over the content of such emergency regulations. *Id*. The Council's demand cannot require a particular form of emergency regulation, and the Secretary retains the ability to block unanimous votes by having her representative, the Regional Director Council Member, vote against such measures to defeat unanimity. Thus, this does not constitute the significant exercise of federal authority. *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 13 (3d Cir. Sep. 26, 2024).

### iii.    Principal vs. Inferior Officers

The Supreme Court has drawn a clear line between principal and inferior officers of the United States: inferior officers are those "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663. As explained above, the "pocket veto" provisions allow the Council to block certain federal actions—to wit, imposing a limited access system or repealing an FMP—and their decisions cannot be reviewed by any federal agency or officer. In fact, the Councils exercise this power over a principal officer, the Secretary of Commerce. For this reason, the Council Members constitute principal officers of the United States. *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 13-14 (3d Cir. Sep. 26, 2024).

As principal officers, the Constitution requires Council Members be appointed by the President and confirmed by the Senate. *See* U.S. CONST. art. II, § 2. The Defendants do not purport that this process took place here. Thus, the appointments of the Council Members are unconstitutional. *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 14 (3d Cir. Sep. 26, 2024).

### iv.    Insulation from Removal

NEFSA insists the MSA violates the federal Constitution by appointing Council Members as federal officers who cannot be removed by the President in his execution of the Vesting and Take Care Clauses. *Pl.'s Mot.* at 20-23. Defendants do not engage with this argument, instead relying on their position that Council Members do not constitute federal officers because their positions are not continuing

and they do not exercise significant authority, and, thus, the constitutional doctrine against insulation from removal does not apply. *Defs.' Mot.* at 21-33.

Based on the prior conclusion that Council Members, in certain circumstances, do exercise significant authority and thus are officers of the United States, the Court concludes that the constitutional limits on removal protections apply and that the Defendants have forfeited their right to contest this point. *See Zannino*, 895 F.2d at 17 (finding "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). Regardless, the statute is clear on this point—the Secretary has no ability to remove the state bureaucrat or governor-nominated Council Members in the absence of financial integrity violations. 16 U.S.C. § 1852(b)(6). The Court concludes that this extremely narrow ground for removal of federal officers interferes with the ability of the President to take care the laws of the United States are being faithfully executed, and thus, violates the principles set forth by the federal Constitution.

### v.    Severability

NEFSA requests an order vacating Framework Adjustment 65 and enjoining its enforcement on the basis of the unconstitutional Council, as well as declaratory relief. It argues against severance, though, focusing largely on the Court's inability to sever the removal protections without contravening the purpose of the statute and the intent of Congress. *Pl.'s Mot.* at 25-27. Defendant did not substantially engage with this issue, instead asking for an opportunity to provide supplemental briefing on remedy and asserting that the remedy should be narrowly tailored to address any

constitutional infirmity identified by the court, such that they could not speculate prior to understanding the statutory flaw. *Defs.' Mot.* at 40.

The Court adopts the standard of review for severability provided by the Supreme Court in *Seila Law*: first, whether the law's "surviving provisions [are] capable of 'functioning independently,'" and second, if Congress would have passed it without its "invalid' components" in light of the law's "text [and] historical context." *Seila Law*, 591 U.S. at 234 (quoting *Free Enter. Fund*, 561 U.S. at 509); *see also Members of Jamestown Sch. Comm. v. Schmidt*, 699 F.2d 1 (1st Cir. 1983) ("Under the general rules concerning severability, the otherwise valid portion of a statute can stand if it is fully operative and there is no showing that the legislature would not have enacted the valid provisions independently") (citing *United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968)). In considering severability, the Court "tr[ies] to limit the solution to the problem, severing any problematic portions while leaving the remainder intact."

Here, again, the Court finds the Third Circuit's recent analysis elegantly resolves this issue regarding the exercise of significant authority in the limited circumstances of the pocket veto provisions. In that case, the Third Circuit noted "Even if we knock out the pocket vetoes, the statute remains 'fully operative.'" *Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 14 (3d Cir. Sep. 26, 2024) (citing *Free Enter. Fund*, 561 U.S. at 508). Quoting the District of the District of Columbia Court in *Natural Resources Defense Council v. National Marine Fisheries Service*, the Third Circuit explained that "[t]he Council's 'most significant

responsibility' is drafting proposed plans," and that severing the pocket veto provisions does nothing to impact that duty. *Id.* (citing *NRDC v. Nat'l Marine Fisheries Serv.*, 71 F. Supp. 3d 35, 40 (D.D.C. 2014)).

The Court finds this solution comports with the Supreme Court's directive to "use a scalpel rather than a bulldozer" to cure constitutional defects. *Seila Law*, 591 U.S. at 237. Removing the ability of the Council to pocket veto the Secretary's desired adoption of a limited access system or to repeal an FMP does not interfere with the primary responsibility of the Councils as policy developers and advisors, nor does it reallocate the truly binding legal authority of the statute, issuing regulations, from the Secretary. Moreover, in severing these limited provisions, the Court addresses both the Appointments Clause and constitutional removal claims, as, without these provisions, the Council Members do not exercise any significant authority, and thus, do not constitute officers of the United States. This resolves the constitutional issues presented without invalidating an entire statutory scheme that has effectively governed the United States for decades or a regulation that did not involve either of the constitutional provisions identified in the case at bar.

Therefore, the Court grants judgment for the Plaintiff and orders 16 U.S.C. §§ 1854(c)(3), (h)) to be severed from the MSA as unconstitutional.

###   b.   Count IV - Defendant Rauch as an Officer of the United States

For the same reasons as the Court concluded NEFSA lacks standing to challenge the conduct of Defendant Rauch as unconstitutional, the Court will briefly explain why the merits of this claim also fail. However, before doing so, the Court

addresses the Defendants' argument that NEFSA has waived its claim against Defendant Rauch by failing to contest, via public comment, the authority of Defendant Rauch at the time of his signature of the Proposed Rule as published in the Federal Register. *Defs.' Mot.* at 38-39. This argument fails for several reasons. As Defendants themselves argue at length, the Proposed Rule took no legal effect, such that Defendant Rauch's signature of the proposal does not pose the same constitutional questions as does his signature of the Final Rule. While Defendants insist "[NEFSA] was aware that DAARP Rauch had signed the Proposed Rule and had no reason to believe he would not sign the Final Rule," any challenge raised at the proposal stage would have been purely speculative. Further, as NEFSA cites, Supreme Court precedent distinguishes constitutional claims from other challenges to agency rulemaking, writing: "agency adjudications are generally ill suited to address structural constitutional challenges, which usually fall outside the adjudicators' areas of technical expertise. As such, it is sometimes appropriate for courts to entertain constitutional challenges to statutes or other agency-wide policies even when those challenges were not raised in administrative proceedings." *Carr*, 593 U.S. at 92-93 (collecting cases) (internal citations omitted). For these reasons, the Court concludes NEFSA's failure to raise this issue during the public comment did not constitute waiver.

Turning to the merits of the claim against Defendant Rauch, as addressed in the Court's standing analysis, the crux of this dispute hinges on whether Defendant Rauch's signature truly constituted the "issuance" of the Rule. As explained in detail

in the standing section of this order, the Court concludes this act, while noteworthy with regard to when the public received notice of the Rule, did not indicate the exercise of significant authority by Defendant Rauch, but rather, the fruition of the rulemaking process determined by Assistant Administrator Coit.    The Administrative Record unequivocally demonstrates that Assistant Administrator Coit expressly approved both the proposed and final versions of Framework Adjustment 65 before Defendant Rauch signed either version for publication in the Federal Register.  *See* A.R. 6072-74; A.R. 6201-13.  Without exercising significant federal authority, Defendant Rauch is not subject to the constitutional strictures on appointment and removal, and thus the Plaintiff's constitutional claim fails.

## B.    Count III - Claim brought under the Private Non-Delegation Doctrine

### 1.    Legal Standard

While not as well-known as its close cousin, the generic non-delegation doctrine, which applies to assignments of authority between federal branches of government which contravene the constitutional separation of powers, the private non-delegation doctrine instead governs, as suggested by its name, delegations of federal authority to non-federal entities.  Justice Alito recently articulated a concise explanation of the private non-delegation doctrine, writing:

> Although no provision of the Constitution expressly forbids the exercise of governmental power by a private entity, our so-called "private nondelegation doctrine" flows logically from the three Vesting Clauses. Because a private entity is neither Congress, nor the President or one of his agents, nor the Supreme Court or an inferior Congress, the court established by Vesting Clauses would categorically preclude it from exercising the legislative, executive, or judicial powers of the Federal Government. In short, the "private nondelegation doctrine" is merely

136

> one application of the provisions of the Constitution that forbid Congress to allocate power to an ineligible entity, whether governmental or private.

*DOT v. Ass'n of Am. R.R.*, 575 U.S. 43, 88 (2015) (Alito, J., con.).  Defendants argue that the private non-delegation doctrine should not be applied to the Councils because certain Members "work[] in the public sector, specifically for state and federal agencies," but, based on the foregoing, this argument fails to address the appropriate inquiry relevant to the private non-delegation doctrine.  Rather, the Court examines whether the Council should be considered a governmental entity as a whole.

To do so, the Court finds helpful the Supreme Court's analysis with regard to Amtrak, which it determined constituted a governmental entity based on "the practical reality of federal control and supervision," citing as evidence  that "[t]he political branches created Amtrak, control its Board, define its mission, specify many of its day-to-day operations, have imposed substantial transparency and accountability mechanisms, and, for all practical purposes, set and supervise its annual budget."  *Id.* at 55.  The Court further finds instructive the Supreme Court's analysis in *Adkins*, which found legislative authority had not been impermissibly delegated because the "members of the code function subordinately to the Commission," as evidenced by the Commission's retaining "authority and surveillance over the activities of these authorities."  *Adkins*, 310 U.S. at 399.

## 2.    Discussion

Plaintiff takes the position that, should the Court find the Council Members do not constitute federal officers, then they must be non-governmental and thus contravene the private non-delegation doctrine.  *Pl.'s Resp.* at 13.  The Court agrees

with Defendants that this presents "a false choice," *Defs.' Reply* at 14, as it ignores the entire category of the federal government's "lesser functionaries" who serve, not as officers themselves, but "subordinate to officers of the United States," the requirements for which the Supreme Court has expressly declined to rule. *See Free Enter. Fund*, 561 U.S. at 506 (clarifying "nor do we decide whether 'lesser functionaries subordinate to officers of the United States' must be subject to the same sort of control as those who exercise 'significant authority pursuant to the laws'") (quoting *Buckley*, 424 U.S. at 126 n.162). The Court thus proceeds to analyze whether the Council constitutes a governmental entity under the inquiry outlined by the Supreme Court in *Department of Transportation v. Association of American Railroads* and whether the Council functions subordinately to any officer of the United States.

Based on the detailed directives provided by the MSA and ongoing supervision by NMFS, the Court deems the Councils to constitute a governmental entity. As conceded by both parties, the Councils derive their creation and duties from federal statute. 16 U.S.C. § 1852(a)(1), (h). Further, that statute provides clear instructions for both voting and non-voting membership of the Councils, 16 U.S.C. § 1852(b)-(c), as well as the compensation and reimbursement structure for Council Members' expenses in performance of their statutory duties. 16 U.S.C. § 1852(d). NMFS also controls the Council's actions, both through its front-end guidance via regulations interpreting the National Standards, 16 U.S.C. § 1851(b), and through its ongoing supervision of the Councils' proposals before any of them take legal effect. 16 U.S.C. § 1854; *see also Franklin*, 898 F.2d at 60 ("The [MSA] also unequivocally vests the

138

Secretary with the discretion to determine whether a Council's progress on conservation and management is reasonable").  Based on the foregoing analysis, the Court finds "the practical reality of federal control and supervision" of the Councils informs their status as governmental entities, such that the MSA does not violate the private non-delegation doctrine, nor was NMFS obligated to reject Framework Adjustment 65 as a proposal contrary to law.

Even if the Court mistook the Councils for a governmental entity, it further rejects NEFSA's contention that the Councils exercise federal power based on the Council's subordinate status to the NMFS and its constitutionally appointed federal officer, Assistant Administrator Coit.  Both parties spend substantial portions of their motions in drawing comparisons and distinctions between the MSA and the HISA; the best the Court can tell, the only issue disputed comes down to the effect of the new provision added as a response to the Fifth Circuit's decision in *Black*, 15 U.S.C. § 3053, which permits the Commission to "abrogate, add to, and modify the rules of the Authority promulgated in accordance with this Act."  *Id.*; *see also Oklahoma*, 62 F.4th at 227.  Plaintiff claims NMFS contains no similar authority to abrogate FMPs without a three-quarters majority vote by the Council pursuant to 16 U.S.C. § 1854(h); Defendants concede this point but argue this distinction "is a difference of degree, not of kind" based on NMFS statutory authority to add or modify rules.  *Defs.' Reply* at 14 (citing 16 U.S.C. §§ 1854(b), (c)(1), (c)(6), (g), 1855(d)).

Of these, the Court finds particularly compelling the Secretary's ability to unilaterally revise final regulations pursuant to 16 U.S.C. § 1855(b)(3).  While she

must consult with the Council and provide an explanation of the basis for changes, 16 U.S.C. § 1855(b)(3), this provision highlights the Secretary's role as superior to the Council's by granting her the ultimate discretion in choosing how to achieve the Act's policy directives.  As previously discussed, courts recognize by consensus that the implementing regulations provide the legally binding thrust of the MSA.  *See, e.g.*, *Lovgren*, 701 F.3d at 30 ("Congress has expressly delegated responsibility to NMFS to implement FMPs through binding regulations")*; Gutierrez*, 550 F.3d at 17 (FMPs "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them").  The Secretary's ultimate control over and ability to revise regulations clarifies the Council's role as advisory and subordinate to the Secretary, by way of NMFS and Assistant Administrator Coit, as a constitutionally appointed officer of the United States.

As Defendants point out, so long as the federal officer retains sufficient supervisory authority, federal circuit courts have routinely upheld the ability of an officer to receive policy proposals from their subordinates without violating the private non-delegation doctrine.  *See, e.g.*, *R.H. Johnson*, 198 F.2d at 695; *Adkins*, 310 U.S. at 388; *Currin*, 306 U.S. at 15-16; *Lynn*, 502 F.2d at 59.  As previously addressed, the few statutory sections that grant unreviewable authority to the Councils through a functional pocket veto do grant substantial authority, and thus have been severed as unconstitutional.  However, the rest of the statute poses no private non-delegation issues because, as explained, the Secretary retains supervisory and ultimate decision-making authority over the adoption and implementation of FMPs, amendments, and

140

regulations, including when NFMS failure to review results in an FMP "tak[ing] effect as if approved," such that these actions are advisory and do not constitute an exercise of federal power. *See, accord, Lofstad v. Raimondo*, Case No. No. 24-1420, slip op. at 11-13 (3d Cir. Sep. 26, 2024).

Thus, both because the New England Council constitutes a governmental entity and because of its subordinate role to the Secretary, NMFS, and Assistant Administrator Coit as a properly appointed officer of the United States, the Court concludes that NEFSA's claim that the structure of the MSA violates the private non-delegation doctrine fails and rejects its contention that NMFS was compelled to reject Framework Adjustment 65 as unlawfully prepared pursuant to the APA.

## VII.  SUMMARY

The Court considered cross motions for summary judgment; the Plaintiff sought an order granting its relief sought, while Defendants asked for the Court to dismiss the case on both standing and the merits.  While the Court determined the Plaintiff satisfied the requirements of standing for the purposes of bringing its claims relating to the unconstitutional membership of the Fishery Councils under the MSA, Counts I-II, the Court grants the Plaintiff's motion for summary judgment and denies the Defendants cross motion for summary judgment on the merits because the Plaintiff established that the Council Members are federal officers based on their ability to block certain federal actions such that their appointment and insulation from removal violates the Constitution.  The Court concludes, however, that these

141

unconstitutional provisions can be severed without contravening the structure of the statute or the will of Congress.

Though granted standing to bring its private non-delegation claim, the Court determined the structure of the MSA with regard to the Fishery Councils, in light of the severance of the pocket veto provisions, does not violate the private non-delegation doctrine and dismisses this claim, Count III, on the merits.

Further, the Court determines the Plaintiff failed to establish that its injuries can be fairly traced to the actions of Defendant Rauch based on his signature for publication in the Federal Register. The Court dismisses this claim, Count IV, without prejudice for lack of standing.

## VIII.  CONCLUSION

The Court hereby GRANTS, in part, and DENIES, in part, the Plaintiff's Motion for Summary Judgment (ECF No. 39). With regard to Counts I and II, the Court ORDERS the Defendants ENJOINED from applying 16 U.S.C. §§ 1854(c)(3), (h), the provisions prohibiting the National Marine Fisheries Service from repealing Fisheries Management Plans or imposing a limited access system without prior approval by the Council, and the Court further ORDERS these provisions SEVERED as unconstitutional from the Magnuson-Stevens Fishery Conservation and Management Act. The Court DENIES Plaintiff's Motion for Summary Judgment as to Counts III and IV.

Further, the Court GRANTS the Defendant's Cross-Motion for Summary Judgment (ECF No. 41) with regard to Counts III and IV and DENIES the Defendant's Cross-Motion with regard to Counts I and II.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 30th day of December, 2024